EXHIBIT B

Page 1

1                UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3                        ---OOO---

4      THOMAS IGLESIAS, individually

       and on behalf of all others

5      similarly situated,

6              Plaintiff,

7      vs.                    CASE NO. 4:22-CV-09108-JSW

8      ARIZONA BEVERAGES, USA,

       LLC,

9

               Defendants.

10     _____/

11

12

13

14

15          VIDEOTAPED DEPOSITION OF THOMAS IGLESIAS

16

17                  September 19, 2024

18

19

20

21     Reported by Diana L. Gonzalez, CSR No. 7935

22

23     PAGES 1 - 159

24     PAGES 78 - 81 and 127 and 135 - 138 ARE CONFIDENTIAL AND

25     BOUND UNDER SEPARATE COVER

Page 2

1                          I N D E X
2                                              PAGE
3      EXAMINATION BY MR. DONOVAN                 10
4
5
6
7
8                        E X H I B I T S
9      DEFENDANT'S                              PAGE
10     Exhibit D1    Defendant's Notice of Oral      16
                     Deposition of Plaintiff Thomas
11                   Iglesias in the Thomas Iglesias
                     versus AriZona Beverages USA, LLC
12                   matter
13     Exhibit D2    Class Action Complaint in the    33
                     Thomas Iglesias versus Welch Foods,
14                   Inc. matter
15     Exhibit D3    Application Pursuant to          37
                     California Rule of Court 3.770
16                   to Voluntarily Dismiss Case With
                     Prejudice in the Thomas Iglesias
17                   versus Welch Foods, Inc. matter
18     Exhibit D4    Class Action Complaint in the    38
                     Thomas Iglesias versus Ferrara
19                   Candy Co. matter
20     Exhibit D5    First Amended Complaint in the   39
                     Thomas Iglesias versus Ferrara
21                   Candy Co. matter
22     Exhibit D6    Second Amended Complaint in the  39
                     Thomas Iglesias versus Ferrara
23                   Candy Co. matter
24     Exhibit D7    Declaration of Thomas Iglesias   42
                     in the Thomas Iglesias versus
25                   Ferrara Candy Co. matter

Page 3

1                    E X H I B I T S (Continued)
2        DEFENDANT'S                                           PAGE
3        Exhibit D8      Class Action Complaint Jury             43
                         Trial Demand in the Thomas
4                        Iglesias versus For Life
                         Products matter
5
         Exhibit D9      First Amended Class Action              48
6                        Complaint Jury Trial Demand in
                         the Thomas Iglesias, et al.
7                        versus For Life Products matter
8        Exhibit D9-A    Exhibits to the First Amended           48
                         Class Action Complaint Product
9                        Labels in the Thomas Iglesias,
                         et al. versus For Life Products
10                       matter
11       Exhibit D10     Plaintiff Thomas Iglesias'              49
                         Responses and Objections to
12                       Defendant For Life Products, LLC's
                         Interrogatories to Plaintiffs - Set
13                       One in the Thomas Iglesias, et al.
                         versus For Life Products matter
14
         Exhibit D11     Plaintiff Thomas Iglesias'              52
15                       Supplemental Responses to Defendant
                         AriZona Beverages USA, LLC's Initial
16                       Interrogatories
17       Exhibit D12     Plaintiff Thomas Iglesias'              57
                         Responses to Defendant AriZona
18                       Beverages USA, LLC's First Request
                         for the Production of Documents
19
         Exhibit D13     Docket sheet for Bankruptcy             59
20                       Petition No. 01-32182
21       Exhibit D14     Grant deed for 686 Hamilton             61
                         Street, San Francisco
22
         Exhibit D15     Grant deed for 1832 Venice Drive,       63
23                       Concord
24       Exhibit D16     Grant deed for 1832 Venice Drive,       68
                         Concord
25

Page 4

1                E X H I B I T S (Continued)

2        DEFENDANTS'                                      PAGE

3        Exhibit D17    Grant deed for 51 Prague Street,    70
                        San Francisco
4

         Exhibit D18    Retainer agreement                  71
5

         Exhibit D19    Letter dated December 14, 2021       91
6                       on Clarkson Law Firm letterhead
                        re AriZona Fruit Juice Cocktail
7                       California litigation

8        Exhibit D20    Letter dated June 13, 2022 on        91
                        Clarkson Law Firm letterhead
9                       re Thomas Iglesias versus
                        Hornell Brewing Co., Inc.
10

         Exhibit D21    Letter dated December 12, 2022       92
11                      on Clarkson Law Firm letterhead
                        re Thomas Iglesias versus AriZona
12                      Beverages USA, LLC

13       Exhibit D22    Class Action Complaint              112

14       Exhibit D23    First Amended Complaint             131

15       Exhibit D24    Order Granting, In Part, and        141
                        Denying, In Part, Motion to Dismiss
16

         Exhibit D25    Order Denying Defendant's Motion     142
17                      to Dismiss First Amended Complaint
                        or to Stay or to Transfer Action
18                      Under First to File Rule

19       *Exhibit D26   AriZona Kiwi Strawberry Fruit        145
                        Juice Cocktail container
20                      (Retained by counsel/photo attached)

21       *Exhibit D27   AriZona Mucho Mango Fruit Juice      147
                        Cocktail container
22                      (Retained by counsel/photo attached)

23       *Exhibit D28   AriZona Mucho Mango Fruit Juice      148
                        Cocktail can
24                      (Retained by counsel/photo attached)

25

Page 5

1                    E X H I B I T S (Continued)

2     DEFENDANTS'                                        PAGE

3       *Exhibit D29  AriZona Green Tea with ginseng and  149
                        honey container
4                       (Retained by counsel/photo attached)

5       *Exhibit D30  AriZona Fruit Punch Fruit Juice    150
                        Cocktail container
6                       (Retained by counsel/photo attached)

7        Exhibit D31  Photocopy of AriZona Grapeade      151
                        Fruit Juice Cocktail
8

         Exhibit D32  Photocopy of AriZona Lemonade      152
9                       Fruit Juice Cocktail

10       Exhibit D33  Jury Trial Demand in the Nicholas  153
                        Brunts versus Hornell Brewing Co.,
11                      Inc., et al.

12

13

14

15

16

17

18

19

20

21

22

23

24

25       *(Exhibits retained by counsel/photos attached)

1      QUESTIONS INSTRUCTED NOT TO ANSWER:

2      Page 36, Line 13

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              VIDEOTAPED DEPOSITION OF THOMAS IGLESIAS
 2
 3          BE IT REMEMBERED, that pursuant to Notice, and
 4     on the 19th day of September, 2024, commencing at the
 5     hour of 9:56 a.m. Pacific time, in the offices of Demler
 6     Armstrong & Rowland, LLP, 101 Montgomery Street, Suite
 7     1800, San Francisco, California, before me, DIANA L.
 8     GONZALEZ, a Certified Shorthand Reporter, personally
 9     appeared THOMAS IGLESIAS, produced as a witness in said
10     action, and being by me first duly sworn, was thereupon
11     examined as a witness in said cause.
12                          ---o0o---
13     APPEARANCES:
14     For the Plaintiff:
15                    ALAN GUDINO
                      Clarkson Law Firm, P.C.
16                    22525 Pacific Coast Highway
                      Malibu, California 90265
17                    (213) 788-4050
                      agudino@clarksonlawfirm.com
18
19
       For the Defendant AriZona Beverages USA LLC:
20
                      ROBERT P. DONOVAN
21                    Stevens & Lee
                      669 River Drive, Suite 201
22                    Elmwood Park, New Jersey 07407
                      (201) 857-6778
23                    robert.donovan@stevenslee.com
24
25
```

Page 8

1        Also Present:

2                    KEIGO PAINTER, VIDEOGRAPHER

                     Veritext Legal Solutions

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    ---oOo---
 2              THE VIDEOGRAPHER:  Good morning.  We're
 3     going on the record at 9:57 a.m. on September 19,
 4     2024.
 5              Please note that the microphones are
 6     sensitive and may pick up whispering and private
 7     conversations.  Please mute your phones at this
 8     time.  Audio and video recording will continue to
 9     take place unless all parties agree to go off the
10     record.
11              This is media unit one of the
12     video-recorded deposition of Thomas Iglesias taken
13     by the counsel for defendants in the matter of
14     Thomas Iglesias versus AriZona Beverages USA, LLC
15     filed in the United States District Court, Northern
16     District of California, Case Number
17     422-CV-09108-JSW.
18              The location of the deposition is 101
19     Montgomery Street, Suite 1800, San Francisco,
20     California 94104.
21              My name is Keigo Painter representing
22     Veritext; I'm the videographer.  The court reporter
23     is Diana Gonzalez from the firm Veritext.  I'm not
24     related to any party this action, nor am I
25     financially interested in the outcome.
```

```
1            If there are any objections to the
2      proceeding, please state them at the time of your
3      appearance.  Counsel and all present, including
4      remotely, will now state their appearances and
5      affiliations for the record, beginning with the
6      noticing attorney.
7            MR. DONOVAN:  Good morning.  Robert
8      Donovan on behalf of the defendant.
9            MR. GUDINO:  Good morning.  Alan Gudino
10     for plaintiff Thomas Iglesias.
11           THE VIDEOGRAPHER:  Will the court reporter
12     please swear in the witness, and then counsel may
13     proceed.
14                  THOMAS IGLESIAS,
15               sworn as a witness,
16               testified as follows:
17     EXAMINATION BY MR. DONOVAN:
18         Q.  Good morning, Mr. Iglesias.
19         A.  Good morning.
20         Q.  My name is Bob Donovan.  I'm an attorney
21     for the defendant in this case, and you're here for
22     your deposition.
23         A.  Yes, sir.
24         Q.  And I'd like to go through some
25     instructions before we start the questioning.
```

Page 11

1            Have you ever been deposed before?

2       A.   Yes, sir.

3       Q.   How many times?

4       A.   Maybe three.

5       Q.   Three times.

6            So the basic ground rules -- did they go

7       over ground rules at those depositions and basic

8       instructions?

9       A.   I can't remember, sir.

10      Q.   The basic ground rules here is it's

11      important for you to understand even though we're

12      in a law office, this is a court proceeding.  So if

13      I pose a question to you, and you answer the

14      question, the court is going to presume that you

15      understood the question.

16      A.   Okay.

17      Q.   If I give you a question that you don't

18      understand, just tell me.

19      A.   Okay.

20      Q.   There could be a time when your attorney

21      will object and wait for you to -- for that

22      objection to go on the record before you answer.

23      Wait for my question to be posed before you answer

24      so the record is clear.

25            As we move along, it could come full point

Page 12

1      where you're going to anticipate the question;
2      that's just human nature.
3          A.   Yes.
4          Q.   Just try, you know, the best you can to
5      wait for the question to be posed; not only for the
6      clarity of the record, but your attorney may
7      object.
8          A.   Okay.
9          Q.   Nonverbal gestures are not good; you'll
10     have to verbal- -- verbally answer all questions.
11         A.   Yes.
12         Q.   Nodding of the head and such is not -- is
13     not responsive -- it's responsive but not good for
14     the record.
15         A.   Yes, sir.
16         Q.   So if there comes a point in time that you
17     need a break, a bathroom break -- for instance,
18     this isn't going to be a War of Attrition; you just
19     tell me.  I would just ask that you answer the
20     question before we break -- before that bathroom
21     break or in that regard.
22             Do you understand those instructions?
23         A.   Yes, sir.
24         Q.   Are you under any medication that would
25     impede your ability to understand these

1    questions --

2         A.   No, sir.

3         Q.   -- that I'm going to pose to you?

4         A.   No, sir.

5         Q.   Did you do anything to prepare for this

6    deposition?

7         A.   I don't think so, sir.

8              Can you rephrase that question?  I'm not

9    sure.

10        Q.   Sure.

11             Did you meet with your attorneys or speak

12   to them to prepare?

13        A.   Yes.

14        Q.   I'm not going to ask you what you spoke

15   about because that's privileged.  But I'm going to

16   ask you who you spoke or met with.

17        A.   My attorney Alan.

18        Q.   Who's with you today?

19        A.   Yes.

20        Q.   Did you speak to any other attorney or

21   meet with any other attorney to prepare for the

22   deposition?

23        A.   It was a Zoom call, and it was -- Bahar, I

24   think was on there -- her name -- was on there,

25   yeah, the other attorney.

Page 14

1          Q.  Any other attorneys that you spoke to to

2     meet?

3          A.  There was two more on the call, but I

4     don't know their names.

5          Q.  So there were four lawyers that were on

6     the call when you were preparing for this

7     deposition?

8          A.  Yes, sir.

9          Q.  And how long was that session?

10         A.  About half an hour, 45 minutes.

11         Q.  Other than that, did you speak or meet

12     with your lawyers to prepare for this deposition?

13         A.  I spoke to Alan one more time.

14         Q.  Okay.  When was that?

15         A.  As far as date or time?

16         Q.  Date.

17         A.  Yesterday.

18         Q.  Okay.  The Zoom meeting, when was that?

19         A.  Last week.

20         Q.  And the subsequent meeting with

21     Mr. Gudino --

22         A.  Zoom.  It was Zoom.  Both Zoom.

23         Q.  You have to wait until I pose --

24         A.  Gotcha.

25         Q.  You're right, though.

Page 15

```
 1        A.   Gotcha.

 2        Q.   Sometimes you're not going to be.

 3        A.   Yes.

 4        Q.   So the subsequent meeting was by Zoom too?

 5        A.   Yes, sir.

 6        Q.   And how long was that meeting?

 7        A.   About the same time, sir.

 8        Q.   And that was yesterday?

 9        A.   Yes, sir.

10        Q.   And was anybody else on that meeting or

11   participating in that meeting?

12        A.   Yesterday was the -- Bahar.  Again, I

13   think it was the same people.

14        Q.   So four other people?

15        A.   Yes.

16        Q.   Did you review any documents to prepare

17   for this deposition?

18        A.   Yes, sir.

19        Q.   What did you review?

20        A.   Just the initial complaint.  My initial

21   complaint that I had that I made that was -- that

22   was filed.

23        Q.   Anything else?

24        A.   Everything that was in that complaint,

25   yeah.
```

1      Q.  Other than what's the complaint, did you

2  review any other documents to prepare for this

3  deposition?

4      A.  Just -- that's what I know of.  The -- the

5  initial document -- complaint document.

6      Q.  I also wanted to bring up to you some --

7  by way of instruction, I should have said this

8  before.  Given the nature of this case, some of

9  these questions that I pose may be -- sound

10  personal --

11      A.  Yes.

12      Q.  -- dietary and such.  I'm not meaning to

13  be disrespectful.

14      A.  Okay.

15      Q.  It's just germane.  I want to let you know

16  ahead of time.

17      A.  Yes, sir.

18          MR. DONOVAN:  Before we proceed any

19  further, can we mark this, please, D1.

20          (Document marked Defendant's Exhibit D1

21           for identification.)

22  BY MR. DONOVAN:

23      Q.  Let me show you what's been marked D1,

24  sir, and ask you if you've ever seen it before?

25      A.  (Witness reviewing document.)

Page 17

1           MR. GUDINO:  Do you have extra copies?

2           MR. DONOVAN:  Yeah, I do.  Sorry about

3     that.

4           THE WITNESS:  (Witness reviewing

5     document.)

6           I'm not sure if I've actually seen this

7     document.

8     BY MR. DONOVAN:

9       Q.  So you don't know whether you saw it?

10      A.  I don't remember this, yeah.

11      Q.  You don't remember?

12      A.  Yeah.

13      Q.  In this deposition notice, you were asked

14    to produce all receipts and product containers

15    concerning your purchases of the product that are

16    at issue in this case.

17      A.  Yes, sir.

18      Q.  Did you know that you were supposed to do

19    that?

20      A.  Yes, sir.

21      Q.  And do you have any product containers or

22    receipts concerning your purchases that are at

23    issue in this case?

24      A.  No, sir.

25      Q.  Did you look for them?

Page 18

1          A.   Yes, sir.

2          Q.   Where did you look?

3          A.   I just looked for receipts, maybe to try

4     to find any receipts that I had.  Not in the

5     garbage because it's been a while since I bought

6     anything of that, so -- yeah, so I looked for my

7     receipts and -- I would have looked in the garbage,

8     but I knew it wasn't there, so --

9          Q.   Where else did you look for receipts?

10          A.   I have drawers.  I tried to see if I could

11     just find some sort of evidence of anything, but --

12     yeah, nothing.

13          Q.   So you have no receipts or product

14     containers that you are aware of?

15          A.   No, sir.

16          Q.   Just for the record --

17          A.   Yes, sir.

18          Q.   -- that's a double negative.

19               Is it correct to say that you don't have

20     receipts or containers regarding any of your

21     purchases?

22          A.   Yes, sir.

23          Q.   Can I have your date of birth?

24          A.   7-17-1970.

25          Q.   And your height?

Page 19

```
 1          A.   Six foot.
 2          Q.   Your weight?
 3          A.   210.
 4          Q.   And where do you currently reside?
 5          A.   San Francisco, California.
 6          Q.   Address?
 7          A.   686 Hamilton, San Francisco, California
 8     94134.
 9          Q.   686 Hamilton Street?
10          A.   Yes.
11          Q.   And where did you reside prior -- well,
12     how long have you been living there?
13          A.   Well, we owned that house for about
14     28 years.
15          Q.   How many years?
16          A.   Twenty-eight.  And -- but I moved out for
17     like four years to Concord, and then I came back.
18          Q.   When you say "we owned that house," who
19     are you referring to as "we"?
20          A.   My family as far as me, my dad, my mom,
21     myself and my sister.
22          Q.   What's your dad's first name?
23          A.   Tomas, Sr.
24          Q.   How do you spell that?
25          A.   T-o-m-a-s.  Tomas, Sr.
```

Page 20

1        Q.  How do you spell your name?

2        A.  T-h-o-m-a-s.  Thomas, Jr.

3        Q.  And your mother's first name?

4        A.  Dolores.

5        Q.  And you said your sister.  What's her

6    name?

7        A.  Adriana.

8        Q.  Okay.  So say you've owned that -- 686

9    where you reside for 28, and you moved back.  When

10   is the most recent time you moved back to 686

11   Hamilton?

12       A.  I'm going to say about seven years ago,

13   eight years ago.

14       Q.  And where did you move from?  What was

15   your address prior to 686 Hamilton?

16       A.  Venice Drive, Concord, California.  I

17   don't remember the address.

18       Q.  Is it 1832 Venice Drive?

19       A.  That's it right there; 1832.

20       Q.  And you lived there you said seven years

21   ago.  So you moved out in `17?

22       A.  Something like that, yes.

23       Q.  And you moved directly to Hamilton Street?

24       A.  Back to Hamilton.

25       Q.  Prior to living on Venice Drive, where did

```
                                          Page 21
 1      you live?
 2           A.   Hamilton Street before that.  Prague
 3      Street.  51 Prague Street is our family --
 4           Q.   Hold on.  Sorry to interrupt.
 5           A.   That's fine.
 6           Q.   Immediately prior to -- well, how long did
 7      you live at Venice Drive, let's put it that way, in
 8      Concord?
 9           A.   I believe maybe a year or two.  One or
10      two years.
11           Q.   And who owned that property?
12           A.   I did.  Me.  I did.
13           Q.   Personally?
14           A.   Yes.
15           Q.   And you lived there, I'm sorry, for about
16      a year?
17           A.   Maybe two years.
18           Q.   And prior to 1832 Venice Drive, where did
19      you live?
20           A.   It was in Concord, but I -- I don't
21      remember the address.
22           Q.   And how long did you live in the other
23      address in Concord?
24           A.   Maybe about two years there too.
25           Q.   Prior to living at this unknown address or
```

Page 22

1      unrecollected address in Concord, where did you
2      live?
3            A.   Prague -- I mean, Hamilton Street.
4            Q.   686 Hamilton?
5            A.   Yes.
6            Q.   And how long did you live there?
7            A.   Since `96.  Or `97.  Excuse me, `97.
8            Q.   Now, you mentioned a Prague Street.
9      What's that --
10           A.   That's my -- the house I grew up in.
11           Q.   What's that address?
12           A.   51 Prague.
13           Q.   What town?
14           A.   San Francisco.
15           Q.   When was the last time you were living
16     there?
17           A.   It's been a long time.  I'm going to say
18     about 28 years.
19           Q.   And who owns 51 Prague now?
20           A.   My parents.
21           Q.   Did you ever have an ownership interest in
22     51 Prague?
23           A.   No.
24           Q.   Do you have an ownership interest in 686
25     Hamilton Street?

Page 23

1        A.  No.

2        Q.  So you've been living at 686 Hamilton

3    Street since on or about 2017, right?

4        A.  Yes.

5        Q.  And who do you live with or who have you

6    lived with at that address?

7        A.  My wife and three kids.

8        Q.  Can I have your wife's name, please?

9        A.  Jisel, J-i-s-e-l.

10       Q.  How old is she?

11       A.  Forty-nine.

12       Q.  What's the date of your marriage?

13       A.  That's a good one.  September 5th, ` 98.

14       Q.  Were you ever divorced?

15       A.  No.

16       Q.  And you say you have three children?

17       A.  Yes.

18       Q.  And they live with you at Hamilton Street?

19       A.  Yes.

20       Q.  And their ages?

21       A.  Twenty-seven, 22 and 10.

22       Q.  Can I have their names?  27-year-old?

23       A.  Tomas III, T-o.

24       Q.  T-o?

25       A.  Yup.

Page 24

1          Q.  So Tomas, T-o-m-a-s.  Okay.

2          A.  Fabian.

3          Q.  Who's the 22-year-old?

4          A.  Yes.

5          Q.  And the ten-year-old?

6          A.  Stephen.

7          Q.  Are you employed?

8          A.  Yes, sir.

9          Q.  By who?

10         A.  San Francisco Recreation and Park

11    Department.

12         Q.  In what position?

13         A.  Facility coordinator.

14         Q.  How long have you worked for San Francisco

15    Rec and Park Department?

16         A.  Thirty years.

17         Q.  Is that a full-time position, sir?

18         A.  Yes, sir.

19         Q.  Do you have any other work by which you

20    draw any income?

21         A.  No.

22         Q.  Prior to working for San Francisco Rec and

23    Park, where did you work?

24         A.  U.S. Embassy, United States Marine Corps.

25         Q.  How many years did you serve in the

Page 25

```
 1    Marines?
 2         A.   Four years.
 3         Q.   Were you honorably discharged?
 4         A.   Yes, sir.
 5         Q.   Back to your children for a second.
 6              Excluding the ten-year-old, your other two
 7    children, have they ever worked for a grocery
 8    store?
 9         A.   No, they haven't.
10         Q.   What does Tomas III do?
11         A.   They both work part-time for Park and Rec.
12         Q.   Neither of your two older children ever
13    worked for, let's say, a Safeway?
14         A.   No.  My dad retired from Safeway.
15         Q.   When did your dad retire from Safeway?
16         A.   Thirty years ago.
17         Q.   So that would be roughly 1997?
18         A.   Wait.  He's 91 right now.
19         Q.   I'm sorry.  That would be roughly 1994.
20         A.   Sixty-two he retired.  So he's 91, 62.
21    What's that?  Twenty-nine years.
22         Q.   And how long did he work for Safeway?
23         A.   I believe maybe 20, 25 years.
24         Q.   Twenty-five years.  What was his position?
25         A.   Produce manager.
```

Page 26

1          Q.  Are you aware whether Safeway provides
2     discounts to employees and families of employees?
3          A.  No, sir.
4          Q.  Did you ever go shopping with your father
5     at Safeway?
6          A.  Not really, sir, no.
7          Q.  Do you have any -- well, did you graduate
8     high school, sir?
9          A.  Riordan High School I graduated.
10          Q.  What year?
11          A.  `88.
12          Q.  Did you go to any higher education --
13          A.  Yes.
14          Q.  You have to wait.  Sorry.
15              -- higher education institutions?
16          A.  Yes, sir.
17          Q.  Can you tell me where?
18          A.  San Francisco State.
19          Q.  What years?
20          A.  `89 to `90.
21          Q.  What did you study there?
22          A.  I was trying to become a physical
23     therapist.
24          Q.  Do you know how many credits you earned
25     during those two years?

Page 27

```
 1          A.   Yeah.  I got about -- about 90 --
 2     90 units.
 3          Q.   And the physical therapy school, what
 4     type -- rather, program, what type of courses?  Can
 5     you give me some examples?
 6          A.   Biology.
 7          Q.   Biology?
 8          A.   Yes.
 9          Q.   Chemistry?
10          A.   I would say chemistry.
11               What's the one with the anatomical stuff?
12          Q.   Physiology?
13          A.   Physiology, there you go.  And
14     kinesiology.
15          Q.   And ultimately you left San Francisco
16     State?
17          A.   I joined the Marines.
18          Q.   Were you stationed anywhere during your
19     tour of duty, sir?
20          A.   Camp Pendleton, and did a little bit of
21     North Carolina, Camp Lejeune.
22          Q.   Ever overseas?
23          A.   Okinawa for just like for -- for a month.
24          Q.   Were you involved in any military
25     engagements?
```

Page 28

```
 1          A.   No.  No, sir.
 2          Q.   And your wife, does she work?
 3          A.   Yes.
 4          Q.   What does she do?
 5          A.   She works -- she's -- I'm trying to
 6     remember her name, what they call her.
 7          Q.   What's her employer?  Who's her employer?
 8          A.   San Francisco State University.  Sort of
 9     like advisor or something like that.
10          Q.   Does your wife use your -- your name?  As
11     a last name, rather.
12          A.   Yes.
13          Q.   So you think that your wife somehow is
14     like an academic advisor?
15          A.   More of a -- yes, kind of like that.
16     Yeah.
17          Q.   And how long has she worked at
18     San Francisco State, sir?
19          A.   About six years.
20          Q.   And prior to that?
21          A.   She was getting her MA.  She spent about
22     three years getting her MA and raising my son,
23     Steph.
24          Q.   Did your wife ever work for a grocery
25     store or big-box store?
```

Page 29

```
1        A.  No, sir.
2        Q.  Have you ever testified at trial?
3        A.  No, sir.
4        Q.  Have you -- other than this lawsuit, have
5    you ever been a party to another lawsuit?
6        A.  Yes, sir.
7        Q.  Can you tell me which ones by naming the
8    parties, including yourself?
9        A.  Ferrara case, Ferrara Candy case; Welch's
10   case.  And the other one is slipping my mind, but I
11   know it.
12       Q.  There's a third case?
13       A.  Yes.  Oh, yeah, sorry.  Rejuvenate.
14       Q.  Rejuvenate?
15       A.  Yes.
16       Q.  So is -- so that's what you -- that's the
17   sum and substance in your entire life of where
18   you've been a party to a lawsuit?
19       A.  I believe so, sir.
20       Q.  The Ferrara Candy case, what was that
21   case?  Or what is that case about?
22       A.  They were filling the boxes of -- it was
23   slack fill.  They weren't filling the boxes with
24   the right amount of candy.
25       Q.  And you were the plaintiff in that case?
```

1          A.   Yes, sir.

2          Q.   And who represented you?  Or who

3     represents you?

4          A.   Is that Clarkson?  I believe it was

5     Clarkson.

6          Q.   What's the status of that case?

7          A.   It's over.  It was done.

8          Q.   When you say "done," "over," what do you

9     mean?

10         A.   It -- it's finished.

11         Q.   Was there a decision by the court?

12         A.   Yes.

13         Q.   What was the decision?

14         A.   That we were right.

15         Q.   And did you receive any compensation as a

16    result of that?

17              MR. GUDINO:  Objection.

18    BY MR. DONOVAN:

19         Q.   You can answer, sir.

20         A.   Can I?

21         Q.   Yeah.  Unless -- unless -- this goes back

22    to the instructions.  Unless you're directed not to

23    answer a question.

24         A.   Gotcha.  Okay.

25              Repeat the question.

Page 31

```
 1              MR. GUDINO:  Go ahead.
 2    BY MR. DONOVAN:
 3        Q.  Did you receive -- did you receive
 4    anything by way of -- monetarily by way of the
 5    Ferrara Candy case?
 6              MR. GUDINO:  Objection as to any
 7    privileged discussions or communications.
 8              Otherwise, answer the question.
 9              THE WITNESS:  I don't have to answer, or I
10    do?  Yes?  Okay.
11              Yes.
12    BY MR. DONOVAN:
13        Q.  How much money did you receive?
14        A.  I believe -- the Ferrara case, we won the
15    Ferrara case.  It was either -- it was two because
16    I don't remember the actual amount.  It's either
17    25- or 5-.
18        Q.  25,000 or 2,500?
19        A.  No, 2,500.  I wish 25,000.
20        Q.  So you're approximating somewhere between
21    2,500 to 5,000; is that what you're telling me?
22        A.  Yes.
23        Q.  When was that Ferrara case filed?
24        A.  It's been a while back.  It's been a long
25    time.
```

1          Q.  You don't remember?

2          A.  I'm going to say like maybe six or seven

3     years ago.

4          Q.  And when was -- you said it's over.  When

5     did it conclude?

6          A.  It -- that took about a year when it

7     started.

8          Q.  So you said it was filed about six or

9     seven years ago, so -- it concluded a year later.

10    So it concluded about six, five years ago?

11         A.  Yes, sir.

12         Q.  Do you remember the attorney at the

13    Clarkson firm that was working on those -- that

14    case?

15         A.  No, sir.

16         Q.  Now, the Welch's case, what was that case

17    about?

18         A.  They -- it says "No preservatives" on

19    there.

20         Q.  You said they say "No preservatives" on

21    there.  Who --

22         A.  Right on the front, it says -- on Welch's,

23    it says, "No preservatives" on the package, but

24    they have preservatives in them.

25         Q.  What product?

Page 33

1          A.   The Welch's gummies.

2          Q.   What preservatives?

3          A.   I don't remember, sir.

4               MR. DONOVAN:  D2, please.

5               (Document marked Defendant's Exhibit D2

6               for identification.)

7     BY MR. DONOVAN:

8          Q.   Let me show you what's been marked D2,

9     sir.  Do you recognize that?

10         A.   Yes, sir.

11         Q.   That's your lawsuit against Welch Foods,

12    correct?

13         A.   Yes, sir.

14         Q.   I'll direct your attention to paragraph

15    three of D2.

16         A.   Paragraph three?

17         Q.   Right.

18         A.   Uh-huh.

19         Q.   Does that refresh your memory as to what

20    preservatives you were alleging existed in the --

21         A.   "They contain ascorbic" --

22         Q.   Does that refresh your memory as to what

23    preservatives you were claiming existed in the

24    Welch's product?

25         A.   Well, the thing is I'm -- I'm not an

Page 34

1    expert, so I don't know.  This is something that my

2    lawyer was able to figure out.  I can't figure that

3    out, so -- it wasn't like my complaint saying, you

4    have too many tocopherols in your thing.  I have no

5    idea what those things are.

6         Q.  Sir, the first sentence of paragraph three

7    says -- has an allegation that ascorbic acid is a

8    preservative, correct?

9         A.  Yes, sir.

10        Q.  And this is your complaint?

11        A.  Yes, sir.

12        Q.  You authorized that complaint D2, correct?

13        A.  Yes, sir.

14        Q.  And the complaint was filed on

15   November 29, 2016?

16        A.  That's what it says, sir.

17        Q.  Now, is the Welch case still proceeding?

18        A.  No, sir.

19        Q.  What happened?

20        A.  Again, we were proven right, sir.

21        Q.  How so?

22            MR. GUDINO:  Objection to form.

23   BY MR. DONOVAN:

24        Q.  How were you proven right?

25        A.  Well, we won the case.

Page 35

```
 1        Q.  Was there a decision that you're aware of?
 2            MR. GUDINO:  Objection to form.
 3   BY MR. DONOVAN:
 4        Q.  In that regard.
 5            MR. GUDINO:  Same objection.
 6            THE WITNESS:  I'm not sure what you mean
 7   by that, sir.
 8   BY MR. DONOVAN:
 9        Q.  You said you won the case.
10        A.  Yes.
11        Q.  Did the court render a decision that
12   you're aware of that makes you have that belief?
13        A.  Yes, sir.
14        Q.  And what was that decision?
15        A.  I believe it was -- they would take the
16   "No preservatives" off their -- they would change
17   the label.
18        Q.  Did you receive any money as a result of
19   that case?
20            MR. GUDINO:  Objection.
21            THE WITNESS:  Yes.
22   BY MR. DONOVAN:
23        Q.  How much money?
24            MR. GUDINO:  I'm going to object to these
25   questions.  To the extent there was any resolution
```

Page 36

1      in the case, it may have been confidential.

2              So I would instruct you not to answer any

3      questions relating to any of the terms of the

4      settlement to the extent that any existed.

5      BY MR. DONOVAN:

6          Q.  Was there a confidential settlement

7      entered into, sir?

8          A.  What does that mean, sir?

9          Q.  Was there an agreement to settle the case,

10     the terms of which could not be disclosed by either

11     party?

12         A.  I don't know, sir.

13         Q.  So I ask now how much money you received

14     as a result of the Welch case?

15             MR. GUDINO:  Objection.

16             THE WITNESS:  Can I answer?

17             MR. GUDINO:  If there was a settlement,

18     don't disclose the terms of the settlement.

19             MR. DONOVAN:  So you're directing him not

20     to answer?

21             MR. GUDINO:  Yeah.

22             MR. DONOVAN:  I reserve my right to

23     redepose the plaintiff and ask questions of -- all

24     about the resolution of that case because there

25     hasn't been any foundation laid as to whether it

Page 37

```
 1    was confidential or not.
 2             Mark this D3, please.
 3             (Document marked Defendant's Exhibit D3
 4             for identification.)
 5    BY MR. DONOVAN:
 6        Q.  Let me show you D3, sir, and ask have you
 7    ever seen that before?
 8        A.  (Witness reviewing document.)
 9             I mean, I don't remember off the top hand
10    if I -- but I'm pretty sure I've seen it.  But off
11    the top of my hand, I can't -- I don't recall if --
12    yeah.
13        Q.  Who's Rosemary Rivas?
14        A.  I believe she was a lawyer.
15        Q.  Was she your lawyer in the Welch case?
16        A.  Rosemary -- I believe so.
17        Q.  How about William Payne?
18        A.  I don't remember that.  I remember Rivas,
19    Rosemary.
20        Q.  If you look at page 4, sir, first full
21    paragraph, it says, "Therefore."  Beginning there,
22    first sentence.
23        A.  (Witness reviewing document.)
24        Q.  And the second sentence says, quote,
25    "Plaintiff, however, no longer wishes to pursue
```

Page 38

```
 1    the," inner quote, "no preservatives," end inner
 2    quote, "claim."
 3              Do you see that?
 4         A.  Yes, sir.
 5         Q.  That was true, correct?
 6         A.  Yes, sir.
 7         Q.  And as a result of this, your attorneys
 8    filed this application -- if you look at the last
 9    sentence on page 4 -- seeking dismissal of that
10    claim, correct?
11         A.  That's what it says, sir.
12         Q.  Why did you dismiss the claims about
13    preservatives in the product?
14         A.  I have no recollection, sir.
15         Q.  Do you know why?
16         A.  No, sir.
17         Q.  Were you deposed in the Welch case?
18         A.  I can't recall, sir.
19              MR. DONOVAN:  Mark this -- I believe we're
20    up to D4 -- please.
21              (Document marked Defendant's Exhibit D4
22              for identification.)
23    BY MR. DONOVAN:
24         Q.  Showing you what's D4, can you tell me
25    what D4 is?
```

Page 39

```
 1          A.   The Ferrara Candy case.
 2          Q.   This is your complaint filed against
 3     Ferrara Candy that you referenced earlier, the
 4     Ferrara Candy case?
 5          A.   Yes, sir.
 6          Q.   And in this case you were seeking to
 7     represent a proposed class of consumers?
 8          A.   Yes, sir.
 9          Q.   And in the Welch case, you were looking to
10     represent a class of consumers too, correct?
11          A.   Yes, sir.
12               MR. DONOVAN:  D5.
13               (Document marked Defendant's Exhibit D5
14               for identification.)
15     BY MR. DONOVAN:
16          Q.   Tell me what D5 is, sir.
17          A.   It says, "First Amended Complaint."
18          Q.   Against Ferrara Candy?
19          A.   Yes, sir.
20          Q.   You also -- did you authorize this
21     complaint to be filed too?
22          A.   Yes, sir.
23               MR. DONOVAN:  D6, please.
24               (Document marked Defendant's Exhibit D6
25               for identification.)
```

Page 40

1    BY MR. DONOVAN:

2        Q.  Showing you D6, do you know what that is?

3        A.  It says, "Second Amended Complaint" for

4    Ferrara.

5        Q.  Did you authorize D6 to be filed on your

6    behalf?

7        A.  Yes, sir.

8        Q.  Sorry?

9        A.  Yes, sir.

10       Q.  Now, with respect to -- now, with respect

11   to -- excuse me.  Thank you, sir.

12           With respect to D4 -- I'm referring back

13   to D4 now -- that was filed when, sir?  You can

14   look on the top.

15       A.  2-21-17.

16       Q.  And who were your lawyers at that time?

17       A.  Ryan Clarkson.  Clarkson firm.

18       Q.  How did you find out about the Clarkson

19   firm?

20       A.  I believe back then I -- I reached out to

21   them on the internet.  I just reached out to --

22   seeing that they were an advertising -- false

23   advertising lawyers.

24       Q.  So you were looking for false advertising

25   lawyers sometime before D4, and you found out about

Page 41

```
 1      the Clarkson firm's services?
 2              MR. GUDINO:  Objection to form.
 3              THE WITNESS:  Yeah.  It was actually after
 4      I was upset about what happened, I started
 5      researching and looking what I can do to fight that
 6      problem.
 7      BY MR. DONOVAN:
 8          Q.  Understood.
 9              But it was before you filed the complaint
10      that's memorialized in D4, correct?
11          A.  What's before I filed the complaint, sir?
12          Q.  You located the Clarkson firm before the
13      complaint was filed.
14          A.  Yes, sir.
15          Q.  Okay.  How much time before?
16          A.  I don't recall, sir.
17          Q.  Had they represented you before in any
18      other matter?
19          A.  Before the Ferrara case?
20          Q.  Yes, before D4.
21          A.  I don't think so, sir.
22          Q.  And you said you found them on the
23      internet.  How?  By Google search or -- what did
24      you do?
25          A.  I believe so.  I don't know if it was
```

Page 42

```
 1     Google.  But, yeah, just surfing the internet.
 2              MR. DONOVAN:  Mark this, please.
 3              (Document marked Defendant's Exhibit D7
 4              for identification.)
 5     BY MR. DONOVAN:
 6         Q.  Bear with me a second, sir, please.
 7              I'm showing you D7, sir.  Can you tell
 8     me -- do you know what that is?
 9         A.  It says, "Declaration of Thomas Iglesias"
10     in the Ferrara case.
11         Q.  Is that your signature on page 5?
12         A.  Yes, sir.
13         Q.  So -- turn your attention to paragraph
14     three.  The first year of purchase in 2016?
15         A.  Yes, sir.
16         Q.  A box of Jujyfruits at a movie theater.
17     Do you see that?
18         A.  Yes, sir.
19         Q.  And in paragraph four, it says you
20     contacted the Clarkson firm.
21         A.  Yes, sir.
22         Q.  Is that the first time you had ever
23     contacted the Clarkson firm?
24         A.  I don't recall, sir.
25         Q.  The last page, sir, paragraph 35, it talks
```

Page 43

1    about how much time you spent on the Ferrara case

2    with your lawyers.  Do you see that?

3        A.  Yes, sir.

4        Q.  It says 45 to 50 hours.  How much time

5    have you spent on this case, the one we're here

6    today for, thus far?

7        A.  A lot less.  Estimate, say maybe six

8    hours, five hours maybe, yeah.

9            (Document marked Defendant's Exhibit D8

10           for identification.)

11   BY MR. DONOVAN:

12       Q.  D8, sir, can you tell me what that is?

13       A.  That is a class action complaint for For

14   Life Products.

15       Q.  Were you a plaintiff in that case?

16       A.  I don't remember what it is.  The clean --

17   Safe For Pets.  That's right.  That's right.  Now I

18   do, yes, sir.

19       Q.  What case is this?

20       A.  This was -- I believe it was a cleaning

21   product that said it was safe for pets and kids,

22   but it's not.  Yeah.

23       Q.  Is this the Rejuvenate case that you're

24   referring to?

25       A.  No, no.  No, sir.  Oh, maybe.  I guess it

Page 44

```
 1    is.  Yes, it is, sir.  Sorry.
 2         Q.  So this is the Rejuvenate case?
 3         A.  Yeah, this is the Rejuvenate.  For Life
 4    Products I didn't -- threw me off.
 5         Q.  What's this case about that's represented
 6    in D8?  What's your complaint?
 7         A.  Well, I thought about a product that was
 8    safe for my kids and pets.  Turns out that it's
 9    not.
10         Q.  How is it not safe?
11         A.  I don't remember how, but the -- it was a
12    false advertisement claim for "Safe For Pets," but
13    my lawyers were able to find out that that's not
14    the case with the -- the chemicals they have in
15    there.
16         Q.  What's the status of -- we'll call this
17    the For Life Products case; you call it the
18    Rejuvenate case.
19         A.  Yes, sir.
20         Q.  What's the status of the For Life Products
21    case?
22         A.  It's still ongoing.
23         Q.  And how much time have you spent on this
24    case?
25         A.  About five, six hours.
```

Page 45

```
 1          Q.  Were you deposed?

 2          A.  Yes, sir.

 3          Q.  How long was your deposition?

 4          A.  How long?

 5          Q.  Yeah.

 6          A.  About four or five hours.

 7          Q.  Did you prepare for the deposition?

 8          A.  A little bit, yes, sir.

 9          Q.  How long did that take?

10          A.  About 45 minutes.

11          Q.  And did you answer interrogatories?

12          A.  What is that, sir?

13          Q.  Questions, written questions.

14          A.  I answered questions, yes, sir.

15          Q.  Written questions?

16          A.  If he wrote it down or not I don't know --

17      it's just like this.  Just like you're asking.  I

18      don't know if he wrote those down or anything; do

19      you know what I'm saying?

20          Q.  Do you know if a class certification

21      motion has been filed in the For Life Products

22      case?

23          A.  I don't know.  My lawyers would know.

24          Q.  You don't know?

25          A.  No.  A class action, you're saying?
```

Page 46

1          Q.  Do you know if a motion to certify a class
2     has been filed in the For Life Products case?
3          A.  I'm not sure what that means, yeah.
4          Q.  Do you know that what's reflected in D8 --
5     it says it's a class action complaint.
6          A.  Okay, yes.
7          Q.  Right?
8          A.  Yes, sir.
9          Q.  Do you have any knowledge that the court
10    has to enter a ruling as to whether a case is going
11    to proceed as a class action or not, or you don't
12    know that?
13         A.  I don't know if it's there or they've done
14    it, you know, yeah.
15         Q.  My question to you is do you know whether
16    a motion has been filed seeking class certification
17    in the For Life Products case?
18         A.  I don't know if it's been done, but I
19    believe so.
20              MR. DONOVAN:  So I'm told that the tape
21    has to be changed.  So we'll take a five-minute
22    bathroom break, if that's okay, Counsel?
23              MR. GUDINO:  Yeah.
24              MR. DONOVAN:  Is that all right?  Thank
25    you.

Page 47

1           THE VIDEOGRAPHER:  We're going on the

2     record.  The time is 11:03.

3           (Break taken.)

4           THE VIDEOGRAPHER:  We're back on the

5     record.  The time is 11:07.

6     BY MR. DONOVAN:

7         Q.  So looking at D8, Mr. Iglesias --

8         A.  Yes, sir.

9         Q.  -- how much time did you spend -- well,

10    strike that.

11          Did you look at D8 before you authorized

12    it to be filed?

13        A.  Yes, sir.

14        Q.  Strike that.

15          Did you authorize it to be filed, D8?

16        A.  Yes, sir.

17        Q.  How much time did you take to review the

18    complaint before you authorized it to be filed?

19        A.  How much time did I --

20        Q.  Did you review the complaint before you

21    authorized it to be filed?

22        A.  Yes, sir.

23        Q.  How much time did you take to review it?

24        A.  Five minutes.

25          MR. DONOVAN:  We're up to D9.

(Document marked Defendant's Exhibit D9 for identification.)

BY MR. DONOVAN:

Q. Do you know what D9 is, sir?

A. It says it's a first amended class action complaint for For Life Products.

Q. Have you ever had any communications with David Salazar?

A. I don't recall, sir.

Q. Olivia Thurman, ever communicate with her?

A. I don't recall, sir.

Q. Bethany Torbert?

A. Don't recall, sir.

Q. Did you authorize D9 to be filed?

A. Yes, sir.

Q. Did you review it before it was filed?

A. Yes, sir.

Q. And how much time did you take to review it?

A. A few minutes, sir.

MR. DONOVAN: Let's mark D9-A. I only have one copy of this.

(Document marked Defendant's Exhibit D9-A for identification.)

BY MR. DONOVAN:

Page 49

1          Q.  So I'm going to show you D9-A, and I can

2     represent to you that these are exhibits to D9-A.

3          A.  Okay.

4          Q.  Not all of them though, because there's a

5     large Exhibit No. 3 I was unable to download.

6               When you say -- did you review these

7     exhibits, too, before you filed -- authorized the

8     complaint to be filed?

9          A.  I don't -- I don't recall, sir.

10              MR. DONOVAN:  D10, please.

11              (Document marked Defendant's Exhibit D10

12              for identification.)

13     BY MR. DONOVAN:

14         Q.  On D10, sir, is that your signature on the

15     second to the last page?

16         A.  Yes, sir.

17         Q.  These are answers to interrogatories in

18     the For Life case, correct?

19         A.  Yes, sir.

20         Q.  And these answers were sworn under penalty

21     of perjury, correct?

22         A.  Yes, sir.

23         Q.  If you look at your response to

24     interrogatory number one, it refers to your e-mail

25     addresses.

Page 50

```
 1              MR. GUDINO:  Can you direct him to the
 2      page, please.
 3              MR. DONOVAN:  Sure.
 4      BY MR. DONOVAN:
 5          Q.  Page 8.  Line 4 and 5.
 6              Do you see that, your e-mail addresses?
 7      The bottom of page 8, sir, not the top.
 8          A.  Okay.
 9              MR. GUDINO:  Sorry to interrupt.  Looks
10      like you gave me one with some of your notes.
11              MR. DONOVAN:  Sorry.  I'll give you the
12      one without my notes.  Thank you, Counsel.  Sorry
13      about that.  Mine's going to have a -- well, mine's
14      stapled too.  I apologize.  Thank you for picking
15      that up.
16      BY MR. DONOVAN:
17          Q.  So we're back to D10, lower page 8.
18          A.  What is the question?
19          Q.  It refers to your e-mail addresses.  Do
20      you still use those addresses?
21          A.  Thefoundation415@hotmail and
22      thefoundation415@gmail, yes, sir.
23          Q.  Are those e-mails that you communicate
24      with your attorneys in this case?
25          A.  Yes, sir.
```

Page 51

1        Q.  It says that you do not have any social

2    media accounts.

3        A.  No, sir.

4        Q.  What do you mean by "social media

5    accounts"?

6        A.  I don't have any Instagram or Facebook

7    or -- none of that stuff.

8        Q.  Do your children?

9        A.  Yeah, I'm pretty sure.

10        Q.  Do you look at their Facebook?

11        A.  No.

12        Q.  Do you use their Facebook account?

13        A.  No.

14        Q.  Do you have LinkedIn?

15        A.  Yes, I do.

16        Q.  Do you use LinkedIn?

17        A.  Yes, I do.

18        Q.  Do you use it to communicate with your

19    lawyers?

20        A.  I haven't used LinkedIn in 50 years.

21        Q.  How many years?

22        A.  A long time.

23        Q.  Did you use LinkedIn to find out anything

24    about the defendant's products in this case?

25        A.  No, sir.

1          Q.  How long did it take you to review and

2     sign these answers to interrogatories reflected in

3     D10?

4          A.  I don't recall the actual time, sir.

5          Q.  Can you approximate?

6          A.  Maybe 10, 15 minutes.

7              MR. DONOVAN:  D11.

8              (Document marked Defendant's Exhibit D11

9              for identification.)

10    BY MR. DONOVAN:

11         Q.  I'm going to show you D11, sir.  Can you

12    tell me what these are?

13         A.  Supplemental responses to def- --

14    plaintiff Thomas Iglesias' supplemental responses

15    in the AriZona case.

16         Q.  You're going to have to speak up a little

17    bit.

18         A.  Supplemental responses to the AriZona

19    case.

20         Q.  And if you look at the second to the last

21    page, tell me if that's your signature.

22         A.  Yes, sir.

23         Q.  And these are sworn as well, these

24    answers, correct?

25         A.  Yes, sir.

Page 53

1      Q.   They're all true and correct?

2      A.   Yes, sir.

3      Q.   If you look at your answer to

4   interrogatory number one, it's at page 8, line 27

5   to 28.

6      A.   Line 27, 28.

7           (Witness reviewing document.)

8      Q.   It says you resided at 51 Prague Street

9   from 2017 to August of 2020.  Do you see that?

10     A.   Yes, sir.

11     Q.   Is that true?

12     A.   Kind of, sir.

13     Q.   Kind of true?

14     A.   Yes.

15     Q.   How -- is some of it false?

16     A.   Well -- because we both own houses, and my

17   dad had a stroke, so I had to kind of like watch

18   him.  But my family stayed at Hamilton, and I was

19   watching him at Prague Street.

20     Q.   So you had dual residencies?

21     A.   Yes, sir.

22     Q.   So earlier on in your testimony when you

23   told me that you resided at 686 Hamilton, you were

24   disregarding your dual residency at 51 Prague

25   Street; is that fair to say?

Page 54

```
 1        A.  No.  I was -- because I always felt I
 2     lived at Hamilton.  That's my house.  I was just
 3     taking care of my father.
 4        Q.  Who -- does anyone else live with your
 5     father at 51 Prague?
 6        A.  No, sir.
 7        Q.  Have you ever been arrested, sir?
 8        A.  No, sir.
 9        Q.  Have you ever had any criminal
10     convictions?
11        A.  No, sir.
12        Q.  Were you ever placed on probation?
13        A.  No, sir.
14        Q.  Did you ever file bankruptcy?
15        A.  Maybe 20 years ago, sir.
16        Q.  So you did?
17        A.  Yes, I did.
18        Q.  Why?
19        A.  It was about 30 years ago.
20        Q.  You said it was 20 years ago.
21        A.  It was in my 20s.  I'm 54, so --
22        Q.  So you filed 30 years ago?
23        A.  Yes, sir.
24        Q.  I'll ask why?
25        A.  I believe I just couldn't keep up with my
```

Page 55

```
 1    debt.
 2        Q.  What type of debt did you have?
 3        A.  I would say probably car and -- and credit
 4    cards.
 5        Q.  And how much debt did you have?
 6        A.  It was like 22-, 23,000.
 7        Q.  And at the time you filed -- did your wife
 8    file with you too?
 9        A.  Yes.
10        Q.  And at the --
11        A.  You know what?  Wait.  I wasn't married
12    when I filed for bankruptcy.  So, no, my wife was
13    not in on that.  It was before I was married.
14        Q.  At the time you filed bankruptcy, did you
15    have any assets?
16        A.  No, sir.
17        Q.  Did you own any real property?
18        A.  No, sir.
19        Q.  You didn't have a bank account?
20        A.  Yes, sir.
21        Q.  Do you remember how much was in it?
22        A.  No, sir.
23        Q.  And you filed -- do you remember filing
24    disclosures or documents with the court in
25    connection with your bankruptcy?
```

Page 56

1          A.   No, I don't recall that, sir.

2          Q.   You don't remember signing documents under

3     oath saying that your assets and situation were

4     accurate and truthful?

5          A.   I believe so.

6          Q.   And were they?

7          A.   Yes, sir.

8          Q.   At the time you filed bankruptcy, were you

9     a trustee under any trust?

10         A.   No, sir.

11         Q.   In connection with document production in

12    this case, did you do anything to look for your

13    bankruptcy records?

14         A.   No, sir.

15         Q.   Why not?

16         A.   They didn't think it was relevant, sir.

17         Q.   Who's Gary Brenner?

18         A.   Sounds like a lawyer.

19         Q.   Was he your lawyer in your bankruptcy?

20         A.   Could have been, sir.

21         Q.   Did you call him to try to obtain your

22    bankruptcy records?

23         A.   No, sir.

24         Q.   Why not?

25         A.   What for?  What's needed for that?

Page 57

```
 1          Q.  Do you recall receiving any requests for
 2     production in this case?
 3          A.  What is that, sir?
 4          Q.  Request for documents, discovery.
 5          A.  In --
 6          Q.  This case.
 7          A.  AriZona case?
 8          Q.  Yes.
 9          A.  As far as like receipts and stuff?
10          Q.  All documents.  Well, strike that.
11              Let's mark this -- I guess we're at D11?
12              THE COURT REPORTER:  D12.
13              (Document marked Defendant's Exhibit D12
14              for identification.)
15     BY MR. DONOVAN:
16          Q.  D12, sir, have you ever seen that document
17     before?
18          A.  Yes, sir.
19          Q.  You have?
20          A.  I believe so, sir.
21          Q.  What is it?
22          A.  It's the responses to AriZona's first
23     request for production of documents.
24          Q.  Turn your attention to page 71, line 8.
25     Were you aware that there was a request for
```

1    documents regarding your bankruptcy proceedings?

2         A.  I did not catch that, sir.  No.

3         Q.  In connection with responding to D12, what

4    did you do by way of looking for responsive

5    documents, if anything?

6         A.  Looked for receipts and any -- maybe a

7    leftover can or something that I had in recycling

8    or something.

9         Q.  Did you do anything else?

10        A.  No, sir.

11        Q.  How much time did you take looking for

12   receipts and looking for cans and containers?

13        A.  Cans and containers, like ten minutes.

14   But receipts like a couple of days' worth, maybe a

15   week's work trying to find stuff.

16        Q.  So you're saying that you spent about

17   40 hours looking for receipts?

18        A.  No, no.  I'll say about five hours.

19        Q.  Looking for receipts?

20        A.  Yes.

21        Q.  So five hours looking for receipts.  About

22   five, ten minutes looking for cans and containers?

23        A.  Yes, sir.

24        Q.  Is that how much time you spent looking

25   for documents responsive to D12?

Page 59

```
 1        A.  An estimate, sir.

 2            MR. DONOVAN:  D13, please.

 3            (Document marked Defendant's Exhibit D13

 4            for identification.)

 5    BY MR. DONOVAN:

 6        Q.  Let me show you D13, sir.  It's a docket

 7    sheet of your bankruptcy.

 8            Does that refresh your memory as to when

 9    you filed bankruptcy?

10        A.  Yes, sir.

11        Q.  It says you filed August 22, 2001,

12    correct?

13        A.  Yes, sir.  Actually we were married then.

14    Okay.

15        Q.  And I'm going to ask you to look through

16    D13 and tell me whether at any one time you had

17    these records?  You had the voluntary petition

18    referenced in number one, correct?  You filed that?

19        A.  What did I file, sir?

20        Q.  Go to the second page, number one.

21        A.  (Witness reviewing document.)

22            Okay.

23        Q.  I'll rephrase the question.

24        A.  Yes.

25        Q.  Well, is it fair to say you didn't look
```

```
                                        Page 60

 1     for any of these documents reflected in D13?
 2          A.   I didn't know I had to, sir.
 3          Q.   So the answer is correct, right, you did
 4     not, right?
 5          A.   Yes, sir.
 6          Q.   Now, Gary Brenner is listed as your
 7     attorney.  Do you see that?
 8          A.   Yes, sir.
 9          Q.   Was anything preventing you from
10     contacting him and trying to get your file?
11          A.   No, sir.
12          Q.   And you can see that the -- there's a
13     final decree, if you look back at D13, on March 27,
14     2002.  Do you see that?
15          A.   Uh-huh.
16          Q.   You have to answer.
17          A.   What is the question?
18          Q.   Did you see the final decree reference as
19     March 27, 2002?
20          A.   Yes, sir.
21          Q.   Do you remember appearing before the
22     trustee and providing testimony?  It's known as a
23     341 hearing.
24          A.   I don't remember, sir.
25          Q.   Do you remember providing any testimony to
```

Page 61

1    anyone during that bankruptcy proceeding?

2        A.  No, sir.  I remember just talking with the

3    lawyer.

4        Q.  Your lawyer?

5        A.  Yes.

6            MR. DONOVAN:  So we're up to D14.

7            (Document marked Defendant's Exhibit D14

8            for identification.)

9    BY MR. DONOVAN:

10       Q.  I'm going to show you a deed, sir.  It's

11   at 686 Hamilton.  Do you see that?

12       A.  Yes, sir.

13       Q.  That's where you're living now?

14       A.  Yes, sir.

15       Q.  And it refers to a grant from Tomas D. and

16   Dolores Iglesias, husband and wife.  Those are your

17   parents?

18       A.  Yes.

19       Q.  To a trust established in 1996.  Do you

20   see that?

21       A.  Yes, sir.

22       Q.  Have you ever seen that trust?

23       A.  No, sir.

24       Q.  Do you know who the beneficiaries are

25   under the trust?

Page 62

```
 1          A.   Probably my sister and myself, sir.
 2          Q.   Do you know?
 3          A.   Yeah.  Yeah, I remember them telling me
 4     they -- they were setting up a trust for us, but
 5     I've never seen any documentation on it or
 6     anything.
 7          Q.   Were you aware of the trust when it was
 8     created in 1996?
 9          A.   They were telling me they were going to do
10     it, but I -- I had no hand in it.  I wasn't living
11     with them.  So I didn't keep up with it as far as
12     knowing what's going on, but --
13          Q.   Do you have -- sorry.
14          A.   They did let me know that they were going
15     to make one for us.
16          Q.   Have you ever seen a copy of the trust?
17          A.   Never.
18          Q.   Are your parents -- is your mother still
19     alive?
20          A.   Yes.
21          Q.   Do your parents have an attorney?
22          A.   I don't know.
23          Q.   Did you disclose the existence of this
24     trust during your bankruptcy?
25          A.   I didn't know -- yeah, I didn't -- it's
```

1       not under my name or anything.  It's not my trust.

2            Q.  Did you disclose the existence of the

3       trust in the bankruptcy case?

4            A.  No, sir.

5            Q.  So at the time of the bankruptcy, you

6       didn't own any real estate?

7            A.  No, sir.

8            Q.  And where were you living at the time of

9       the bankruptcy?

10           A.  At 686 Hamilton.

11           Q.  And were you paying rent?

12           A.  Yes, sir.

13           Q.  To whom?

14           A.  My parents.

15               MR. DONOVAN:  D15, please.

16               (Document marked Defendant's Exhibit D15

17               for identification.)

18      BY MR. DONOVAN:

19           Q.  I'll show you D15, and I'll ask you if

20      you've ever seen that before?

21           A.  Grant deed.  City of Concord.  Joint

22      tenants.

23               Is this for the house that I bought?

24           Q.  The question is have you ever seen this

25      deed before?

Page 64

```
 1          A.  I don't recall, sir.
 2          Q.  Did you purchase property from an Arlene
 3     Scoles located in Concord, California?
 4          A.  We did buy property in Concord, yes.
 5          Q.  Did you procure a mortgage to obtain that
 6     property?
 7          A.  Yes.
 8          Q.  How much was the purchase price?
 9          A.  I want to say in the 200-s, 200,000s,
10     somewhere in there.
11          Q.  And how much was the mortgage?
12          A.  I believe about 2,000.  Maybe a little
13     less.
14          Q.  2,000?
15          A.  Yeah.  I don't remember.  I don't recall.
16          Q.  The face amount of the mortgage, how
17     much did you -- when I say "mortgage," I mean how
18     much of a loan did you have to take?
19          A.  Oh, yeah.  The whole thing.  The whole
20     loan.
21          Q.  And how much was it?
22          A.  I don't recall, sir.
23          Q.  More than a hundred thousand?  Less than a
24     hundred thousand?
25          A.  More than a hundred thousand.
```

Page 65

```
 1        Q.  Did you have to fill out an application to
 2    get that loan?
 3        A.  Me, no.  I didn't buy the house.
 4        Q.  Who bought the house?
 5        A.  Oh, yes.  Excuse me.  That's right.
 6    That's right.  This house in Concord, yes, I did
 7    fill out an application.  Yes, sir.
 8        Q.  And did the application ask you if you had
 9    filed bankruptcy before?
10        A.  I don't recall, sir.
11        Q.  Do you still own the property referenced
12    in D15?
13        A.  No, sir.
14        Q.  Did you sell it?
15        A.  Yes, sir.
16        Q.  When?
17        A.  About a year later, I believe.  A year or
18    two later.
19        Q.  Were you ever the -- a defendant in a
20    foreclosure proceeding?
21        A.  No, sir.  A short sale.
22        Q.  With respect to this property reflected in
23    D15?
24        A.  1832 Venice.
25        Q.  So D15 you said you sold a year or two
```

1    later?

2          A.   Yes.

3          Q.   Do you know for how much?

4          A.   I don't recall, sir.

5          Q.   How much money did you have to put down by

6    way of a down payment to buy the property reflected

7    in D15?

8          A.   I believe it was 20,000.

9          Q.   Now, when you say 1832 Venice there was a

10   short sale, that's another property you owned,

11   correct?

12         A.   So we moved to Concord.  I bought this

13   property, and then we sold it, and then we bought

14   1832 Venice.

15         Q.   When you say you moved to Concord, you

16   moved to the address -- the property referenced in

17   D15?

18         A.   I don't see the address here.

19         Q.   Well, it's referenced on the second page

20   as Monte Gardens, Unit Number 6.

21         A.   Gotcha.

22         Q.   Is that where you moved to?

23         A.   Yes.

24         Q.   In 2006?

25         A.   I don't recall when the actual time was,

Page 67

```
 1      sir.
 2          Q.  Well, this deed is dated November 27,
 3      2006.  After you purchased the property, did you
 4      move to the property reflected in D15?
 5          A.  Yes, sir.
 6          Q.  And how long did you live there?
 7          A.  About a year or two, sir.
 8          Q.  And who did you live with?
 9          A.  My family.  Wife and kids.
10          Q.  The record will reflect what your
11      testimony was, but my recollection is that you
12      didn't say that you lived at this property during
13      that period.  You said you lived at 686 Hamilton.
14              Why didn't you mention this property?
15          A.  What period, sir?  When I moved to
16      Concord?
17          Q.  I'll strike the question.
18              So you sold this property reflected in D15
19      two years later?
20          A.  Uh-huh.
21          Q.  To whom?
22          A.  To a private party.
23          Q.  Do you know their names?
24          A.  No, sir.
25          Q.  How much was the --
```

1    A.  I don't recall, sir.

2    Q.  -- price?

3        Was it more than $200,000?

4    A.  Yes, I would think so.

5    Q.  Do you recall making a profit on the sale?

6    A.  No, sir.

7        MR. DONOVAN:  D16.

8        (Document marked Defendant's Exhibit D16

9        for identification.)

10   BY MR. DONOVAN:

11   Q.  Let me show you D16, sir.  Can you tell me

12   what that is?

13   A.  The grant deed to Venice Drive.

14   Q.  So at some point you purchased the Venice

15   Drive property?

16   A.  Yes, sir.

17   Q.  Which is separate from the property --

18   A.  On Monte Gardens -- yes.  We upgraded

19   houses.  That's what happened.  Monte Gardens was a

20   terrible house, and we were able to upgrade and get

21   a nice house.

22   Q.  Did you own the properties at the same

23   time?

24   A.  No.  We sold -- we sold and bought.

25   Q.  So then you sold -- how much did you buy

Page 69

```
 1      the Venice property -- or Venice Drive property?
 2           A.  It was around 400,000, something like
 3      that.
 4           Q.  400,000?
 5           A.  Yeah.
 6           Q.  And when did you buy the property?
 7           A.  A couple of years after that one.  I don't
 8      remember the actual date.
 9           Q.  A couple of years after D15?
10           A.  Yes.
11           Q.  Around 2008, 2009?
12           A.  Yes, sir.
13           Q.  And it was about 400,000?
14           A.  Yes, sir.
15           Q.  And how did you have the money to pay for
16      a 400,000 house?
17           A.  We didn't.  That's why we short saled
18      (sic).  That's when the 2008 crashes hit.  Yeah,
19      our mortgage went from 2,000 to 4,000 overnight.
20           Q.  I guess my question to you is -- well,
21      have you ever received any monies or any --
22      anything of value from that trust?
23           A.  No, sir.
24           Q.  "The trust" being the Tomas Iglesias and
25      Dolores Iglesias trust.
```

1        A.  No, sir.

2        Q.  So you purchased the property reflected in

3    D16 around 2008, 2010 for about $400,000?

4        A.  Yes, sir.

5        Q.  How much money did you put down?

6        A.  I don't think we had to put anything down.

7        Q.  By that I meant down payment.

8        A.  Yeah, I don't -- I don't recall, sir.

9            MR. DONOVAN:  D17, please.

10           (Document marked Defendant's Exhibit D17

11           for identification.)

12   BY MR. DONOVAN:

13       Q.  Let me show you D17.  Can you tell me do

14   you know what that is?

15       A.  It is a grant deed with my sister's name

16   on it.  Uh-huh.

17       Q.  And Adriana Iglesias is your sister?

18       A.  Yes, sir.

19       Q.  Where does she live?

20       A.  On Cotter Street.

21       Q.  What address?

22       A.  I think it's 101 Cotter, but -- or 125

23   Cotter.  125.

24       Q.  C-o-t-t-e-r?

25       A.  Yes.

Page 71

1       Q.  In San Francisco?

2       A.  Yes.

3       Q.  And it refers to a Adriana V. Iglesias,

4    trustee of the Adriana Iglesias 2008 trust.

5       A.  Okay.

6       Q.  Have you ever seen that trust?

7       A.  No, sir.

8       Q.  And it grants to your mom and dad as

9    trustees of their 1996 trust.  And you see it's

10   created on April 19, 2006?  Do you see that?  It's

11   transferring 51 Prague Street to that trust, right?

12      A.  I think so.

13      Q.  Sorry?

14      A.  I think so.  I don't know.

15      Q.  Were you aware --

16      A.  I've never -- no.

17      Q.  Were you aware of this transaction, D17?

18      A.  No, sir.

19          MR. DONOVAN:  D18, please.

20          (Document marked Defendant's Exhibit D18

21          for identification.)

22   BY MR. DONOVAN:

23      Q.  Let me show you D18, sir.

24      A.  Yes, sir.

25      Q.  Do you know what that is?

Page 72

1        A.   Retainer agreement.

2        Q.   Is that your signature on the last page?

3        A.   Yes, sir.

4        Q.   Do you know who Yana Hart is?

5        A.   No, sir.

6        Q.   Sorry?

7        A.   No, sir.

8        Q.   Now, this agreement is dated -- your

9   signature is September 9, 2021.

10        A.   Uh-huh.

11        Q.   Do you know what the purpose of this

12   agreement was?

13        A.   It's a retainer agreement that I retained

14   a lawyer for this case.

15        Q.   So it's fair to say that as of

16   September 9, 2021, you were authorizing the

17   Clarkson firm to sue Hornell Brewing Co. and

18   related parties in connection with what you believe

19   were false and misleading labels on AriZona's fruit

20   juice cocktail beverages; is that correct?

21        A.   Yes, sir.

22        Q.   And what were you -- believed that was

23   false and misleading at the time that you signed

24   this agreement, D18?

25        A.   Well, I believe I thought I was buying an

1    all-natural product.

2         Q.  And you believe that it wasn't all

3    natural?

4         A.  Well, I thought it was.

5         Q.  But why would you believe at that time

6    that you were deceived?

7         A.  I didn't know.  I bought a lot of product,

8    and then I remember just hearing something about

9    that it -- it's not all natural, you know.  And it

10   started from that, a little inquiry, and I reached

11   out to see if that was true or not to Clarkson.

12   And not knowing if it was or not, and -- but lo and

13   behold it's true.  It's not all natural.

14        Q.  When you said you reached out to them,

15   before September 9, 2021 you reached out to them

16   about that?

17        A.  I believe so, sir.

18        Q.  And who did you speak to?

19        A.  I don't recall, sir.

20        Q.  Who did you communicate with at the

21   Clarkson firm?

22        A.  Mr. Clarkson, I believe.

23        Q.  Did you communicate by phone or by e-mail?

24        A.  I don't recall, sir.

25        Q.  Now, on page 1 it says, "AriZona Fruit

Page 74

```
 1    Juice Cocktail Beverages."  Do you see that?
 2         A.  Yes, sir.
 3         Q.  What beverages were you referring to?
 4         A.  Just the ones that I would purchase, the
 5    ones that I bought.  Like I bought the mango and
 6    the Kiwi Strawberries and stuff like that.
 7         Q.  And again, why did you believe that it was
 8    not natural, the products?
 9         A.  Well, I believed it was all natural when I
10    was buying the products.
11         Q.  Right.
12         A.  But --
13         Q.  Fair enough.  I'll rephrase the question.
14              Why did you come to believe that the
15    products were mislabeled?  What ingredients did you
16    discover were not natural?
17         A.   I never discovered it myself.  I just -- I
18    really don't remember how I found out, but it was
19    an inquiry to Clarkson to see if that was what it
20    was, you know.  I didn't know, but -- I just -- I
21    don't remember how I got the -- the inquiry -- like
22    why I would -- someone told me that.  But I
23    remember that I reached out to Clarkson just to
24    check it, you know.  And -- yeah, that's --
25         Q.  And how soon before did you reach out to
```

Page 75

1    them that you received D18?

2        A.  I don't recall, sir.

3        Q.  Is it fair to say that at time you signed

4    D18 you believed that the defendant's labels were

5    false and misleading?

6        A.  Yes, sir.

7        Q.  Have you ever heard of a Ryan Ardi?

8        A.  I don't recall, sir.

9        Q.  Did you ever communicate with a Ryan Ardi?

10       A.  I don't think so, sir.

11       Q.  What about a Tiara Avaness; did you ever

12   hear of her?

13       A.  Tiara?

14       Q.  Or that person.

15       A.  Maybe Tiara, yeah.

16       Q.  In what way did you communicate with her,

17   without telling me what you communicated with her

18   about?

19       A.  I actually don't know.  I just -- it --

20   Tatiana kind of sounds --

21       Q.  Not Tatiana.  Tiara, T-i-a-r-a.

22       A.  Yeah.  I don't recall, sir.

23       Q.  What about Zach Chrzan, C-h-r-z-a-n; have

24   you ever communicated with him?

25       A.  Zach Chrzan?

Page 76

1          Q.  Yes.

2          A.  I don't recall, sir.

3          Q.  Did you receive D18 by e-mail -- strike

4      that.

5              Do you know how you received it?  By

6      e-mail?  By regular mail?

7          A.  I don't remember, sir.  Yeah, I don't

8      remember how I got it or how I read it.

9          Q.  And how long -- did you review D18 before

10     you signed it?

11         A.  Maybe ten minutes.

12         Q.  So the answer is yes, for ten minutes?

13         A.  Yes, sir.

14         Q.  Did you text anybody at the Clarkson firm

15     about this case?

16         A.  I guess I have.  Not just to meet up with

17     them or anything.

18         Q.  Who has been your cell phone provider

19     since 2018?

20         A.  Metro.

21         Q.  Metro?

22         A.  MetroPCS.

23         Q.  And how many cell phones do you have?

24         A.  One.

25              MR. DONOVAN:  We can mark this

Page 77

1       confidential.

2               (Pages 77 through 81 are marked

3       "Confidential," and bound under separate cover.

4       The non-confidential portion of this transcript

5       begins on page 82.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     BY MR. DONOVAN:

2          Q.   And who is your internet service provider

3     since 2018.

4          A.   I want to say Wave internet.  Broadband.

5          Q.   Where are they located?

6          A.   I don't know.  They used to be Astound

7     Broadband, and then Wave bought them out.

8          Q.   Do they send you a bill?

9          A.   Yeah, online.  I pay online.

10         Q.   Were you aware of any other lawsuit

11    against AriZona prior to deciding to sue them?

12         A.   No, sir.

13         Q.   D18, did you print it out before you

14    signed it, or did you sign it online?

15         A.   What I would do is I would print it out,

16    sign it and then send it back online.  That's how I

17    would do it.

18         Q.   Do you know whether you signed D18 the

19    same day you received it?

20         A.   I don't recall, sir.

21         Q.   Do you know when you received D18 before

22    you signed it?

23         A.   I can't recall that, sir.

24         Q.   Prior to signing this agreement, D18, did

25    you have any communications with anybody about

1    defendant's products?

2        A.  No, sir.

3        Q.  And you said you did some research or you

4    noticed some things.  Can you tell me what you

5    noticed about defendant's products before you

6    signed D18?

7        A.  Can you repeat that question, please?

8        Q.  I believe your testimony was that you

9    noticed some things online about their labeling not

10   being true.  Can you tell me what you saw?

11       A.  Yeah.  I don't remember the actual moment.

12   I just remember that it came to my attention that

13   the all natural -- it's not an all-natural product.

14   So it kind of messed me up because I was thinking

15   it would be an all-natural product.

16       Q.  What did you see?

17       A.  I didn't see anything.  At that point I --

18   I tried to get in contact with them so they can

19   check.  Because I have no way of checking or seeing

20   what the hell is going on.

21       Q.  But what did you base your knowledge on or

22   beliefs on that it may not have been all natural?

23       A.  Like I said, I don't remember the actual

24   moment I was --

25       Q.  I'm not asking about the moment.  I'm

Page 84

```
 1    asking about the source of information.  What did
 2    you read or see?
 3         A.  That's what I'm saying.  If I can't
 4    remember the moment, how am I going to know the
 5    source?
 6         Q.  That's fine.  You don't know -- you don't
 7    remember the source?
 8         A.  That's what I said.  Yeah.
 9         Q.  And do you remember how you found it?  Was
10    it online?
11         A.  No, I don't remember, sir.
12         Q.  Do you remember what it said?
13         A.  No.  I've been trying to rack my brain to
14    remember the moment and the actual time, but I
15    literally cannot remember.
16         Q.  I'm not asking you about the moment.  I'm
17    asking you about what it said, the information;
18    that's what I'm asking.  Not the moment in time.
19         A.  But I can't remember it -- when that
20    happened, how it happened, what happened or who let
21    me know.  I don't remember that.  I just
22    remember --
23         Q.  I'm not asking you who let you -- when you
24    found out.  I'm asking about what you learned.
25         A.  I just learned that it might not be all
```

Page 85

1      natural.

2           Q.   What might not be all natural?

3           A.   The product.

4           Q.   What product?

5           A.   AriZona Beverages.

6           Q.   What flavors?

7           A.   Man.  All of them.  I don't know.  The

8      flavors that I was buying.

9           Q.   And do you remember why it was saying that

10     it wasn't all natural?

11          A.   Specifically, no, I don't.

12          Q.   But based upon this information, that's

13     when you contacted the Clarkson firm, and then they

14     sent you D18 to sign, right?

15          A.   I think it was more they did their

16     research and then figured that it's not all

17     natural, and then they sent me the agreement.

18          Q.   Then they sent you D18?

19          A.   Yes.

20          Q.   Did you ever see the results of any

21     findings in the investigation?

22          A.   No, sir.

23          Q.   And how much time elapsed between you

24     contacting them about your concerns and receiving

25     D18?

1          A.  I don't recall, sir.

2          Q.  More than a month?  Less than a month?

3          A.  I don't recall, sir.  I'll be guessing.

4          Q.  Look at paragraph number three, please.

5          A.  Yes, sir.

6          Q.  It's the four lines up, the sentence that

7     begins with, "While the attorneys."  Do you see

8     that?

9          A.  Yes.

10         Q.  I'll read it aloud.  Quote, "While the

11    attorneys agree to attempt to be guided by and to

12    accommodate my directions and requests in

13    connection with the conduct of the lawsuit and

14    prosecution of the represented claims, the

15    attorneys have explained to me, and I have agreed,

16    that to the extent my directions or requests

17    conflict with the attorneys' duties under the law

18    to all members of the class, the attorneys will act

19    in accordance with their duties to all members of

20    the class."

21              Do you see that?

22         A.  Yes, sir.

23         Q.  When did they make that explanation to

24    you?  I mean, is that true; they -- strike that.

25              Did they explain that to you?

Page 87

```
 1        A.  I don't recall, sir, specifically.  Like
 2    explained what?
 3        Q.  Well, it refers to the attorneys giving
 4    you an explanation.  Do you recall that
 5    explanation?
 6        A.  I don't recall, sir.
 7        Q.  My point there is the agreement refers to
 8    an explanation.  Correct me if I'm wrong; that if
 9    it occurred, that it would have occurred before D18
10    was signed, right?
11        A.  If -- excuse me?
12        Q.  Tell me if I'm wrong.  Paragraph three
13    refers -- the sentence I just read refers to an
14    explanation being afforded to you by your
15    attorneys?
16        A.  An explanation of what?
17        Q.  It says it right there.
18        A.  "While the attorneys" --
19        Q.  What I just read.
20        A.  "While the attorneys agree to attempt to
21    be guided by and to accommodate my directions and
22    requests in connection with the conduct of the
23    lawsuit and prosecution of the represented claims,
24    the attorneys have explained to me, and I have
25    agreed, that to the extent my directions or
```

Page 88

```
 1      requests conflict with the attorneys' duties under
 2      the law to all members of the class, the" --
 3              THE COURT REPORTER:  Hold on.  Can you
 4      slow it down, please.
 5              THE WITNESS:  Sure.
 6              -- "under the law to all members of the
 7      class, the attorneys will act in accordance with
 8      their duties to all members of the class."
 9      BY MR. DONOVAN:
10          Q.  So my question to you is, was there an
11      explanation afforded to you before signing D18?
12      Because certainly the document says that.
13          A.  Uh-huh.
14          Q.  Was there?
15          A.  I don't recall, sir.
16          Q.  Look at paragraph five, please.  Midway
17      down, if you could.  Starts with "I authorize
18      attorneys."
19          A.  Yes, sir.
20          Q.  Do you see that?
21          A.  Yes, sir.
22          Q.  Are you aware of your attorneys entering
23      into a finance agreement with anybody in connection
24      with this case?
25          A.  No, sir.
```

Page 89

```
 1              MR. DONOVAN:  Can we go off the record for
 2       a second.
 3              THE VIDEOGRAPHER:  We're going off the
 4       record.  The time is 12:08.
 5              (Off the record.)
 6              THE VIDEOGRAPHER:  Back on the record.
 7       The time is 12:10.
 8              MR. DONOVAN:  It's 12:10, so we're going
 9       to take a lunch break.  Half hour, 45 minutes.  Try
10       to get back on the record around ten of 1:00.
11       Okay?  Is that okay?
12              THE WITNESS:  Okay.
13              MR. DONOVAN:  See you then.  Thank you.
14              THE VIDEOGRAPHER:  We're going off the
15       record.  The time is 12:10.
16              (Lunch recess taken.)
17              THE VIDEOGRAPHER:  We're back on the
18       record.  The time is 12:46.
19       BY MR. DONOVAN:
20          Q.  Good afternoon, Mr. Iglesias.  You know
21       that you're still sworn, right?
22          A.  Yes, sir.
23          Q.  So other than the Ferrara Candy lawsuit,
24       the Welch's lawsuit and the For Life Products
25       lawsuit, have there been any other lawsuits where
```

Page 90

```
 1     you have been a party?
 2          A.  So we have the Rejuvenate, right?
 3          Q.  Didn't we agree that's --
 4          A.  For Life.
 5          Q.  It's For Life.
 6          A.  Ferrara and Welch's.  I believe that's it.
 7          Q.  I think earlier you said that you had a
 8     short sale action -- or short sale transaction.
 9     And was that a result of a notice of default?
10          A.  That was a -- the 2008 crisis, and it
11     wasn't a default.  But I sold before I was going to
12     default.
13          Q.  Did you get a notice from the bank?
14          A.  No.
15          Q.  Do you recall ever seeing letters sent by
16     your lawyers with regard to your intention to file
17     a lawsuit?
18          MR. GUDINO:  Objection to form.
19          MR. DONOVAN:  I'll rephrase it.
20     BY MR. DONOVAN:
21          Q.  Letters being sent to anyone who makes or
22     is asserted to make AriZona product.  Did you ever
23     see any of those letters referring to your
24     intention to file a lawsuit?
25          A.  I don't know, sir.
```

Page 91

1        MR. DONOVAN:  I think we're up to 20.
2        THE COURT REPORTER:  19.
3        (Document marked Defendant's Exhibit D19
4        for identification.)
5    BY MR. DONOVAN:
6        Q.  I'm going to show you D19.  Again, bear
7    with me one second, sir.
8        D19, have you ever seen that document
9    before?
10       A.  I think so, yes.
11       Q.  You think so?
12       A.  I've seen these pictures right here.  I
13   remember these pictures (indicating).
14       Q.  Did you authorize D19 to be sent on your
15   behalf by your lawyers?
16       A.  I believe so, sir.
17       Q.  Did you read this letter before you
18   authorized it to be sent?
19       A.  I believe so, yes.
20       Q.  And you agree with the assertions?
21       A.  Yes, sir.
22       MR. DONOVAN:  Mark this as D20, please.
23       (Document marked Defendant's Exhibit D20
24       for identification.)
25   BY MR. DONOVAN:

Page 92

1          Q.  Have you ever seen D20 before, sir?

2          A.  I believe so, sir.

3          Q.  Did you also authorize that to be sent?

4          A.  I believe so, sir.

5          Q.  And you agree with the assertions and

6     allegations that are being made in there?

7          A.  Yes, sir.

8              MR. DONOVAN:  D21.

9              (Document marked Defendant's Exhibit D21

10             for identification.)

11    BY MR. DONOVAN:

12         Q.  I'll show you D21, sir.  Have you ever

13    seen that before?

14         A.  (Witness reviewing document.)

15             I believe so, sir.  Yes.

16         Q.  When was the first time you ever saw D21?

17         A.  I don't recall, sir.

18         Q.  Do you know what the purpose of D21 is?

19         A.  Not offhand, sir, no.

20         Q.  Did you authorize D21 to be sent?

21         A.  I would believe so, sir.

22         Q.  Sorry?

23         A.  I believe so.

24         Q.  And again, you agree with the allegations

25    that are being made there?

Page 93

```
 1          A.  Yes, sir.
 2          Q.  With regard to the AriZona brand products
 3     that you're suing about --
 4          A.  Yes, sir.
 5          Q.  -- can you tell me the products that you
 6     purchased?
 7          A.  I would buy the mango one; I bought that
 8     strawberry one.  I believe it's Kiwi Strawberry;
 9     bought the Grapeade; bought the iced tea; Lemonade.
10     That's about it.
11          Q.  So you have the mango.  Is that the Mucho
12     Mango?
13          A.  Yes, sir.
14          Q.  The Kiwi Strawberry.  The -- did you say
15     the Grapeade?
16          A.  Yes.
17          Q.  When you said the iced tea, is there any
18     flavored iced tea?  Lemon --
19          A.  It's AriZona iced tea.
20          Q.  Is it lemon flavored?
21          A.  No.  It's --
22          Q.  You're looking now --
23          A.  It's this one -- I want to show you which.
24          Q.  You're referring back now to D21?
25          A.  I guess.
```

Page 94

1        Q.  Okay.  What page?
2        A.  Page -- this one right there (indicating).
3        Q.  Oh, okay.  When you say the iced tea, you
4   mean the green tea that's depicted on page 12 of
5   D21?
6        A.  Yes, sir.
7        Q.  So then we have the green.  And that's
8   with ginseng and honey, right?
9        A.  Yes, sir.
10       Q.  So we have the AriZona Mucho Mango; the
11  Kiwi Strawberry; the Grapeade; the Green Tea with
12  ginseng and honey; and the Lemonade.
13       A.  Yes, sir.
14       Q.  Any other flavors that you purchased?
15       A.  I just don't remember any other flavors,
16  sir.
17       Q.  And the Mucho Mango, where did you
18  purchase it?
19       A.  It would be at Safeway or at Food Co.
20       Q.  When did you purchase it, the Mucho Mango?
21       A.  Years prior to that.  I bought it over a
22  few years.
23       Q.  What years?
24       A.  I'm going to say from, what, `16 to -- to
25  the lawsuit.

Page 95

1      Q.  The lawsuit was filed in December of 2022.
2   You mean you purchased the Mucho Mango on a regular
3   basis from 2016 to December 2022?
4      A.  Something like that, yes, sir.
5      Q.  And how many Mucho Mangos did you buy?
6      A.  I don't recall, sir.
7      Q.  Can you approximate?
8      A.  I'd be guessing, sir.
9      Q.  So you don't know?
10     A.  No, sir.
11     Q.  What was the container size of the Mucho
12  Mango?
13     A.  The big one.  The gallon one.
14     Q.  Did you ever buy it in a smaller size?
15     A.  Of the Mucho Mango?
16     Q.  Yes.
17     A.  I might have bought a can size.
18     Q.  Do you know whether you bought it in can
19  size or not?
20     A.  I can't remember, sir.
21     Q.  And in the gallon size, what was the
22  price?
23     A.  I believe it was 4 or $5.
24     Q.  Do you know?
25     A.  The exact price?

```
 1        Q.  Yeah.
 2        A.  No, sir.
 3        Q.  So you're approximating somewhere between
 4   4 and $5?
 5        A.  Yes, sir.
 6        Q.  Could have been a little less than $4?
 7   Could have been a little bit more than $5?  You
 8   don't know?
 9        A.  I'm thinking it's right in there
10   somewhere.  It might be more now, but --
11        Q.  And was the 4 or $5 price pretty much the
12   same during that period that you purchased it
13   between 2016 and the commencement of this lawsuit?
14        A.  Yes, sir.
15        Q.  And the Kiwi Strawberry, where did you
16   purchase that?
17        A.  It would be same: Safeway or Food Co.
18        Q.  Oh, I have to ask you.  With the Safeway,
19   did it have an address?
20        A.  Yes.  It's on Mission Street.  I don't
21   know the actual number of the address.
22        Q.  Mission Street where?
23        A.  San Francisco.
24        Q.  And the Food Co.?
25        A.  Food Co. is on Third Street.
```

Page 97

1          Q.  And that's --

2          A.  San Francisco.

3          Q.  And that's relevant to your purchases of

4     Mucho Mango.

5              Now, back to Kiwi Strawberry, you

6     purchased it where?

7          A.  It would be the same spots: Safeway and

8     Food Co.

9          Q.  At the same locations?

10         A.  Yes.

11         Q.  When did you purchase the Kiwi Strawberry?

12         A.  More or less the same time frame, between

13    `17 and the lawsuit.

14         Q.  Between `17 and December of 2022?

15         A.  Yes, sir.

16         Q.  Let me go back to Mucho Mango.  Are you

17    certain that you purchased it in 2016?

18         A.  Yes, sir.

19         Q.  Are you certain you purchased it in 2017?

20         A.  Yes, sir.

21         Q.  Are you certain you purchased it in 2018?

22         A.  Yes, sir.

23         Q.  Are you certain you purchased it in 2019?

24         A.  Yes, sir.

25         Q.  Are you certain you purchased it in 2020?

Page 98

1        A.  Yes, sir.

2        Q.  Are you certain you purchased it in 2021?

3        A.  Yes, sir.

4        Q.  Are you certain you purchased it in 2022?

5        A.  Yes, sir.

6        Q.  Sorry?

7        A.  Yes, sir.

8        Q.  Same questions for the Kiwi Strawberry.

9    Are you certain you purchased it every year from

10   2016?

11       A.  Yes, sir.

12       Q.  2017?

13       A.  Yes, sir.

14       Q.  2018?

15       A.  Yes, sir.

16       Q.  2019?

17       A.  Yes, sir.

18       Q.  2020?

19       A.  Yes, sir.

20       Q.  You purchased it in 2021?

21       A.  Yes, sir.

22       Q.  You purchased it in 2022?

23       A.  Yes, sir.

24       Q.  What -- how many Kiwi Strawberries did you

25   purchase?

Page 99

1        A.  I don't remember, sir.

2        Q.  Can you approximate?

3        A.  I'm guessing, sir.

4        Q.  How much money did you spend in total on

5   the Kiwi Strawberry?

6        A.  I have no idea, sir.

7        Q.  What container sizes of the Kiwi

8   Strawberry did you buy?

9        A.  The gallon.

10       Q.  Any other sizes?

11       A.  No, sir.

12       Q.  What was the price of the Kiwi Strawberry?

13       A.  I believe it was between 4 and 5.

14       Q.  Did the price stay the same between the

15   periods that you purchased it?

16       A.  Yes, sir.

17       Q.  From 2016 to 2022?

18       A.  I believe so, sir.

19       Q.  Grapeade.

20       A.  Yes.

21       Q.  Where did you purchase that?

22       A.  Safeway and Food Co.

23       Q.  Same locations?

24       A.  Yes, sir.

25       Q.  What -- when?

Page 100

1          A.   Same time frame.

2          Q.   You purchased it in 2016?

3          A.   `17, `18, `19, `20, `21.

4          Q.   And 2022?

5          A.   I don't know about `22.

6          Q.   Do you know where you purchased it last in

7     2021, the Grapeade?

8          A.   No, I don't, sir.

9          Q.   And how many of the Grapeade products did

10    you purchase?

11         A.   I don't recall, sir.

12         Q.   And how much money in total did you

13    expend?

14         A.   I do not recall, sir.

15         Q.   What container size of the Grapeade did

16    you purchase?

17         A.   It would be the gallon size, sir.

18         Q.   Any other container size?

19         A.   No, sir.

20         Q.   And what was the price?

21         A.   I believe between 4 and 5.

22         Q.   And was that price the same during the

23    period you're certain you purchased it between 2016

24    and 2021?

25         A.   Yes, sir.

Page 101

1          Q.  You have to speak up, okay.

2               Now, the Green Tea with ginseng and honey,

3     where did you purchase that?

4          A.  Safeway and Food Co.

5          Q.  Same locations?

6          A.  Yes, sir.

7          Q.  Same locations as the prior purchases that

8     you've testified to?

9          A.  Yes, sir.

10         Q.  And what time period?  When did you make

11    these purchases?

12         A.  Between `17 and `21, sir.

13         Q.  So you didn't purchase the Green Tea in

14    2016?

15         A.  I don't know the actual dates of that,

16    because that wasn't a purchase that I would buy a

17    lot.  So I don't know if I bought it every year.  I

18    can't say that to this product.

19         Q.  Where did you purchase the Green Tea with

20    ginseng and honey in 2017?

21         A.  I don't know.  I said -- I didn't buy too

22    much of those particular ones, so I can't tell you

23    what years I bought those, but I know I bought

24    those.

25         Q.  So you can't tell me when you purchased

Page 102

1      the Green Tea with ginseng and honey; is that fair
2      to say?
3          A.  Not -- I can tell you between `17 and `21,
4      but I can't tell you what years I bought it, yeah.
5          Q.  Can you tell me what months during the
6      year that you purchased the ginseng and honey?
7          A.  No, sir.
8          Q.  Do you know how many -- do you know how
9      many Green Tea --
10         A.  No, sir.
11         Q.  -- products you purchased?
12         A.  No, sir.
13         Q.  Do you know how much money you spent?
14         A.  No, sir.
15         Q.  Do you know the container size of the
16     Green Tea?
17         A.  It would be both gallon and the single-can
18     size.
19         Q.  How big was the can size?
20         A.  Just one can, single can (indicating).
21         Q.  Do you know how many ounces?
22         A.  Off the top of my head, no, sir.
23         Q.  What was the price of the gallon?
24         A.  I believe between 4 and $5, sir.
25         Q.  What was the price of the can?

```
                                              Page 103

1           A.   I can't recall that, sir.

2           Q.   Sorry?

3           A.   I can't recall that, sir.

4           Q.   Do you know how much money you expended

5      for the ginseng and honey?

6           A.   No.

7           Q.   Now Lemonade, where did you purchase that?

8           A.   Again, Safeway and Food Co., sir.

9           Q.   Same location as the other purchases?

10          A.   Yes.  Yes.

11          Q.   No other location?

12          A.   That's my neighborhood grocery shops.

13     That's where I go shopping.

14          Q.   So there's no other location you know of

15     with regard to --

16          A.   I don't go -- that's where I go do my

17     shopping.

18          Q.   When did you purchase the Lemonade?

19          A.   Between `17 and `21.

20          Q.   Can you give me the months?

21          A.   No, sir.

22          Q.   How many lemonades did you purchase?

23          A.   I don't know.  Don't recall, sir.

24          Q.   How much money did you expend for the

25     lemonade?
```

Page 104

1        A.   I don't know, sir.

2        Q.   What was the container size?

3        A.   The Lemonade, I believe it was the gallon

4    ones.

5        Q.   Any other container size?

6        A.   No, sir.

7        Q.   What was the price?

8        A.   I believe between 4 and $5.

9        Q.   So other than those flavors -- the AriZona

10   Mucho Mango, the Kiwi Strawberry, the Grapeade, the

11   green iced tea and the Lemonade -- were there any

12   other flavors of iced tea -- sorry, strike that --

13   were there any other flavors of AriZona brand

14   products that you purchased that are the subject of

15   this suit?

16       A.   (Witness reviewing document.)

17       Q.   You're looking at D21 again.

18       A.   Yes.  The Lemonade, the Kiwi Strawberry.

19   Oh, there's that Fruit Punch.  Yeah, definitely

20   Fruit Punch.

21       Q.   Oh, you're certain -- now we've got Fruit

22   Punch, okay.

23       A.   Well, that's what it is.  Yup.

24       Q.   Other than the Fruit Punch, any other ones

25   that you purchased?

```
                                              Page 105

1        A.  No, sir.

2        Q.  Where did you buy the Fruit Punch?

3        A.  Safeway and Food Co.

4        Q.  Same locations?

5        A.  Yes, sir.

6        Q.  When?

7        A.  Between `17 and `21.

8        Q.  Do you know how many you purchased?

9        A.  No, sir.

10       Q.  Can you give me a month --

11       A.  No, sir.

12       Q.  Sorry.  Let me finish.

13            -- a month during the year, any year, that

14   you purchased the Fruit Punch?

15       A.  No, sir.

16       Q.  How many of the Fruit Punches did you

17   purchase?

18       A.  I don't know, sir.

19       Q.  How much money did you expend for the

20   Fruit Punch?

21       A.  I don't know, sir.

22       Q.  What was the container size?

23       A.  A gallon.

24       Q.  Any other container size?

25       A.  No, sir.
```

Page 106

```
1        Q.  And what was the price?

2        A.  I think between 4 and $5.

3        Q.  Now, what -- do you know the month and

4    year you purchased the Mucho Mango -- the months

5    during the years that you purchased the Mucho

6    Mango?

7        A.  No, sir.

8        Q.  Do you know the months during the years

9    you purchased the Kiwi Strawberry?

10        A.  No, sir.

11        Q.  Do you know the months during the years

12    you purchased the Grapeade?

13        A.  No, sir.

14        Q.  Why did you purchase the Mucho Mango?

15        A.  Because I love mango.

16        Q.  Any other reason?

17        A.  I thought it was okay.  Seemed like it was

18    a hundred percent natural.  That's what it said.

19        Q.  Any other reason?

20        A.  No, sir.

21        Q.  What did you love about the mango?

22        A.  Just personally like mango.

23        Q.  Like the taste?

24        A.  Flavor -- mango flavor, yes.

25        Q.  You like the taste.
```

1          What about the price of the product; did

2     you think the price of the product of the Mucho

3     Mango was reasonable?

4          A.  Yes, sir.

5          Q.  Would it be okay to say it was fairly

6     priced?

7          A.  Yes, sir.

8          Q.  Were you aware of any Mucho Mango product

9     sold by anybody else that sold at a less price per

10    gallon than the AriZona one?

11         A.  No, sir.

12         Q.  Did you consume the Mucho Mango yourself

13    entirely every time you purchased it?

14         A.  No, sir.

15         Q.  Who?

16         A.  My family.

17         Q.  Who in your family?

18         A.  Everyone.

19         Q.  Your wife and your three children?

20         A.  (Witness nods head.)

21         Q.  You have to verbally answer.

22         A.  My wife and three children.

23         Q.  Why did you purchase the Kiwi Strawberry?

24         A.  I like strawberry and kiwi.

25         Q.  What do you like about strawberry and

1     kiwi?

2          A.  It tastes good.

3          Q.  What about the taste -- what is it about

4     the taste that you like?

5          A.  It's very strawberry-ish.

6          Q.  Is that a tartness or sweetness or both?

7          A.  Sweetness -- yes.

8          Q.  Any other reason for the kiwi?

9          A.  Also it says a hundred percent natural.

10    I'm thinking it's a natural product.

11         Q.  Any other reason?

12         A.  No, sir.

13         Q.  What about the price of the kiwi; did you

14    think it was a fair price too?

15         A.  Yes, sir.

16         Q.  Provided a good value?

17         A.  I don't know about that, sir.

18         Q.  Let's put it this way.  Sold at a price

19    per ounce that -- had a value -- strike that.

20              At a price per ounce, are you aware of any

21    other product kiwi --

22         A.  No, sir.

23         Q.  Let me finish so the record is clear.

24              -- are you aware of any other kiwi

25    strawberry products that's sold by anybody else

1    that's sold at a lower price per ounce than the

2    AriZona product you bought?

3         A.  No, sir.

4         Q.  What about the Grapeade product; why did

5    you buy that?

6         A.  I like grape.

7         Q.  You like the taste of grape?

8         A.  Yes, sir.  Grape juice.

9         Q.  What is it about the taste that you like?

10        A.  Very grapy.  I don't know how else to

11   explain it.

12        Q.  Any other reason?

13        A.  Again, I'm thinking I'm buying a hundred

14   percent natural product.

15        Q.  Again, the price, did the price play a

16   role in your purchase?

17        A.  Did it play a role in the purchase?  Not

18   really, no.

19        Q.  So it's the grape taste and the hundred

20   percent natural product label for the reasons for

21   the Grapeade?

22        A.  Yes, sir.

23        Q.  Did you consider the price to be a fair

24   and reasonable price for the Grapeade?

25        A.  Yes, sir.

1           Q.  Are you aware of any Grapeade -- rather,

2      any grape products sold in that container size sold

3      at a -- at or even near that price per ounce?

4           A.  No, I don't, sir.

5           Q.  The Green Tea with ginseng and honey, why

6      did you buy that?

7           A.  I'm guessing it seemed like a healthy

8      drink.

9           Q.  Do you like the taste of ginseng?

10          A.  Yes.

11          Q.  What about it do you like?

12          A.  The tart taste, I guess.

13          Q.  You like the taste of honey?

14          A.  Yes, sir.

15          Q.  What do you like about it?

16          A.  Sweetness.

17          Q.  Why did you buy the Green Tea with ginseng

18      and honey?

19          A.  Because I wanted to.

20          Q.  Any other reason?

21          A.  Yeah.  I thought I was buying a healthy

22      product, a hundred percent natural.

23          Q.  Any other reason?

24          A.  The taste.

25          Q.  Now, correct me if I'm wrong, you didn't

1    know what the price of the can was.  Did you know

2    what the gallon of the Green Tea was?

3         A.  More or less the same, between 4 and 5.

4         Q.  And did you find that price to be fair?

5         A.  Yes, sir.  Yes, sir.

6         Q.  Any other reasons, other than what you

7    mentioned, for buying the Green Tea with ginseng

8    and honey?

9         A.  No, sir.

10        Q.  And the Lemonade; why did you buy the

11   Lemonade?

12        A.  We like lemonade.

13        Q.  What did you like about the Lemonade?

14        A.  The lemony taste.  It said it was all

15   natural.

16        Q.  Lemony taste and what?  Sorry?

17        A.  It said it was a hundred percent natural.

18        Q.  Any other reason?

19        A.  No, sir.

20        Q.  And again, the price, you say, somewhere

21   between 4 and $5?

22        A.  Yes, sir.

23        Q.  You think that was a fair price?

24        A.  Yes, sir.

25        Q.  Do you know of any lemonade product sold

Page 112

1    in gallons sold at a lower price per ounce?

2         A.  No, sir.

3         Q.  And then I think we have the Fruit Punch.

4    Why did you buy the Fruit Punch?

5         A.  We love fruit punch.

6         Q.  What do you love about the AriZona Fruit

7    Punch?

8         A.  Fruity taste, and it was a hundred percent

9    natural.

10        Q.  Any other reason?

11        A.  No, sir.

12        Q.  And the price, was that a fair price in

13   your view?

14        A.  Yes, sir.

15        Q.  Do you know of any other fruit punch

16   products sold in gallons sold at a lower price per

17   ounce?

18        A.  No, sir.

19             MR. DONOVAN:  Mark this, please.

20             (Document marked Defendant's Exhibit D22

21             for identification.)

22   BY MR. DONOVAN:

23        Q.  I'll show you D22.  Do you know what this

24   is, sir?

25             D22, do you know what that is, sir?

Page 113

1          A.   Class action complaint for AriZona.

2          Q.   This is the lawsuit in this case, correct?

3          A.   Yes, sir.

4          Q.   It was filed on December 23, 2022?

5          A.   Yes, sir.

6          Q.   So when you said you bought the AriZona

7     Mucho Mango up to the date of the lawsuit, you're

8     referring up until December 23, 2022?

9          A.   Close to it, sir.

10         Q.   How close to it?

11         A.   I'm going to say a few months.

12         Q.   Say through October 2022?

13         A.   We'll say -- to be safe, I'm going to say

14    July 2022.

15         Q.   That's when you stopped purchasing the

16    Mucho Mango?

17         A.   No.  When I stopped, I was -- after it was

18    filed, I stopped buying the product.

19         Q.   So after December 23, 2022 you stopped

20    buying --

21         A.   I made sure I was not buying it.

22         Q.   But you purchased it up until December 23,

23    2022?

24         A.   I don't think I purchased it in December

25    or Novem- -- you know what I'm saying?  Like close

Page 114

```
1      to it.
2           Q.  I'm asking you to approximate.  So by
3      October --
4           A.  July.  I'm going to say July.
5           Q.  So by July 2022 you stopped buying the
6      AriZona Mucho Mango?
7           A.  Yes, sir.
8           Q.  Fair to say by July 2022 you stopped
9      purchasing the Kiwi Strawberry?
10          A.  I believe so.
11          Q.  And then by July 2022, you stopped
12     purchasing the Grapeade?
13          A.  I believe so.
14          Q.  So your last purchase of the Mucho Mango
15     was around July 2022?
16          A.  I don't recall, sir.
17          Q.  Your last purchase of the Mucho Mango was
18     in June of 2022?
19          A.  I don't remember my last purchases of any
20     of those.
21          Q.  Then how do you know you stopped
22     purchasing in July of 2022?
23          A.  I know I stopped purchasing when this was
24     filed; that's what I told you.
25          Q.  Do you know when the last purchase of any
```

Page 115

1       AriZona product was?

2           A.   No, I don't, sir.

3           Q.   So it's possible it was after July of

4       2022; it's possible it was before?  You don't know?

5           A.   I know after this was filed I did not

6       purchase.

7           Q.   So your testimony is what it is.  You said

8       you purchased the product in 2022, so --

9           A.   Cool.

10          Q.   Right?  You did purchase the Mucho Mango

11      in 2022, correct?

12          A.   I just don't know what month.

13          Q.   Fair enough.

14               And you did purchase the Kiwi Strawberry

15      in 2020; you just don't know --

16          A.   Yes, sir.

17          Q.   -- what month?

18          A.   Yes, sir.

19          Q.   And you did purchase the Grapeade in 2022;

20      you just don't know what month?  Right?

21          A.   Yes, sir.

22          Q.   Now, with respect to this lawsuit

23      reflected in D22, do you know whether this

24      complaint was ever amended?

25          A.   I don't recall, sir.

1           Q.  Do you know whether it was amended?  I'm
2      not asking whether you recall.  Do you know --
3           A.  I do not know, sir.
4           Q.  Do you know whether any claims in this
5      case were dismissed?
6           A.  I do not recall or remember, sir.
7           Q.  Do you know whether any claims in this
8      lawsuit were dismissed?
9           A.  I do not know.
10          Q.  Do you know the name of the judge assigned
11     to this case?
12          A.  No, sir.
13          Q.  Did you ever see a written decision in
14     this case concerning a motion to dismiss?
15          A.  I don't recall, sir.
16          Q.  Did you authorize an amended complaint to
17     be filed in this case?
18          A.  I don't recall, sir.
19          Q.  Were all of your purchases of defendant's
20     products at stores by you in person?
21          A.  Yes, sir.
22          Q.  Did you ever purchase defendant's products
23     on any website?
24          A.  No, sir.
25          Q.  Did you ever purchase any of defendant's

1       products at any Walmart?

2              A.  No, sir.

3              Q.  Did you ever hear of any defendant's

4       products being advertised on the radio?

5              A.  No, sir.

6              Q.  Did you ever see defendant's products

7       being advertised on the television?

8              A.  I've seen one commercial of AriZona, yeah.

9              Q.  What did it say?

10             A.  I think it was the owner or something.

11             Q.  Do you recall what it said?

12             A.  No, sir.

13             Q.  Did you ever read any advertisement in the

14      newspaper, in the media about defendant's

15      products -- selling defendant's products?

16             A.  No, sir.

17             Q.  When you bought the gallon products at the

18      stores, they were warm, correct?

19             A.  Yes, sir.

20             Q.  So you brought them home and put them in

21      your refrigerator?

22             A.  Yes, sir.

23             Q.  Did you ever return the product because

24      you were dissatisfied with it?

25             A.  No, sir.

1         Q.   Did the products quench your thirst?

2         A.   I believe so, sir.

3         Q.   Did you enjoy the taste of the products?

4         A.   Yes, sir.

5         Q.   Now, you said you're certain that you

6    stopped purchasing the products after

7    December 12th -- sorry, December 23, 2022.

8              Have you purchased the products -- any

9    other products since December 23, 2022?

10        A.   No, sir.

11        Q.   Why not?

12        A.   Just haven't, sir.

13        Q.   Is there a reason?

14        A.   Just the false claim needs to be fixed for

15   me, sir.

16        Q.   Say again.

17        A.   The false claim needs to be fixed.  Then

18   if I decide to drink something that's not so good,

19   it's up to me instead of being tricked into

20   drinking it.

21             MR. DONOVAN:  Can you read back that

22   question and answer, please.

23             (Record read.)

24   BY MR. DONOVAN:

25        Q.   When you say "the false claim needs to be

1   fixed," what do you mean?

2       A.  A hundred percent natural.

3       Q.  And in your view if that was -- what

4   you're asserting is a false claim, if that was,

5   quote, fixed, you would purchase the products

6   again?

7       A.  I would -- if I wanted to, yes, I would.

8   If I decided -- if I felt like it, I would buy it

9   again.

10      Q.  But right now you don't feel like it; is

11  that correct?

12      A.  Right now I just feel like I'm being lied

13  to, and so I'm not messing with their product.

14      Q.  Do you have any present intention to

15  purchase the products again?

16      A.  No, sir.

17      Q.  Can you identify any other product that

18  you would have purchased instead of the AriZona

19  product?

20      A.  You mean as far as juice?

21      Q.  Yes.

22      A.  Well, I've bought different juices before.

23  Yes, I have.

24      Q.  What juices?

25      A.  Let's see here.  The cranberry grape

Page 120

```
1      juice, apple juice, grape juice, fruit punches.
2      Yeah.
3           Q.  Any other flavors you can think of?
4           A.  What -- what did I say so far?
5           Q.  Cranberry grape, apple juice, grape juice,
6      and fruit punch.
7           A.  Mango and lemonade.
8           Q.  These are all made by other people?
9           A.  Yes, sir.
10          Q.  Or other businesses.
11              What brands?
12          A.  Other companies, yeah.
13              I'd buy Safeway brand.  There's the one
14     that makes cranberry grape.  Is that Welch's?
15          Q.  Who makes cranberry grape, the ones that
16     you -- let me just back up.
17              These flavors are flavors that you've
18     purchased before?
19          A.  Yes.
20          Q.  And who makes the cranberry grape?
21          A.  I believe it's Welch's, but I'm not
22     positive.
23          Q.  You don't know?  Are you guessing?
24          A.  Yeah, I'm guessing.  Yeah.
25          Q.  So you don't know who makes the cranberry
```

Page 121

1      grape that you purchased.

2              How about the apple juice?

3          A.  Safeway.  Safeway apple juice.

4          Q.  How about the grape juice?

5          A.  I don't know who makes that.

6          Q.  Fruit punch?

7          A.  Same.  I don't know who makes that either.

8          Q.  And I have the mango?

9          A.  Mango, yes.  It's all flavors I buy.

10         Q.  Who makes that, other than AriZona, that

11     you've bought?

12         A.  I mean, I would -- I don't know.

13         Q.  What about the lemonade?

14         A.  Safeway brand.

15         Q.  And those are the products -- the Safeway

16     brands are the products that you're purchasing now?

17         A.  Actually, I haven't bought juice in a

18     while, so I'm not buying those right now.

19         Q.  When you say "in a while," how long?

20         A.  It's been about a year.

21         Q.  And why is that?

22         A.  I had a health scare, so I had to change

23     my diet.

24         Q.  Do you have any dietary restrictions, sir?

25         A.  Just -- just eat natural foods.  No

Page 122

```
1        process- -- no hardly processed foods.
2             Q.  Do you have any medical conditions?
3             A.  Prediabetic with the beginning of heart
4        disease.
5             Q.  When were you diagnosed with that?
6             A.  Last year.
7             Q.  In 2023?
8             A.  Yes.
9             Q.  Are you under any medication for your
10       condition?
11            A.  I take cholesterol and high blood
12       pressure.
13            Q.  How is your vision?
14            A.  It's good.
15            Q.  Do you wear glasses?
16            A.  Reading glasses.
17            Q.  Did you have your reading glasses on every
18       time you purchased the AriZona product?
19            A.  No, sir.
20            Q.  Did you have your reading glasses on any
21       time you purchased the AriZona product?
22            A.  No, sir.
23            Q.  Do you know what your vision is offhand?
24            A.  I believe it's 20/20.
25            Q.  But you need -- you need glasses to read?
```

```
                                              Page 123

 1          A.   To -- if I'm reading a long time, yeah.

 2          Q.   Do you need them to read a label?

 3          A.   No.

 4          Q.   Do you know what ingredients are alleged

 5     to be artificial in this case?

 6          A.   No, sir.

 7          Q.   Do you know whether there were allegations

 8     in this case about preservatives?

 9          A.   I don't know, sir.

10          Q.   Look at D22, paragraph number two.

11          A.   What page?

12          Q.   Page 2.

13          A.   Where?

14          Q.   Well, it's -- read the full context of the

15     first sentence, so it's line 23 to line 29.  You

16     can read it to yourself.  If that refreshes your

17     memory of a claim in this case about preservatives.

18          A.   Yes.  That's right.

19          Q.   Do you know whether you're still making

20     any claims about preservatives in this case?

21          A.   I don't think we are, sir.

22          Q.   Why not?

23          A.   I don't know, sir.

24          Q.   Sorry?

25          A.   I don't know, sir.
```

1    Q.  Do you still believe that ascorbic acid is

2    a well-known preservative?

3    A.  Do I still believe that ascorbic is a

4    well-known preservative?

5    Q.  That's what you alleged in the complaint.

6    A.  Yeah.

7    Q.  You still believe that?

8    A.  Yes, sir.  It is.

9    Q.  Do you maintain a file of documents

10   relating to AriZona products?

11   A.  No, sir.

12   Q.  Now, there was a shelter-in-place order in

13   Northern California, right, due to COVID?

14   A.  Yes, sir.

15   Q.  It was around March of 2020?

16   A.  Yes.

17   Q.  How did that impact your grocery shopping?

18   A.  So I worked all through that, every day.

19   We didn't stay home, Park and Rec.  We were the

20   emergency City people, so I was out every day.  I

21   wasn't affected by that.  My family was home, so a

22   lot of food was being eaten.  I had to buy a lot of

23   groceries at that time.

24   Q.  So it didn't impact the manner in which

25   you grocery shopped?

Page 125

1          A.  (Witness shakes head.)

2          Q.  You have to answer.

3          A.  No, it didn't.

4          Q.  Have you ever heard of a person named

5     Nicholas Brunts?

6          A.  No, sir.

7          Q.  Do you know that your attorneys

8     represented him?

9          A.  No, sir.

10          Q.  Do you know there was a motion filed in

11    this case concerning -- this case -- concerning

12    whether to transfer or stay this case because of

13    the Brunts case?

14          A.  No, sir.

15          Q.  When you paid for the AriZona product, did

16    you pay cash?

17          A.  Most of the time.

18          Q.  When you didn't use cash, what did you

19    use?

20          A.  My debit.

21          Q.  Debit card with whom?

22          A.  Chase.

23          Q.  Do you have that on you?

24          A.  Yes.

25          Q.  Can you produce it, please.

Page 126

1          A.   (Witness complies.)

2               MR. DONOVAN:   We'll put this under a

3     confidential.

4               (Page 127 is marked "Confidential," and

5     bound under separate cover.   The non-confidential

6     portion of this transcript begins on page 128.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. DONOVAN:

2        Q.  So you're saying your debit card that you

3    would use for AriZona purchases at times was used

4    with a Chase card?

5        A.  Yes.

6        Q.  And do you have a debit card?

7        A.  No, sir.

8        Q.  Did you ever use a credit card to purchase

9    AriZona product?

10       A.  I might have, yes.

11       Q.  What credit card?

12       A.  The ones that I used to have.

13       Q.  You don't have them anymore?

14       A.  No.

15       Q.  When did you stop them?

16       A.  I don't know.  A couple years ago.

17       Q.  What financial entity held the credit

18   card?

19       A.  I believe it was Credit One.

20       Q.  Did you do anything to contact Chase to

21   pull down any records of your AriZona purchases?

22       A.  I went online to look at -- see if I can

23   find anything on my statements.

24       Q.  You looked at your statements?

25       A.  I tried to see, yeah, but it doesn't

1      give -- it just says what the price -- how much I

2      paid.  It doesn't give me what I bought.

3          Q.  And how far back did you look at your

4      Chase card?

5          A.  Probably a few years.

6          Q.  Going back to when?

7          A.  Probably like `19, `18.  `19 or `18.

8          Q.  Do you know which?

9          A.  No, I don't recall.

10         Q.  What about your credit card; did you look

11     at your credit card statements to determine whether

12     they had any record of AriZona purchases?

13         A.  All nothing new -- what I've got now, no,

14     no purchases.

15         Q.  So you did look?

16         A.  Of course.

17         Q.  How far back did you look?

18         A.  I tried to find purchases all the way back

19     to -- to `18.  2018.

20         Q.  Did you find any?

21         A.  No, sir.

22         Q.  Did you see the "All Natural" statement on

23     any of the products?

24         A.  See the what?

25         Q.  The "All Natural" statement on any of the

```
                                              Page 130

  1      labels of the products.

  2           A.  Yes, sir.

  3           Q.  Which ones?

  4           A.  All of them.

  5           Q.  All of the ones that you purchased that

  6      you testified to?

  7           A.  I believe the Mucho Mango, Kiwi

  8      Strawberry, Grapeade -- yeah.  I know those --

  9      those for sure.

 10           Q.  Any other products?

 11           A.  I said Mucho Mango, Kiwi Strawberry,

 12      Grapeade, the Lemonade and the iced tea.  Yeah,

 13      they all said "All Natural."

 14           Q.  Other than the iced tea, which is the

 15      Green Tea --

 16           A.  Yes.

 17           Q.  -- the Lemonade, Grapeade, Kiwi

 18      Strawberry, Mucho Mango, did you see the "All

 19      Natural" statement on any of the other products

 20      that you purchased?  AriZona products.

 21           A.  Those are the products that for sure I

 22      know had that on there.

 23           Q.  So you can't testify as to any others; is

 24      that fair to say?

 25           A.  Yes, sir.
```

Page 131

1          (Document marked Defendant's Exhibit D23
2          for identification.)
3     BY MR. DONOVAN:
4          Q.   What does the term "all natural" mean to
5     you?
6          A.   That it's all-natural products.  No
7     chemicals; no additives; no preservatives.
8          Q.   No chemicals; no additives; no
9     preservatives.  What else?
10         A.   It shouldn't have any unnatural products
11    in it.
12         Q.   Anything else, however you define "all
13    natural"?
14         A.   Yeah, that's it.
15         Q.   Sorry?
16         A.   That's it.
17         Q.   Would you agree that people have different
18    definitions of what "all natural" means?
19         A.   No.
20         Q.   You think that there's only one
21    definition, and that's the definition that you just
22    described?
23         A.   "All natural" means all natural.
24         Q.   I'm going to show you D23.  That's your
25    complaint filed in this case.  All right?

```
                                            Page 132

 1          A.   Yes, sir.

 2          Q.   I want you to turn to page (sic) 69,

 3     allegations A through L --

 4          A.   What page?

 5          Q.   Page 45.

 6               And in that allegation you reference

 7     public comments to the FDA about what "natural"

 8     means to people.

 9          A.   Okay.

10          Q.   Can you tell me which one of these

11     comments you think most closely aligns with your

12     definition that you just described?

13          A.   Where is the comments you're talking

14     about?

15          Q.   It's 69A --

16          A.   69A -- oh, up there.  Gotcha.

17          Q.   A through L.

18          A.   (Witness reviewing document.)

19               Yes, sir.

20          Q.   Which one do you think most closely

21     aligns, if any one?

22          A.   "Free from additives," "preservatives."

23          Q.   Is there any particular paragraph you're

24     reading from?

25          A.   18.
```

Page 133

1      Q.  I'm sorry?

2      A.  Page 45, 18.

3      Q.  So from -- you're reading from comment

4  69C?

5      A.  Okay.  69C.

6      Q.  The paragraph is C, right.

7          So is that comment the one that you think

8  most closely aligns with your definition of

9  "natural"?

10      A.  Yes.

11      Q.  And again, your view is that the term "all

12  natural" isn't subject to varying interpretations

13  by consumers?

14      A.  It's pretty clear cut.

15      Q.  As part of your dietary restrictions due

16  to your condition, are you supposed to cut down on

17  your sugar intake?

18      A.  Yes, sir.

19      Q.  And that would be pertinent to purchasing

20  products -- sweetened products like the AriZona

21  tea, would it not?

22      A.  Yes, sir.

23      Q.  Were you instructed to stop purchasing

24  sweetened beverages?

25      A.  I was instructed to mind myself of

Page 134

1      sweetened beverages and high processed foods.

2           Q.   "Mind myself," what does that mean?

3           A.   Just cut down on it.

4           Q.   And you view that that would cut down on

5      the amounts that you'd purchase?

6           A.   Well, not --

7           Q.   Or consume, I should say.

8           A.   Yeah, we're not consuming stuff like that

9      too much anymore.

10          Q.   "Stuff like that," that means sweetened

11     beverages?

12          A.   Sugary -- yeah, sugary stuff.

13          Q.   Since when?

14          A.   About a year and a half ago since my

15     health scare.

16               (Page 135 is marked "Confidential," and

17     bound under separate cover.  The non-confidential

18     portion of this transcript begins on page 138.)

19

20

21

22

23

24

25

Page 138

```
 1    BY MR. DONOVAN:
 2        Q.  Are you seeking a monetary recovery in
 3    this case?
 4        A.  No, sir.
 5        Q.  Sorry?
 6        A.  No, sir.
 7        Q.  What are you seeking?
 8        A.  Change that.  Just be fair.  Just --
 9        Q.  Change what?
10        A.  Change that "natural" thing on the -- the
11    "hundred percent natural" on the product.  Just
12    change it.  Stop lying to consumers; that's it.
13        Q.  Change it to what?
14        A.  Get it out of there.
15        Q.  Remove the "all natural" label?
16        A.  Yes.  Simple.
17        Q.  And that's the sum and substance of what
18    you're seeking in this lawsuit?
19        A.  Yes, sir.
20            MR. DONOVAN:  Let's take a five-minute
21    bathroom break.  Is that okay?
22            THE WITNESS:  Sure.
23            THE VIDEOGRAPHER:  We're going off the
24    record.  The time is 2:04.
25            (Break taken.)
```

```
 1            THE VIDEOGRAPHER:  We're back on the
 2     record.  The time is 2:10.
 3     BY MR. DONOVAN:
 4        Q.  We had talked about the "All Natural"
 5     statement that you saw on the Mucho Mango, Kiwi
 6     Strawberry and the Grapeade.
 7            Can you tell me where that statement was
 8     on the label?
 9        A.  I believe it's in the front.
10        Q.  What did it say?
11        A.  "A hundred percent natural."
12        Q.  Did it say anything else?
13        A.  No.
14        Q.  And when do you recall first seeing that
15     statement, "A hundred natural"?
16        A.  When making a purchase.
17        Q.  Sorry?
18        A.  When making a purchase.
19        Q.  When making your first purchase or
20     subsequent to that?
21        A.  No, my first purchase.
22        Q.  Is that true for all the products that
23     you've testified to buying?
24        A.  Well, they're the same -- the products
25     come from the same thing.  So when I see the
```

Page 140

1       "hundred percent" on each one, I think it's the

2       same, a hundred percent natural, yes.

3               MR. DONOVAN:  Can we go off the record

4       real quick.

5               THE VIDEOGRAPHER:  Going off the record.

6       The time is 2:11.

7               (Off the record.)

8               THE VIDEOGRAPHER:  Back on the record.

9       The time is 2:12.

10      BY MR. DONOVAN:

11         Q.  Are you aware of a -- a lawsuit that was

12      filed against you by Hornell Brewing?

13         A.  Isn't this AriZona, the AriZona case?

14         Q.  Are you aware of a lawsuit that you filed

15      against Hornell Brewing that was dismissed?

16         A.  I don't recall.  Isn't this Hornell

17      (indicating)?

18              AriZona?

19         Q.  That's a complaint against AriZona

20      Beverages USA.  Do you see that, sir?

21         A.  Gotcha.  No, no, I don't recall.

22         Q.  Are you aware of a lawsuit that you filed

23      against Hornell Brewing that was dismissed?

24         A.  Yeah, I don't remember that.

25         Q.  Do you know why it was dismissed?

Page 141

1           A.   I don't remember, sir.

2           Q.   So you don't remember.  Do you know?

3           A.   You know, I don't remember what that

4      lawsuit is about.

5           Q.   Did you authorize a lawsuit against

6      Hornell Brewing?

7           A.   I don't remember, sir.

8                MR. DONOVAN:  Give me a moment to read

9      over my notes, and I can give you an estimate,

10     Alan, okay, of where we are?

11               MR. GUDINO:  Okay.

12               MR. DONOVAN:  Can we go off the record for

13     a minute?

14               MR. GUDINO:  Sure.

15               MR. DONOVAN:  A couple of minutes.

16               THE VIDEOGRAPHER:  We are going off the

17     record.  The time is 2:17.

18               (Break taken.)

19               THE VIDEOGRAPHER:  Back on the record.

20     The time is 2:20.

21               MR. DONOVAN:  Mark this, please.

22               (Document marked Defendant's Exhibit D24

23               for identification.)

24     BY MR. DONOVAN:

25          Q.   Thank you.  So I'm showing you D24.  Have

1      you ever seen that decision in this case, sir?

2          A.  Let's see here.

3              (Witness reviewing document.)

4              Yeah, I don't recall this.

5              MR. DONOVAN:  D25, please.

6              (Document marked Defendant's Exhibit D25

7              for identification.)

8      BY MR. DONOVAN:

9          Q.  Showing you D25, have you ever seen that

10     before, sir?

11         A.  Let's see.

12             (Witness reviewing document.)

13             MR. GUDINO:  Do you have a copy, Bob?

14             MR. DONOVAN:  I'm sorry.  Sorry about

15     that.

16             THE WITNESS:  Yeah, I don't recall this.

17     BY MR. DONOVAN:

18         Q.  Do you know whether or not you're making

19     any claims about the color of the products that you

20     purchased?

21         A.  I don't know.  I don't know.

22         Q.  Sorry?

23         A.  I don't know.

24         Q.  Do you believe the way the products were

25     colored was deceptive to you?

Page 143

```
 1          A.  I don't know how they colored them.
 2          Q.  My question is do you believe the coloring
 3      of any of the products was deceptive to you?
 4          A.  I don't know.
 5          Q.  Do you believe that the flavoring of the
 6      products in any way were deceptive to you?
 7          A.  I don't know.
 8              MR. DONOVAN:  Let's go off the record one
 9      more time, and I'll look at my notes.  I'll do it
10      outside, if that's okay.
11              THE VIDEOGRAPHER:  We're going off the
12      record.  The time is 2:25.
13              (Off the record.)
14              THE VIDEOGRAPHER:  We're back on the
15      record.  The time is 2:29.
16      BY MR. DONOVAN:
17          Q.  Were you willing to pay more for
18      defendant's product labeled "All Natural" as
19      opposed to products that weren't labeled that way?
20          A.  Yes, sir.
21          Q.  How much more?
22          A.  If I wanted it, it doesn't matter.
23          Q.  Wouldn't matter what the cost is?
24          A.  No.
25          Q.  Were you willing to pay more for a product
```

Page 144

1      labeled "All Natural" versus a product containing

2      artificial ingredients?

3           A.  Yes, sir.

4           Q.  How much more?

5           A.  It doesn't matter.

6           Q.  Do you know how much more you spent, if

7      any, on defendant's product as opposed to a product

8      that wasn't labeled "All Natural"?

9           A.  No, sir.

10          Q.  When you made the purchases of the

11     defendant's products, were there products available

12     at the store at the time of the purchase that you

13     chose not to buy because of the "All Natural"

14     label?

15          A.  Can you repeat?  I don't understand that

16     question.

17          Q.  When you went shopping and you bought

18     defendant's products, there were other beverages

19     available, right?

20          A.  Okay.

21          Q.  Do you know how they were labeled?

22          A.  I mean, I'm sure there's all sorts of

23     labels.

24          Q.  Do you know whether they were labeled "All

25     Natural" or not?

1        A.   I'm sure there was.

2        Q.   Do you know which ones?

3        A.   No, sir.

4        Q.   And my question to you is whether you know

5   that you chose the defendant's product instead of

6   purchasing another product that was available that

7   you could have bought?

8        A.   That was all natural?

9        Q.   Doesn't matter what reason.

10        A.   Okay.  Yes, I could have bought other ones

11   if I want- -- chose to.

12        Q.   What other products did you chose not to

13   buy?

14        A.   I have no -- all the other -- I have no

15   idea.

16        Q.   And then what products, if you know, were

17   available not labeled "All Natural" that you --

18   that you could have purchased but chose not to and

19   bought defendant's product instead?

20        A.   I don't know, sir.

21        Q.   I'm sorry?

22        A.   I don't know, sir.

23             MR. DONOVAN:  I guess we'll mark this D26.

24             (Container marked Defendant's Exhibit D26

25             for identification.)

Page 146

1    BY MR. DONOVAN:

2        Q.  Sir, I'm going to show you a container,

3    D26.  Does that look like the container size of the

4    Kiwi Strawberry that you bought?

5        A.  Yes, sir.

6        Q.  And does that look like the label that you

7    purchased it in?

8        A.  Yes, sir.

9        Q.  Both front and back?

10       A.  I didn't look at the back, so I don't know

11   about the back.

12       Q.  Did you ever look at the back of the label

13   when you bought the product?

14       A.  No, sir.

15       Q.  Why not?

16       A.  Just didn't.  I didn't do that back

17   then.

18       Q.  Well, did you know that the product

19   ingredients are on the back of the label?

20       A.  Yes.

21       Q.  So looking at D26, that looks like the

22   label of the product that you purchased that you

23   testified to?

24       A.  Yes, sir.

25           MR. DONOVAN:  D27.

1            (Container marked Defendant's Exhibit D27

2            for identification.)

3    BY MR. DONOVAN:

4        Q.  I'll show you D27, sir.  It's a container

5    of the Mucho Mango.  Is that the gallon size that

6    you purchased?

7        A.  Yes, sir.

8        Q.  And does that have the label that you

9    remember having when you made the purchases?

10       A.  I believe so.  I thought it said "a

11   hundred percent natural," though, sir.

12       Q.  What's it say there?

13       A.  "All Natural."

14       Q.  Is there a difference to you between "a

15   hundred percent" and "all natural"?

16       A.  Not -- not really.

17       Q.  How about the back label; do you know

18   whether it has the same label as the one you

19   purchased?

20       A.  No, sir.

21       Q.  How do you know?

22       A.  Because I don't -- I don't look in the

23   back.

24       Q.  So you don't know whether it was the same?

25       A.  I know the front label, yeah.

1          Q.   My question to you is do you know whether
2     the back is the same?
3          A.   No, I don't.
4          Q.   You don't, sir.  Because you never looked
5     at the back label?
6          A.   Yes, sir.
7          Q.   By not looking at the back label, is it
8     fair to say you did not know what the ingredients
9     were in D26 when you bought it?
10          A.   Yes, sir.
11          Q.   And same thing for D27, the Mucho Mango;
12     is it fair to say because you didn't look at the
13     back label, you're unaware of the ingredients that
14     were in the product when you purchased them?
15          A.   Yeah.  I just believed it was all natural
16     (indicating).  Main action right there.
17               Is that a lie?  I don't know.
18               MR. DONOVAN:  D28, please.
19               (Can marked Defendant's Exhibit D28
20               for identification.)
21     BY MR. DONOVAN:
22          Q.   I think you mentioned earlier that you
23     bought the Mucho Mango in a can.  Is that the can
24     size that you purchased?
25          A.   Yes, sir.

1        Q.  And is that -- it's the same type of label
2    when you purchased?
3        A.  Yes, sir.
4        Q.  And did you look at the nutrition facts
5    panel before you made the purchase?
6        A.  No, sir.
7        Q.  Why not?
8        A.  I just looked at "All Natural," sir.
9        Q.  And this product says, "Great Buy 99
10   cents."  Do you remember whether that's what it
11   said?
12       A.  It was for a dollar.  Yes, sir.  A dollar.
13   99 cents; that's right.
14       Q.  And again, do you know how many of the
15   Mucho Mango you bought --
16       A.  No.
17       Q.  -- D28?
18       A.  No, sir.
19       Q.  You agree that -- it says, "Great Buy."
20   Do you agree with that assessment?
21       A.  For 99 cents, maybe.
22            MR. DONOVAN:  D29 I guess.
23            (Container marked Defendant's Exhibit D29
24            for identification.)
25   BY MR. DONOVAN:

1        Q.  I'm going to show you D29, which is the

2    Green Tea.  I think you said you bought that in

3    gallons.

4        A.  Yes.

5        Q.  Does that look like the label on the

6    container that you purchased?

7        A.  I believe so.

8        Q.  And the back?

9        A.  I don't know about the back.

10           (Container marked Defendant's Exhibit D30

11           for identification.)

12   BY MR. DONOVAN:

13       Q.  Now, we have the fruit punch --

14       A.  Yes, sir.

15       Q.  Does that look like -- I have to finish

16   the question.  Can you leave it in front of you,

17   please, so the reporter can see that.

18           Does that look like the label of the fruit

19   punch that you -- on the gallon that you've

20   testified earlier that you purchased?

21       A.  Yes, sir.

22       Q.  What about the back of the label; do you

23   know whether that's the same?

24       A.  I don't know, sir.

25       Q.  Because?

```
                                              Page 151
 1         A.  I don't look in the back.
 2              MR. DONOVAN:  D31, please.
 3              (Document marked Defendant's Exhibit D31
 4              for identification.)
 5              MR. DONOVAN:  I'll show you D31.
 6              Sorry, Counsel, I don't have a copy.  I
 7      don't have a copy for me.
 8      BY MR. DONOVAN:
 9         Q.  That's a label of the Grapeade.  Does that
10      look like the label of the product that you
11      purchased?
12         A.  I believe so.
13         Q.  What about the second page, the back
14      label; is it the same label?
15         A.  I don't know, sir.
16         Q.  You don't know because?
17         A.  I don't look at the back.  Or I didn't
18      look at the back.
19         Q.  Sorry?
20         A.  I didn't look at the back.
21         Q.  Now you do?
22         A.  Not necessarily, no.
23         Q.  Sometimes you do?
24         A.  Maybe.
25         Q.  Why?
```

1        A.   Let's see.   Just interested in what's in

2   it.

3        Q.   Any other reason?

4        A.   No.

5        Q.   When did you start doing that?

6        A.   Sometime after realizing that our products

7   are being poisoned.

8        Q.   It was sometime --

9        A.   After this (indicating).

10        Q.   After the lawsuit in --

11        A.   Yes, sir.

12        Q.   Let me finish.

13             After the lawsuit was filed in

14   December 2022?

15        A.   Say around my health scare too.   Uh-huh.

16        Q.   So about a year and a half ago?

17        A.   Something like that.   Yes, sir.

18        Q.   Would it be fair to say, and correct me if

19   I'm wrong, due to your health scare you're a little

20   more wary of the foods that you're ingesting, and

21   you're looking at the ingredients?

22        A.   Yes, sir.

23             MR. DONOVAN:  D32, please.

24             (Document marked Defendant's Exhibit D32

25             for identification.)

1     BY MR. DONOVAN:

2          Q.   I'm going to show you D32 and ask you if

3     that looks like the label of the gallon of the

4     Lemonade that you've testified to previously?

5          A.   I believe so.

6          Q.   What about the back label?

7          A.   I don't know.

8          Q.   That's because you never read the back

9     label, correct?

10         A.   Yes.

11         Q.   Had you read the back label and learned

12    there was ascorbic acid in the products, would you

13    have purchased them?

14         A.   Maybe.

15         Q.   Why?

16         A.   Really thirsty.

17         Q.   Any other reason?

18         A.   Nope.

19              (Document marked Defendant's Exhibit D33

20              for identification.)

21    BY MR. DONOVAN:

22         Q.   Let me show you D33 and ask you if you've

23    ever seen that complaint before?

24         A.   (Witness reviewing document.)

25              I believe I have, sir.

Page 154

1          Q.  I'm sorry?

2          A.  I believe I have, sir.

3          Q.  You have seen it?

4          A.  I believe I have, sir.

5          Q.  When is the first time you saw it?

6          A.  Today.  Yeah.

7          Q.  After your deposition started?

8          A.  No.  No, sir.  Let's see here.  Third

9     amended class action complaint?  Yeah, I don't

10    know.

11         Q.  Do you remember seeing D33, sir?

12         A.  No.

13         Q.  Do you know whether your attorneys who

14    represent you in this case represented Mr. Brunts?

15         A.  My attorneys repre- -- no, I don't know

16    that.

17         Q.  Do you know what happened --

18         A.  Oh, it's not even my name.  This is not

19    mine.  I've never seen this.  I thought my name was

20    up there.  I didn't even look at that, so excuse

21    me.

22         Q.  That's okay.

23         A.  I've never seen this before.

24         Q.  You've never seen D33?

25         A.  No.

Page 155

1      Q.  Did you know that your counsel in this
2    case represented Mr. Brunts?
3      A.  No, sir.
4      Q.  Do you know what happened with regard to
5    the Brunts lawsuit?
6      A.  No, sir.
7      Q.  Did you ever buy defendant's product off
8    defendant's website?
9      A.  No, sir.
10     Q.  Have you ever been in Agoura, California?
11     A.  No, sir.
12     Q.  Did you ever see anything on your LinkedIn
13   account about AriZona iced tea?
14     A.  No, sir.
15         MR. DONOVAN:  Give me one more minute to
16   look outside.  I think I'm done.  Is that okay?
17         Let's go off the record.
18         THE VIDEOGRAPHER:  We're going off the
19   record.  The time is 2:51.
20         (Off the record.)
21         THE VIDEOGRAPHER:  We're back on the
22   record.  The time is 2:57.
23   BY MR. DONOVAN:
24     Q.  With respect to the gallons that you
25   testified that you purchased -- the Mucho Mango,

1    the Kiwi Strawberry, the Green Tea -- would you buy

2    multiple gallons at a time, or will you just buy

3    one gallon generally?

4         A.  Just -- just one.

5         Q.  And you put it in your fridge.  How long

6    would it stay in there before it was finished, on

7    average?  A week?  Less than a week?

8         A.  Three, four days.

9         Q.  And what would you do, generally; buy one

10   the following week?

11        A.  More or less, yes.

12             MR. DONOVAN:  I have nothing further,

13   other than to say I'm reserving my right because

14   there was a question posed, my recollection is,

15   about the Welch Foods matter or one of the class

16   action cases that he was directed not to answer.

17             And also, I have a little concern about

18   the failure to produce at least the bankruptcy

19   records and maybe the purchase records.  We'll have

20   to see what the records show.

21             But subject to that reservation, thank you

22   for your time.

23             THE WITNESS:  Thank you.

24             THE COURT REPORTER:  Counsel, would you

25   like a copy of this transcript?

Page 157

1           MR. GUDINO:  Yes, please.

2           THE VIDEOGRAPHER:  We're off the record at

3     2:58 p.m., and this concludes today's testimony

4     given by Thomas Iglesias.  The total number of

5     media units used was nine and will be retained by

6     Veritext.

7           (Back on the written record only.)

8           MR. GUDINO:  And the parties will

9     stipulate to 30 days for review --

10          MR. DONOVAN:  Under the rules.

11          MR. GUDINO:  Yeah, under the rules.

12          MR. DONOVAN:  Whatever the rule is, you're

13    reserving the right under the rules to review and

14    sign?

15          MR. GUDINO:  Yes.

16          MR. DONOVAN:  Correct?

17          MR. GUDINO:  That's right.

18          THE COURT REPORTER:  Off the record.

19           (Whereupon, the deposition was concluded

20            at 2:58 p.m. Pacific time.)

21

22

23

24

25

Page 158

1                    REPORTER'S CERTIFICATE

2

3

4              I, DIANA L. GONZALEZ, a Shorthand Reporter,

5       State of California, do hereby certify:

6              That THOMAS IGLESIAS, in the foregoing

7       deposition named, was present and by me sworn as a

8       witness in the above-entitled action at the time

9       and place therein specified;

10             That said deposition was taken before me at

11      said time and place, and was taken down in

12      shorthand by me, a Certified Shorthand Reporter of

13      the State of California, and was thereafter

14      transcribed into typewriting, and that the

15      foregoing transcript constitutes a full, true and

16      correct report of said deposition and of the

17      proceedings that took place;

18             That before completion of the proceedings,

19      review of the transcript was requested.

20             IN WITNESS WHEREOF, I have hereunder

21      subscribed my hand this 1st day of October 2024.

22

23

24

                DIANA L. GONZALEZ, CSR NO. 7935

25              State of California

Page 159

1    ALAN GUDINO

2    agudino@clarksonlawfirm.com

3                        October 1, 2024

4    RE:    Iglesias, Thomas v. Arizona Beverages Usa Llc,

5          9/19/2024, Thomas Iglesias (#6888869)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-ny@veritext.com

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                   Yours,

23                   Veritext Legal Solutions

24

25

```
                                                    Page 160

 1    Iglesias, Thomas v. Arizona Beverages Usa Llc,

 2    Thomas Iglesias (#6888869)

 3                  E R R A T A   S H E E T

 4    PAGE_____ LINE_____ CHANGE_____

 5    _____

 6    REASON_____

 7    PAGE_____ LINE_____ CHANGE_____

 8    _____

 9    REASON_____

10    PAGE_____ LINE_____ CHANGE_____

11    _____

12    REASON_____

13    PAGE_____ LINE_____ CHANGE_____

14    _____

15    REASON_____

16    PAGE_____ LINE_____ CHANGE_____

17    _____

18    REASON_____

19    PAGE_____ LINE_____ CHANGE_____

20    _____

21    REASON_____

22

23    _____    _____

24    Thomas Iglesias                              Date

25
```

Page 161

1  Iglesias, Thomas v. Arizona Beverages Usa Llc,

2  Thomas Iglesias (#6888869)

3              ACKNOWLEDGEMENT OF DEPONENT

4      I, Thomas Iglesias, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____    _____

12  Thomas Iglesias                          Date

13  *If notary is required

14                      SUBSCRIBED AND SWORN TO BEFORE ME THIS

15  _____ DAY OF _____, 20___.

16

17

18                      _____

19                      NOTARY PUBLIC

20

21

22

23

24

25

**[& - 22]**                                                                    Page 1

| & | | | |
|---|---|---|---|

**&**   7:6,21

**0**

**01-32182**   3:20
**07407**   7:22
**09108**   1:7 9:17

**1**

**1**   1:23 73:25
  159:3
**10**   2:3 23:21
  52:6
**101**   7:6 9:18
  70:22
**112**   4:13
**11:03**   47:2
**11:07**   47:5
**12**   4:10 94:4
**125**   70:22,23
**127**   1:24 126:4
**128**   126:6
**12:08**   89:4
**12:10**   89:7,8,15
**12:46**   89:18
**12th**   118:7
**13**   4:8 6:2
**131**   4:14
**135**   1:24
  134:16
**138**   1:24
  134:18
**14**   4:5
**141**   4:15
**142**   4:16

**145**   4:19
**147**   4:21
**148**   4:23
**149**   5:3
**15**   52:6
**150**   5:5
**151**   5:7
**152**   5:8
**153**   5:10
**159**   1:23
**16**   2:10 94:24
**17**   20:21 97:13
  97:14 100:3
  101:12 102:3
  103:19 105:7
**18**   100:3 129:7
  129:7,19
  132:25 133:2
**1800**   7:7 9:19
**1832**   3:22,24
  20:18,19 21:18
  65:24 66:9,14
**19**   1:17 9:3
  71:10 91:2
  100:3 129:7,7
**1994**   25:19
**1996**   61:19
  62:8 71:9
**1997**   25:17
**19th**   7:4
**1:00**   89:10
**1st**   158:21

| 2 | | | |
|---|---|---|---|

**2**   123:12
**2,000**   64:12,14
  69:19
**2,500**   31:18,19
  31:21
**2-21-17**   40:15
**20**   25:23 54:15
  54:20 91:1
  100:3 161:15
**20,000**   66:8
**20/20**   122:24
**200**   64:9
**200,000**   68:3
**200,000s**   64:9
**2001**   59:11
**2002**   60:14,19
**2006**   66:24
  67:3 71:10
**2008**   69:11,18
  70:3 71:4
  90:10
**2009**   69:11
**201**   7:21,22
**2010**   70:3
**2016**   34:15
  42:14 95:3
  96:13 97:17
  98:10 99:17
  100:2,23
  101:14
**2017**   23:3 53:9
  97:19 98:12
  101:20

**2018**   76:19
  82:3 97:21
  98:14 129:19
**2019**   97:23
  98:16
**2020**   53:9
  97:25 98:18
  115:15 124:15
**2021**   4:5 72:9
  72:16 73:15
  98:2,20 100:7
  100:24
**2022**   4:8,10
  95:1,3 97:14
  98:4,22 99:17
  100:4 113:4,8
  113:12,14,19
  113:23 114:5,8
  114:11,15,18
  114:22 115:4,8
  115:11,19
  118:7,9 152:14
**2023**   122:7
**2024**   1:17 7:4
  9:4 158:21
  159:3
**20s**   54:21
**21**   100:3
  101:12 102:3
  103:19 105:7
**210**   19:3
**213**   7:17
**21354**   158:23
**22**   23:21 24:3
  55:6 59:11

100:5
**22525** 7:16
**23** 113:4,8,19
  113:22 118:7,9
  123:15
**23,000** 55:6
**25** 25:23 31:17
**25,000** 31:18,19
**27** 23:22 53:4,6
  60:13,19 67:2
**28** 19:14 20:9
  22:18 53:5,6
**29** 34:15
  123:15
**2:04** 138:24
**2:10** 139:2
**2:11** 140:6
**2:12** 140:9
**2:17** 141:17
**2:20** 141:20
**2:25** 143:12
**2:29** 143:15
**2:51** 155:19
**2:57** 155:22
**2:58** 157:3,20

**3**

**3** 49:5
**3.770** 2:15
**30** 54:19,22
  157:9 159:16
**33** 2:13
**341** 60:23
**35** 42:25
**36** 6:2

**37** 2:15
**38** 2:18
**39** 2:20,22

**4**

**4** 37:20 38:9
  50:5 95:23
  96:4,6,11
  99:13 100:21
  102:24 104:8
  106:2 111:3,21
**4,000** 69:19
**40** 58:17
**400,000** 69:2,4
  69:13,16 70:3
**42** 2:24
**422** 9:17
**43** 3:3
**45** 14:10 43:4
  45:10 89:9
  132:5 133:2
**48** 3:5,8
**49** 3:11
**4:22** 1:7

**5**

**5** 31:17 42:11
  50:5 95:23
  96:4,7,11
  99:13 100:21
  102:24 104:8
  106:2 111:3,21
**5,000** 31:21
**50** 43:4 51:20
**51** 4:3 21:3
  22:12,19,22

53:8,24 54:5
  71:11
**52** 3:14
**54** 54:21
**57** 3:17
**59** 3:19
**5th** 23:13

**6**

**6** 66:20
**61** 3:21
**62** 25:20
**63** 3:22
**669** 7:21
**68** 3:24
**686** 3:21 19:7,9
  20:8,10,15
  22:4,24 23:2
  53:23 61:11
  63:10 67:13
**6888869** 159:5
  160:2 161:2
**69** 132:2
**69a** 132:15,16
**69c** 133:4,5

**7**

**7-17-1970**
  18:24
**70** 4:3
**71** 4:4 57:24
**77** 77:2
**78** 1:24
**788-4050** 7:17
**7935** 1:21
  158:24

**8**

**8** 50:5,7,17
  53:4 57:24
**81** 1:24 77:2
**82** 77:5
**857-6778** 7:22
**88** 26:11
**89** 26:20

**9**

**9** 72:9,16 73:15
**9/19/2024**
  159:5
**90** 26:20 27:1,2
**90265** 7:16
**91** 4:5,8 25:18
  25:20
**92** 4:10
**94104** 9:20
**94134** 19:8
**96** 22:7
**97** 22:7,7
**98** 23:13
**99** 149:9,13,21
**9:56** 7:5
**9:57** 9:3

**a**

**a.m.** 7:5 9:3
**ability** 12:25
**able** 34:2 44:13
  68:20
**above** 158:8
  159:6 161:7
**academic** 28:14

**accommodate**
  86:12 87:21
**accordance**
  86:19 88:7
**account** 51:12
  55:19 155:13
**accounts** 51:2,5
**accuracy** 159:9
**accurate** 56:4
**acid** 34:7 124:1
  153:12
**acknowledge...**
  161:3
**acknowledg...**
  159:12
**act** 86:18 88:7
**action** 2:13,18
  3:3,5,8 4:13,17
  7:10 9:24
  43:13 45:25
  46:5,11 48:5
  90:8 113:1
  148:16 154:9
  156:16 158:8
**actual** 31:16
  52:4 66:25
  69:8 83:11,23
  84:14 96:21
  101:15
**actually** 17:6
  41:3 59:13
  75:19 121:17
**additions** 161:6
**additives** 131:7
  131:8 132:22

**address** 19:6
  20:15,17 21:21
  21:23,25 22:1
  22:11 23:6
  66:16,18 70:21
  96:19,21
**addresses**
  49:25 50:6,19
  50:20
**adriana** 20:7
  70:17 71:3,4
**advertised**
  117:4,7
**advertisement**
  44:12 117:13
**advertising**
  40:22,23,24
**advisor** 28:9,14
**affected** 124:21
**affiliations**
  10:5
**afforded** 87:14
  88:11
**afternoon**
  89:20
**ages** 23:20
**ago** 20:12,13,21
  25:16 32:3,9
  32:10 54:15,19
  54:20,22
  128:16 134:14
  152:16
**agoura** 155:10
**agree** 9:9 86:11
  87:20 90:3

91:20 92:5,24
  131:17 149:19
  149:20
**agreed** 86:15
  87:25
**agreement** 4:4
  36:9 72:1,8,12
  72:13,24 82:24
  85:17 87:7
  88:23
**agudino** 7:17
  159:2
**ahead** 16:16
  31:1
**al** 3:6,9,13 5:11
**alan** 7:15 10:9
  13:17 14:13
  141:10 159:1
**aligns** 132:11
  132:21 133:8
**alive** 62:19
**allegation** 34:7
  132:6
**allegations**
  92:6,24 123:7
  132:3
**alleged** 123:4
  124:5
**alleging** 33:20
**allotted** 159:19
**aloud** 86:10
**amended** 2:20
  2:22 3:5,8 4:14
  4:17 39:17
  40:3 48:5

115:24 116:1
  116:16 154:9
**amount** 29:24
  31:16 64:16
**amounts** 134:5
**anatomical**
  27:11
**answer** 6:1
  11:13,22,23
  12:10,19 30:19
  30:23 31:8,9
  36:2,16,20
  45:11 53:3
  60:3,16 76:12
  107:21 118:22
  125:2 156:16
**answered**
  45:14
**answers** 49:17
  49:20 52:2,24
**anticipate** 12:1
**anybody** 15:10
  76:14 82:25
  88:23 107:9
  108:25
**anymore**
  128:13 134:9
**apologize** 50:14
**appearance**
  10:3
**appearances**
  7:13 10:4
**appeared** 7:9
**appearing**
  60:21

**appended**
  161:7
**apple** 120:1,5
  121:2,3
**applicable**
  159:8
**application**
  2:15 38:8 65:1
  65:7,8
**approximate**
  52:5 95:7 99:2
  114:2
**approximating**
  31:20 96:3
**april** 71:10
**ardi** 75:7,9
**arizona** 1:8
  2:11 3:15,17
  4:6,11,19,21,23
  5:3,5,7,8 7:19
  9:14 52:15,18
  57:7 73:25
  82:11 85:5
  90:22 93:2,19
  94:10 104:9,13
  107:10 109:2
  112:6 113:1,6
  114:6 115:1
  117:8 119:18
  121:10 122:18
  122:21 124:10
  125:15 128:3,9
  128:21 129:12
  130:20 133:20
  140:13,13,18

  140:19 155:13
  159:4 160:1
  161:1
**arizona's** 57:22
  72:19
**arlene** 64:2
**armstrong** 7:6
**arrested** 54:7
**artificial** 123:5
  144:2
**ascorbic** 33:21
  34:7 124:1,3
  153:12
**asked** 17:13
**asking** 45:17
  83:25 84:1,16
  84:17,18,23,24
  114:2 116:2
**asserted** 90:22
**asserting** 119:4
**assertions**
  91:20 92:5
**assessment**
  149:20
**assets** 55:15
  56:3
**assigned**
  116:10
**astound** 82:6
**attached** 4:20
  4:22,24 5:4,6
  5:25 159:11
**attempt** 86:11
  87:20

**attention** 33:14
  42:13 57:24
  83:12
**attorney** 10:6
  10:20 11:20
  12:6 13:17,20
  13:21,25 32:12
  60:7 62:21
  159:13
**attorneys** 13:11
  14:1 38:7
  50:24 86:7,11
  86:15,17,18
  87:3,15,18,20
  87:24 88:1,7
  88:18,22 125:7
  154:13,15
**attrition** 12:18
**audio** 9:8
**august** 53:9
  59:11
**authorize**
  39:20 40:5
  47:15 48:14
  88:17 91:14
  92:3,20 116:16
  141:5
**authorized**
  34:12 47:11,18
  47:21 49:7
  91:18
**authorizing**
  72:16
**available**
  144:11,19

  145:6,17 159:6
**avaness** 75:11
**average** 156:7
**aware** 18:14
  26:1 35:1,12
  57:25 62:7
  71:15,17 82:10
  88:22 107:8
  108:20,24
  110:1 140:11
  140:14,22

**b**

**b** 2:8 3:1 4:1
  5:1
**back** 19:17
  20:9,10,24
  25:5 30:21
  31:24 40:12,20
  47:4 50:17
  60:13 82:16
  89:6,10,17
  93:24 97:5,16
  118:21 120:16
  129:3,6,17,18
  139:1 140:8
  141:19 143:14
  146:9,10,11,12
  146:16,19
  147:17,23
  148:2,5,7,13
  150:8,9,22
  151:1,13,17,18
  151:20 153:6,8
  153:11 155:21
  157:7

**bahar** 13:23
15:12
**bank** 55:19
90:13
**bankruptcy**
3:19 54:14
55:12,14,25
56:8,13,19,22
58:1 59:7,9
61:1 62:24
63:3,5,9 65:9
156:18
**base** 83:21
**based** 85:12
**basic** 11:6,7,10
**basis** 95:3
**bathroom**
12:17,20 46:22
138:21
**bear** 42:6 91:6
**beginning** 10:5
37:21 122:3
**begins** 77:5
86:7 126:6
134:18
**behalf** 1:4 10:8
40:6 91:15
**behold** 73:13
**belief** 35:12
**beliefs** 83:22
**believe** 21:9
25:23 29:19
30:4 31:14
35:15 37:14,16
38:19 40:20

41:25 43:20
46:19 54:25
56:5 57:20
64:12 65:17
66:8 72:18,25
73:2,5,17,22
74:7,14 83:8
90:6 91:16,19
92:2,4,15,21,23
93:8 95:23
99:13,18
100:21 102:24
104:3,8 114:10
114:13 118:2
120:21 122:24
124:1,3,7
128:19 130:7
139:9 142:24
143:2,5 147:10
150:7 151:12
153:5,25 154:2
154:4
**believed** 72:22
74:9 75:4
148:15
**beneficiaries**
61:24
**best** 12:4
**bethany** 48:12
**beverages** 1:8
2:11 3:15,18
4:12 7:19 9:14
72:20 74:1,3
85:5 133:24
134:1,11

140:20 144:18
159:4 160:1
161:1
**big** 28:25 95:13
102:19
**bill** 82:8
**biology** 27:6,7
**birth** 18:23
**bit** 27:20 45:8
52:17 96:7
**blood** 122:11
**bob** 10:20
142:13
**bottom** 50:7
**bought** 18:5
63:23 65:4
66:12,13 68:24
73:7 74:5,5
82:7 93:7,9,9
94:21 95:17,18
101:17,23,23
102:4 109:2
113:6 117:17
119:22 121:11
121:17 129:2
144:17 145:7
145:10,19
146:4,13 148:9
148:23 149:15
150:2
**bound** 1:25
77:3 126:5
134:17
**box** 28:25
42:16

**boxes** 29:22,23
**brain** 84:13
**brand** 93:2
104:13 120:13
121:14
**brands** 120:11
121:16
**break** 12:17,17
12:20,21 46:22
47:3 89:9
138:21,25
141:18
**brenner** 56:17
60:6
**brewing** 4:9
5:10 72:17
140:12,15,23
141:6
**bring** 16:6
**broadband**
82:4,7
**brought** 117:20
**brunts** 5:10
125:5,13
154:14 155:2,5
**businesses**
120:10
**buy** 64:4 65:3
66:6 68:25
69:6 93:7 95:5
95:14 99:8
101:16,21
105:2 109:5
110:6,17
111:10 112:4

119:8 120:13
121:9 124:22
144:13 145:13
149:9,19 155:7
156:1,2,9
**buying** 72:25
74:10 85:8
109:13 110:21
111:7 113:18
113:20,21
114:5 121:18
139:23

**c**

**c** 70:24 75:23
133:6
**california** 1:2
2:15 4:7 7:7,16
9:16,20 19:5,7
20:16 64:3
124:13 155:10
158:5,13,25
**call** 13:23 14:3
14:6 28:6
44:16,17 56:21
**camp** 27:20,21
**candy** 2:19,21
2:23,25 29:9
29:20,24 31:5
39:1,3,4,18
89:23
**cans** 58:12,13
58:22
**car** 55:3
**card** 125:21
128:2,4,6,8,11

128:18 129:4
129:10,11
**cards** 55:4
**care** 54:3
**carolina** 27:21
**case** 1:7 2:16
9:16 10:21
16:8 17:16,23
29:9,9,10,12,20
29:21,21,25
30:6 31:5,14
31:15,23 32:14
32:16,16 34:17
34:25 35:9,19
36:1,9,14,24
37:15 38:17
39:1,4,6,9
41:19 42:10
43:1,5,15,19,23
44:2,5,14,17,18
44:21,24 45:22
46:2,10,17
49:18 50:24
51:24 52:15,19
56:12 57:2,6,7
63:3 72:14
76:15 88:24
113:2 116:5,11
116:14,17
123:5,8,17,20
125:11,11,12
125:13 131:25
138:3 140:13
142:1 154:14
155:2

**cases** 156:16
**cash** 125:16,18
**catch** 58:2
**cause** 7:11
**cell** 76:18,23
**cents** 149:10,13
149:21
**certain** 97:17
97:19,21,23,25
98:2,4,9
100:23 104:21
118:5
**certainly** 88:12
**certificate**
158:1
**certification**
45:20 46:16
**certified** 7:8
158:12
**certify** 46:1
158:5
**change** 35:16
121:22 138:8,9
138:10,12,13
160:4,7,10,13
160:16,19
**changed** 46:21
**changes** 159:10
161:6
**chase** 125:22
128:4,20 129:4
**check** 74:24
83:19
**checking** 83:19

**chemicals**
44:14 131:7,8
**chemistry** 27:9
27:10
**children** 23:16
25:5,7,12 51:8
107:19,22
**cholesterol**
122:11
**chose** 144:13
145:5,11,12,18
**chrzan** 75:23
75:25
**city** 63:21
124:20
**claim** 38:2,10
44:12 118:14
118:17,25
119:4 123:17
**claiming** 33:23
**claims** 38:12
86:14 87:23
116:4,7 123:20
142:19
**clarity** 12:6
**clarkson** 4:6,8
4:11 7:15 30:4
30:5 32:13
40:17,17,18
41:1,12 42:20
42:23 72:17
73:11,21,22
74:19,23 76:14
85:13

clarksonlawfi...
  7:17 159:2
class   2:13,18
  3:3,5,8 4:13
  39:7,10 43:13
  45:20,25 46:1
  46:5,11,16
  48:5 86:18,20
  88:2,7,8 113:1
  154:9 156:15
clean   43:16
cleaning   43:20
clear   11:24
  108:23 133:14
close   113:9,10
  113:25
closely   132:11
  132:20 133:8
coast   7:16
cocktail   4:6,19
  4:21,23 5:5,7,9
  72:20 74:1
color   142:19
colored   142:25
  143:1
coloring   143:2
come   11:25
  74:14 139:25
comes   12:16
commencem...
  96:13
commencing
  7:4
comment   133:3
  133:7

comments
  132:7,11,13
commercial
  117:8
communicate
  48:10 50:23
  51:18 73:20,23
  75:9,16
communicated
  75:17,24
communicati...
  31:7 48:7
  82:25
companies
  120:12
compensation
  30:15
complaint   2:13
  2:18,20,22 3:3
  3:6,8 4:13,14
  4:17 15:20,21
  15:24 16:1,5
  34:3,10,12,14
  39:2,17,21
  40:3 41:9,11
  41:13 43:13
  44:6 46:5
  47:18,20 48:6
  49:8 113:1
  115:24 116:16
  124:5 131:25
  140:19 153:23
  154:9
complete   161:8

completed
  159:16
completion
  158:18
complies   126:1
concern   156:17
concerning
  17:15,22
  116:14 125:11
  125:11
concerns   85:24
conclude   32:5
concluded   32:9
  32:10 157:19
concludes
  157:3
concord   3:23
  3:24 19:17
  20:16 21:8,20
  21:23 22:1
  63:21 64:3,4
  65:6 66:12,15
  67:16
condition
  122:10 133:16
conditions
  122:2
conduct   86:13
  87:22
confidential
  1:24 36:1,6
  37:1 77:1,3,4
  126:3,4,5
  134:16,17

conflict   86:17
  88:1
connection
  55:25 56:11
  58:3 72:18
  86:13 87:22
  88:23
consider
  109:23
constitutes
  158:15
consume
  107:12 134:7
consumers   39:7
  39:10 133:13
  138:12
consuming
  134:8
contact   83:18
  128:20
contacted
  42:20,23 85:13
contacting
  60:10 85:24
contain   33:21
container   4:19
  4:21 5:3,5
  95:11 99:7
  100:15,18
  102:15 104:2,5
  105:22,24
  110:2 145:24
  146:2,3 147:1
  147:4 149:23
  150:6,10

**containers**
  17:14,21 18:14
  18:20 58:12,13
  58:22
**containing**
  144:1
**context**  123:14
**continue**  9:8
**continued**  3:1
  4:1 5:1
**conversations**
  9:7
**convictions**
  54:10
**cool**  115:9
**coordinator**
  24:13
**copies**  17:1
  159:14
**copy**  48:22
  62:16 142:13
  151:6,7 156:25
**corps**  24:24
**correct**  18:19
  33:12 34:8,12
  38:5,10 39:10
  41:10 49:18,21
  52:24 53:1
  59:12,18 60:3
  66:11 72:20
  87:8 110:25
  113:2 115:11
  117:18 119:11
  152:18 153:9
  157:16 158:16

161:8
**corrections**
  161:6
**cost**  143:23
**cotter**  70:20,22
  70:23
**counsel**  4:20,22
  4:24 5:4,6,25
  9:13 10:3,12
  46:22 50:12
  151:6 155:1
  156:24 159:14
**couple**  58:14
  69:7,9 128:16
  141:15
**course**  129:16
**courses**  27:4
**court**  1:1 2:15
  9:15,22 10:11
  11:12,14 30:11
  35:11 46:9
  55:24 57:12
  88:3 91:2
  156:24 157:18
**cover**  1:25 77:3
  126:5 134:17
**covid**  124:13
**cranberry**
  119:25 120:5
  120:14,15,20
  120:25
**crashes**  69:18
**created**  62:8
  71:10

**credit**  55:3
  128:8,11,17,19
  129:10,11
**credits**  26:24
**criminal**  54:9
**crisis**  90:10
**cs**  159:15
**csr**  1:21 158:24
**currently**  19:4
**cut**  133:14,16
  134:3,4
**cv**  1:7 9:17

**d**

**d**  2:1 61:15
**d1**  2:10 16:19
  16:20,23
**d10**  3:11 49:10
  49:11,14 50:17
  52:3
**d11**  3:14 52:7,8
  52:11 57:11
**d12**  3:17 57:12
  57:13,16 58:3
  58:25
**d13**  3:19 59:2,3
  59:6,16 60:1
  60:13
**d14**  3:21 61:6,7
**d15**  3:22 63:15
  63:16,19 65:12
  65:23,25 66:7
  66:17 67:4,18
  69:9
**d16**  3:24 68:7,8
  68:11 70:3

**d17**  4:3 70:9,10
  70:13 71:17
**d18**  4:4 71:19
  71:20,23 72:24
  75:1,4 76:3,9
  82:13,18,21,24
  83:6 85:14,18
  85:25 87:9
  88:11
**d19**  4:5 91:3,6
  91:8,14
**d2**  2:13 33:4,5
  33:8,15 34:12
**d20**  4:8 91:22
  91:23 92:1
**d21**  4:10 92:8,9
  92:12,16,18,20
  93:24 94:5
  104:17
**d22**  4:13
  112:20,23,25
  115:23 123:10
**d23**  4:14 131:1
  131:24
**d24**  4:15
  141:22,25
**d25**  4:16 142:5
  142:6,9
**d26**  4:19
  145:23,24
  146:3,21 148:9
**d27**  4:21
  146:25 147:1,4
  148:11

[d28 - deposition]                                                    Page 9

| | | | |
|---|---|---|---|
| **d28** 4:23 | **date** 14:15,16 | **declare** 161:4 | 151:3 152:24 |
| 148:18,19 | 18:23 23:12 | **decree** 60:13,18 | 153:19 155:7,8 |
| 149:17 | 69:8 113:7 | **deed** 3:21,22,24 | **defendants** 1:9 |
| **d29** 5:3 149:22 | 160:24 161:12 | 4:3 61:10 | 4:2 5:2 9:13 |
| 149:23 150:1 | **dated** 4:5,8,10 | 63:21,25 67:2 | **define** 131:12 |
| **d3** 2:15 37:2,3 | 67:2 72:8 | 68:13 70:15 | **definitely** |
| 37:6 | **dates** 101:15 | **deemed** 161:6 | 104:19 |
| **d30** 5:5 150:10 | **david** 48:8 | **def** 52:13 | **definition** |
| **d31** 5:7 151:2,3 | **day** 7:4 82:19 | **default** 90:9,11 | 131:21,21 |
| 151:5 | 124:18,20 | 90:12 | 132:12 133:8 |
| **d32** 5:8 152:23 | 158:21 161:15 | **defendant** 3:12 | **definitions** |
| 152:24 153:2 | **days** 58:14 | 3:15,17 7:19 | 131:18 |
| **d33** 5:10 | 156:8 157:9 | 10:8,21 65:19 | **demand** 3:3,6 |
| 153:19,22 | 159:16 | **defendant's** 2:9 | 5:10 |
| 154:11,24 | **debit** 125:20,21 | 2:10 3:2 4:16 | **demler** 7:5 |
| **d4** 2:18 38:20 | 128:2,6 | 16:20 33:5 | **denying** 4:15 |
| 38:21,24,25 | **debt** 55:1,2,5 | 37:3 38:21 | 4:16 |
| 40:12,13,25 | **deceived** 73:6 | 39:13,24 42:3 | **department** |
| 41:10,20 | **december** 4:5 | 43:9 48:1,23 | 24:11,15 |
| **d5** 2:20 39:12 | 4:10 95:1,3 | 49:11 51:24 | **depicted** 94:4 |
| 39:13,16 | 97:14 113:4,8 | 52:8 57:13 | **deponent** |
| **d6** 2:22 39:23 | 113:19,22,24 | 59:3 61:7 | 159:13 161:3 |
| 39:24 40:2,5 | 118:7,7,9 | 63:16 68:8 | **deposed** 11:1 |
| **d7** 2:24 42:3,7 | 152:14 | 70:10 71:20 | 38:17 45:1 |
| **d8** 3:3 43:9,12 | **deceptive** | 75:4 83:1,5 | **deposing** |
| 44:6 46:4 47:7 | 142:25 143:3,6 | 91:3,23 92:9 | 159:13 |
| 47:11,15 | **decide** 118:18 | 112:20 116:19 | **deposition** 1:15 |
| **d9** 3:5,8 47:25 | **decided** 119:8 | 116:22,25 | 2:10 7:1 9:12 |
| 48:1,4,14,21,23 | **deciding** 82:11 | 117:3,6,14,15 | 9:18 10:22 |
| 49:1,2 | **decision** 30:11 | 131:1 141:22 | 13:6,22 14:7 |
| **dad** 19:20 | 30:13 35:1,11 | 142:6 143:18 | 14:12 15:17 |
| 25:14,15 53:17 | 35:14 116:13 | 144:7,11,18 | 16:3 17:13 |
| 71:8 | 142:1 | 145:5,19,24 | 45:3,7 154:7 |
| **dad's** 19:22 | **declaration** | 147:1 148:19 | 157:19 158:7 |
| | 2:24 42:9 | 149:23 150:10 | 158:10,16 |

**depositions**
  11:7
**described**
  131:22 132:12
**determine**
  129:11
**diagnosed**
  122:5
**diana**  1:21 7:7
  9:23 158:4,24
**diet**  121:23
**dietary**  16:12
  121:24 133:15
**difference**
  147:14
**different**
  119:22 131:17
**direct**  33:14
  50:1
**directed**  30:22
  156:16
**directing**  36:19
**directions**
  86:12,16 87:21
  87:25
**directly**  20:23
**discharged**
  25:3
**disclose**  36:18
  62:23 63:2
**disclosed**  36:10
**disclosures**
  55:24
**discounts**  26:2

**discover**  74:16
**discovered**
  74:17
**discovery**  57:4
**discussions**
  31:7
**disease**  122:4
**dismiss**  2:16
  4:15,17 38:12
  116:14
**dismissal**  38:9
**dismissed**
  116:5,8 140:15
  140:23,25
**disregarding**
  53:24
**disrespectful**
  16:13
**dissatisfied**
  117:24
**district**  1:1,2
  9:15,16
**divorced**  23:14
**docket**  3:19
  59:6
**document**  16:5
  16:5,20,25
  17:5,7 33:5
  37:3,8,23
  38:21 39:13,24
  42:3 43:9 48:1
  48:23 49:11
  52:8 53:7
  56:11 57:13,16
  59:3,21 61:7

63:16 68:8
70:10 71:20
88:12 91:3,8
91:23 92:9,14
104:16 112:20
131:1 132:18
141:22 142:3,6
142:12 151:3
152:24 153:19
153:24
**documentation**
  62:5
**documents**
  3:18 15:16
  16:2 55:24
  56:2 57:4,10
  57:23 58:1,5
  58:25 60:1
  124:9
**doing**  152:5
**dollar**  149:12
  149:12
**dolores**  20:4
  61:16 69:25
**donovan**  2:3
  7:20 10:7,8,17
  10:20 16:18,22
  17:2,8 30:18
  31:2,12 33:4,7
  34:23 35:3,8
  35:22 36:5,19
  36:22 37:5
  38:19,23 39:12
  39:15,23 40:1
  41:7 42:2,5

43:11 46:20,24
47:6,25 48:3
48:21,25 49:10
49:13 50:3,4
50:11,16 52:7
52:10 57:15
59:2,5 61:6,9
63:15,18 68:7
68:10 70:9,12
71:19,22 76:25
82:1 88:9 89:1
89:8,13,19
90:19,20 91:1
91:5,22,25
92:8,11 112:19
112:22 118:21
118:24 126:2
128:1 131:3
138:1,20 139:3
140:3,10 141:8
141:12,15,21
141:24 142:5,8
142:14,17
143:8,16
145:23 146:1
146:25 147:3
148:18,21
149:22,25
150:12 151:2,5
151:8 152:23
153:1,21
155:15,23
156:12 157:10
157:12,16

**[double - fair]**   Page 11

| | | | |
|---|---|---|---|
| **double** 18:18 | **eight** 19:16 | **examination** | **existed** 33:20 |
| **download** 49:5 | 20:13 | 2:3 10:17 | 33:23 36:4 |
| **draw** 24:20 | **either** 31:15,16 | **examined** 7:11 | **existence** 62:23 |
| **drawers** 18:10 | 36:10 121:7 | **examples** 27:5 | 63:2 |
| **drink** 110:8 | **elapsed** 85:23 | **excluding** 25:6 | **expend** 100:13 |
| 118:18 | **elmwood** 7:22 | **excuse** 22:7 | 103:24 105:19 |
| **drinking** | **embassy** 24:24 | 40:11 65:5 | **expended** |
| 118:20 | **emergency** | 87:11 154:20 | 103:4 |
| **drive** 3:22,24 | 124:20 | **exhibit** 2:10,13 | **expert** 34:1 |
| 7:21 20:16,18 | **employed** 24:7 | 2:15,18,20,22 | **explain** 86:25 |
| 20:25 21:7,18 | **employees** 26:2 | 2:24 3:3,5,8,11 | 109:11 |
| 68:13,15 69:1 | 26:2 | 3:14,17,19,21 | **explained** |
| **dual** 53:20,24 | **employer** 28:7 | 3:22,24 4:3,4,5 | 86:15 87:2,24 |
| **due** 124:13 | 28:7 | 4:8,10,13,14,15 | **explanation** |
| 133:15 152:19 | **engagements** | 4:16,19,21,23 | 86:23 87:4,5,8 |
| **duly** 7:10 | 27:25 | 5:3,5,7,8,10 | 87:14,16 88:11 |
| **duties** 86:17,19 | **enjoy** 118:3 | 16:20 33:5 | **extent** 35:25 |
| 88:1,8 | **enter** 46:10 | 37:3 38:21 | 36:4 86:16 |
| **duty** 27:19 | **entered** 36:7 | 39:13,24 42:3 | 87:25 |
| **e** | **entering** 88:22 | 43:9 48:1,23 | **extra** 17:1 |
| **e** 2:1,8 3:1 4:1 | **entire** 29:17 | 49:5,11 52:8 | **f** |
| 5:1 23:9 49:24 | **entirely** 107:13 | 57:13 59:3 | **fabian** 24:2 |
| 50:6,19,23 | **entitled** 158:8 | 61:7 63:16 | **face** 64:16 |
| 70:24 73:23 | **entity** 128:17 | 68:8 70:10 | **facebook** 51:6 |
| 76:3,6 160:3,3 | **errata** 159:11 | 71:20 91:3,23 | 51:10,12 |
| 160:3 | 159:13,16 | 92:9 112:20 | **facility** 24:13 |
| **earlier** 39:3 | **established** | 131:1 141:22 | **facts** 149:4 |
| 53:22 90:7 | 61:19 | 142:6 145:24 | **fails** 159:18 |
| 148:22 150:20 | **estate** 63:6 | 147:1 148:19 | **failure** 156:18 |
| **earned** 26:24 | **estimate** 43:7 | 149:23 150:10 | **fair** 53:25 |
| **eat** 121:25 | 59:1 141:9 | 151:3 152:24 | 59:25 72:15 |
| **eaten** 124:22 | **et** 3:6,9,13 5:11 | 153:19 | 74:13 75:3 |
| **education** | **evidence** 18:11 | **exhibits** 3:8 | 102:1 108:14 |
| 26:12,15 | **exact** 95:25 | 5:25 49:2,7 | 109:23 111:4 |
| | | | 111:23 112:12 |

114:8 115:13
130:24 138:8
148:8,12
152:18
**fairly** 107:5
**false** 40:22,24
44:12 53:15
72:19,23 75:5
118:14,17,25
119:4
**families** 26:2
**family** 19:20
21:3 53:18
67:9 107:16,17
124:21
**far** 14:15 19:20
43:6 57:9
62:11 119:20
120:4 129:3,17
**father** 26:4
54:3,5
**fda** 132:7
**feel** 119:10,12
**felt** 54:1 119:8
**ferrara** 2:18,20
2:22,25 29:9,9
29:20 31:5,14
31:15,23 39:1
39:3,4,18 40:4
41:19 42:10
43:1 89:23
90:6
**fight** 41:5
**figure** 34:2,2

**figured** 85:16
**file** 4:18 54:14
55:8 59:19
60:10 90:16,24
124:9
**filed** 9:15 15:22
31:23 32:8
34:14 38:8
39:2,21 40:5
40:13 41:9,11
41:13 45:21
46:2,16 47:12
47:15,18,21
48:14,16 49:7
49:8 54:22
55:7,12,14,23
56:8 59:9,11
59:18 65:9
95:1 113:4,18
114:24 115:5
116:17 125:10
131:25 140:12
140:14,22
152:13
**filing** 55:23
**fill** 29:23 65:1,7
**filling** 29:22,23
**final** 60:13,18
**finance** 88:23
**financial**
128:17
**financially** 9:25
**find** 18:4,11
40:18 44:13
51:23 58:15

111:4 128:23
129:18,20
**findings** 85:21
**fine** 21:5 84:6
**finish** 105:12
108:23 150:15
152:12
**finished** 30:10
156:6
**firm** 4:6,8,11
7:15 9:23
32:13 40:17,19
41:12 42:20,23
72:17 73:21
76:14 85:13
**firm's** 41:1
**first** 2:20 3:5,8
3:18 4:14,17
4:18 7:10
19:22 20:3
34:6 37:20,22
39:17 42:14,22
48:5 57:22
92:16 123:15
139:14,19,21
154:5
**five** 25:24
32:10 43:8
44:25 45:6
46:21 47:24
58:18,21,22
88:16 138:20
**fixed** 118:14,17
119:1,5

**flavor** 106:24
106:24
**flavored** 93:18
93:20
**flavoring** 143:5
**flavors** 85:6,8
94:14,15 104:9
104:12,13
120:3,17,17
121:9
**following**
156:10
**follows** 10:16
**food** 94:19
96:17,24,25
97:8 99:22
101:4 103:8
105:3 124:22
**foods** 2:13,17
33:11 121:25
122:1 134:1
152:20 156:15
**foot** 19:1
**foreclosure**
65:20
**foregoing**
158:6,15 161:5
**form** 34:22
35:2 41:2
90:18
**forty** 23:11
**found** 40:25
41:22 74:18
84:9,24

| | | | |
|---|---|---|---|
| **foundation** | **g** | **glasses** 122:15 | **good** 9:2 10:7,9 |
| 36:25 | | 122:16,17,20 | 10:18,19 12:9 |
| **four** 14:5 15:14 | **gallon** 95:13,21 | 122:25 | 12:13 23:13 |
| 19:17 25:2 | 99:9 100:17 | **gmail** 50:22 | 89:20 108:2,16 |
| 42:19 45:6 | 102:17,23 | **go** 9:9 10:24 | 118:18 122:14 |
| 86:6 156:8 | 104:3 105:23 | 11:6,22 26:4 | **google** 41:23 |
| **frame** 97:12 | 107:10 111:2 | 26:12 27:13 | 42:1 |
| 100:1 | 117:17 147:5 | 31:1 59:20 | **gotcha** 14:24 |
| **francisco** 3:21 | 150:19 153:3 | 89:1 97:16 | 15:1 30:24 |
| 4:3 7:7 9:19 | 156:3 | 103:13,16,16 | 66:21 132:16 |
| 19:5,7 22:14 | **gallons** 112:1 | 140:3 141:12 | 140:21 |
| 24:10,14,22 | 112:16 150:3 | 143:8 155:17 | **graduate** 26:7 |
| 26:18 27:15 | 155:24 156:2 | **goes** 30:21 | **graduated** 26:9 |
| 28:8,18 71:1 | **garbage** 18:5,7 | **going** 9:3 11:14 | **grant** 3:21,22 |
| 96:23 97:2 | **gardens** 66:20 | 12:1,18 13:3 | 3:24 4:3 61:15 |
| **free** 132:22 | 68:18,19 | 13:14,15 15:2 | 63:21 68:13 |
| **fridge** 156:5 | **gary** 56:17 60:6 | 20:12 22:17 | 70:15 |
| **front** 32:22 | **generally** 156:3 | 32:2 35:24 | **granting** 4:15 |
| 139:9 146:9 | 156:9 | 46:10 47:1 | **grants** 71:8 |
| 147:25 150:16 | **germane** 16:15 | 49:1 50:13 | **grape** 109:6,7,8 |
| **fruit** 4:6,19,21 | **gestures** 12:9 | 52:11,16 59:15 | 109:19 110:2 |
| 4:23 5:5,5,7,9 | **getting** 28:21 | 61:10 62:9,12 | 119:25 120:1,5 |
| 72:19 73:25 | 28:22 | 62:14 83:20 | 120:5,14,15,20 |
| 104:19,20,21 | **ginseng** 5:3 | 84:4 89:3,8,14 | 121:1,4 |
| 104:24 105:2 | 94:8,12 101:2 | 90:11 91:6 | **grapeade** 5:7 |
| 105:14,16,20 | 101:20 102:1,6 | 94:24 113:11 | 93:9,15 94:11 |
| 112:3,4,5,6,15 | 103:5 110:5,9 | 113:13 114:4 | 99:19 100:7,9 |
| 120:1,6 121:6 | 110:17 111:7 | 129:6 131:24 | 100:15 104:10 |
| 150:13,18 | **give** 11:17 27:5 | 138:23 140:5 | 106:12 109:4 |
| **fruity** 112:8 | 50:11 103:20 | 141:16 143:11 | 109:21,24 |
| **full** 11:25 24:17 | 105:10 129:1,2 | 146:2 150:1 | 110:1 114:12 |
| 37:20 123:14 | 141:8,9 155:15 | 153:2 155:18 | 115:19 130:8 |
| 158:15 | **given** 16:8 | **gonzalez** 1:21 | 130:12,17 |
| **further** 16:19 | 157:4 161:9 | 7:8 9:23 158:4 | 139:6 151:9 |
| 156:12 | **giving** 87:3 | 158:24 | |

**[grapy - idea]**                                                    Page 14

**grapy** 109:10
**great** 149:9,19
**green** 5:3 94:4
  94:7,11 101:2
  101:13,19
  102:1,9,16
  104:11 110:5
  110:17 111:2,7
  130:15 150:2
  156:1
**grew** 22:10
**groceries**
  124:23
**grocery** 25:7
  28:24 103:12
  124:17,25
**ground** 11:6,7
  11:10
**gudino** 7:15
  10:9,9 14:21
  17:1 30:17
  31:1,6 34:22
  35:2,5,20,24
  36:15,17,21
  41:2 46:23
  50:1,9 90:18
  141:11,14
  142:13 157:1,8
  157:11,15,17
  159:1
**guess** 43:25
  57:11 69:20
  76:16 93:25
  110:12 145:23
  149:22

**guessing** 86:3
  95:8 99:3
  110:7 120:23
  120:24
**guided** 86:11
  87:21
**gummies** 33:1

**h**

**h** 2:8 3:1 4:1
  5:1 20:2 75:23
  160:3
**half** 14:10 89:9
  134:14 152:16
**hamilton** 3:21
  19:7,9 20:11
  20:15,23,24
  21:2 22:3,4,25
  23:2,18 53:18
  53:23 54:2
  61:11 63:10
  67:13
**hand** 37:9,11
  62:10 158:21
**happened**
  34:19 41:4
  68:19 84:20,20
  84:20 154:17
  155:4
**hart** 72:4
**head** 12:12
  102:22 107:20
  125:1
**health** 121:22
  134:15 152:15
  152:19

**healthy** 110:7
  110:21
**hear** 75:12
  117:3
**heard** 75:7
  125:4
**hearing** 60:23
  73:8
**heart** 122:3
**height** 18:25
**held** 128:17
**hell** 83:20
**hereto** 161:7
**hereunder**
  158:20
**high** 26:8,9
  122:11 134:1
**higher** 26:12,15
**highway** 7:16
**hit** 69:18
**hold** 21:4 88:3
**home** 117:20
  124:19,21
**honey** 5:3 94:8
  94:12 101:2,20
  102:1,6 103:5
  110:5,13,18
  111:8
**honorably** 25:3
**hornell** 4:9
  5:10 72:17
  140:12,15,16
  140:23 141:6
**hotmail** 50:21

**hour** 7:5 14:10
  89:9
**hours** 43:4,8,8
  44:25 45:6
  58:17,18,21
**house** 19:13,18
  22:10 54:2
  63:23 65:3,4,6
  68:20,21 69:16
**houses** 53:16
  68:19
**huh** 33:18
  60:15 67:20
  70:16 72:10
  88:13 152:15
**human** 12:2
**hundred** 64:23
  64:24,25
  106:18 108:9
  109:13,19
  110:22 111:17
  112:8 119:2
  138:11 139:11
  139:15 140:1,2
  147:11,15
**husband** 61:16

**i**

**iced** 93:9,17,18
  93:19 94:3
  104:11,12
  130:12,14
  155:13
**idea** 34:5 99:6
  145:15

| identification | immediately | instruct 36:2 | j |
|---|---|---|---|
| 16:21 33:6 | 21:6 | instructed 6:1 | j 23:9 |
| 37:4 38:22 | impact 124:17 | 133:23,25 | jersey 7:22 |
| 39:14,25 42:4 | 124:24 | instruction | jisel 23:9 |
| 43:10 48:2,24 | impede 12:25 | 16:7 | joined 27:17 |
| 49:12 52:9 | important | instructions | joint 63:21 |
| 57:14 59:4 | 11:11 | 10:25 11:8 | jr 20:2 |
| 61:8 63:17 | including 10:3 | 12:22 30:22 | jsw 1:7 9:17 |
| 68:9 70:11 | 29:8 | intake 133:17 | judge 116:10 |
| 71:21 91:4,24 | income 24:20 | intention 90:16 | juice 4:6,19,21 |
| 92:10 112:21 | indicating | 90:24 119:14 | 4:23 5:5,7,9 |
| 131:2 141:23 | 91:13 94:2 | interest 22:21 | 72:20 74:1 |
| 142:7 145:25 | 102:20 140:17 | 22:24 | 109:8 119:20 |
| 147:2 148:20 | 148:16 152:9 | interested 9:25 | 120:1,1,1,5,5 |
| 149:24 150:11 | individually | 152:1 | 121:2,3,4,17 |
| 151:4 152:25 | 1:4 | internet 40:21 | juices 119:22 |
| 153:20 | information | 41:23 42:1 | 119:24 |
| identify 119:17 | 84:1,17 85:12 | 82:2,4 | jujyfruits |
| iglesias 1:4,15 | ingesting | interpretations | 42:16 |
| 2:11,11,13,16 | 152:20 | 133:12 | july 113:14 |
| 2:18,20,22,24 | ingredients | interrogatories | 114:4,4,5,8,11 |
| 2:24 3:4,6,9,11 | 74:15 123:4 | 3:12,16 45:11 | 114:15,22 |
| 3:13,14,17 4:9 | 144:2 146:19 | 49:17 52:2 | 115:3 |
| 4:11 7:1,9 9:12 | 148:8,13 | interrogatory | june 4:8 114:18 |
| 9:14 10:10,14 | 152:21 | 49:24 53:4 | jury 3:3,6 5:10 |
| 10:18 42:9 | initial 3:15 | interrupt 21:4 | k |
| 47:7 52:14 | 15:20,20 16:5 | 50:9 | keep 54:25 |
| 61:16 69:24,25 | inner 38:1,1 | investigation | 62:11 |
| 70:17 71:3,4 | inquiry 73:10 | 85:21 | keigo 8:2 9:21 |
| 89:20 157:4 | 74:19,21 | involved 27:24 | kids 23:7 43:21 |
| 158:6 159:4,5 | instagram 51:6 | ish 108:5 | 44:8 67:9 |
| 160:1,2,24 | instance 12:17 | issue 17:16,23 | kind 28:15 |
| 161:1,2,4,12 | institutions | | 53:12,13,17 |
| iii 23:23 25:10 | 26:15 | | 75:20 83:14 |

**kinesiology**
  27:14
**kiwi**  4:19 74:6
  93:8,14 94:11
  96:15 97:5,11
  98:8,24 99:5,7
  99:12 104:10
  104:18 106:9
  107:23,24
  108:1,8,13,21
  108:24 114:9
  115:14 130:7
  130:11,17
  139:5 146:4
  156:1
**knew**  18:8
**know**  12:4 14:4
  16:4,15 17:9
  17:18 26:24
  29:11 34:1
  36:12 38:15
  40:2 41:25
  42:8 45:16,18
  45:19,20,23,23
  45:24 46:1,4
  46:12,13,14,15
  46:18 48:4
  55:11 60:2
  61:24 62:2,14
  62:22,25 66:3
  67:23 70:14
  71:14,25 72:4
  72:11 73:7,9
  74:20,20,24
  75:19 76:5

82:6,18,21
84:4,6,21 85:7
89:20 90:25
92:18 95:9,18
95:24 96:8,21
100:5,6 101:15
101:17,21,23
102:8,8,13,15
102:21 103:4
103:14,23
104:1 105:8,18
105:21 106:3,8
106:11 108:17
109:10 111:1,1
111:25 112:15
112:23,25
113:25 114:21
114:23,25
115:4,5,12,15
115:20,23
116:1,2,3,4,7,9
116:10 120:23
120:25 121:5,7
121:12 122:23
123:4,7,9,19,23
123:25 125:7
125:10 128:16
129:8 130:8,22
140:25 141:2,3
142:18,21,21
142:23 143:1,4
143:7 144:6,21
144:24 145:2,4
145:16,20,22
146:10,18

147:17,21,24
147:25 148:1,8
148:17 149:14
150:9,23,24
151:15,16
153:7 154:10
154:13,15,17
155:1,4
**knowing**  62:12
73:12
**knowledge**
  46:9 83:21
**known**  60:22
  124:2,4

**l**

**l**  1:21 7:7 23:9
  132:3,17 158:4
  158:24
**label**  35:17
  109:20 123:2
  138:15 139:8
  144:14 146:6
  146:12,19,22
  147:8,17,18,25
  148:5,7,13
  149:1 150:5,18
  150:22 151:9
  151:10,14,14
  153:3,6,9,11
**labeled**  143:18
  143:19 144:1,8
  144:21,24
  145:17
**labeling**  83:9

**labels**  3:9 72:19
  75:4 130:1
  144:23
**laid**  36:25
**large**  49:5
**law**  4:6,8,11
  7:15 11:12
  86:17 88:2,6
**lawsuit**  29:4,5
  29:18 33:11
  82:10 86:13
  87:23 89:23,24
  89:25 90:17,24
  94:25 95:1
  96:13 97:13
  113:2,7 115:22
  116:8 138:18
  140:11,14,22
  141:4,5 152:10
  152:13 155:5
**lawsuits**  89:25
**lawyer**  34:2
  37:14,15 56:18
  56:19 61:3,4
  72:14
**lawyers**  14:5
  14:12 40:16,23
  40:25 43:2
  44:13 45:23
  51:19 90:16
  91:15
**learned**  84:24
  84:25 153:11
**leave**  150:16

| | | | |
|---|---|---|---|
| **lee** 7:21 | **line** 6:2 50:5 | **lo** 73:12 | 151:10,17,18 |
| **left** 27:15 | 53:4,6 57:24 | **loan** 64:18,20 | 151:20 154:20 |
| **leftover** 58:7 | 123:15,15 | 65:2 | 155:16 |
| **legal** 8:2 | 160:4,7,10,13 | **located** 41:12 | **looked** 18:3,6,7 |
| 159:23 | 160:16,19 | 64:3 82:5 | 58:6 128:24 |
| **lejeune** 27:21 | **lines** 86:6 | **location** 9:18 | 148:4 149:8 |
| **lemon** 93:18,20 | **linkedin** 51:14 | 103:9,11,14 | **looking** 39:9 |
| **lemonade** 5:8 | 51:16,20,23 | **locations** 97:9 | 40:24 41:5 |
| 93:9 94:12 | 155:12 | 99:23 101:5,7 | 47:7 58:4,11 |
| 103:7,18,25 | **listed** 60:6 | 105:4 | 58:12,17,19,21 |
| 104:3,11,18 | **literally** 84:15 | **long** 14:9 15:6 | 58:22,24 93:22 |
| 111:10,11,12 | **litigation** 4:7 | 19:12 21:6,22 | 104:17 146:21 |
| 111:13,25 | **little** 27:20 45:8 | 22:6,17 24:14 | 148:7 152:21 |
| 120:7 121:13 | 52:16 64:12 | 25:22 28:17 | **looks** 50:9 |
| 130:12,17 | 73:10 96:6,7 | 31:24 45:3,4,9 | 146:21 153:3 |
| 153:4 | 152:19 156:17 | 51:22 52:1 | **lot** 43:7 73:7 |
| **lemonades** | **live** 21:1,7,19 | 67:6 76:9 | 101:17 124:22 |
| 103:22 | 21:22 22:2,6 | 121:19 123:1 | 124:22 |
| **lemony** 111:14 | 23:5,18 54:4 | 156:5 | **love** 106:15,21 |
| 111:16 | 67:6,8 70:19 | **longer** 37:25 | 112:5,6 |
| **letter** 4:5,8,10 | **lived** 20:20 | **look** 17:25 18:2 | **lower** 50:17 |
| 91:17 | 21:15 23:6 | 18:9 37:20 | 109:1 112:1,16 |
| **letterhead** 4:6 | 54:2 67:12,13 | 38:8 40:14 | **lunch** 89:9,16 |
| 4:8,11 | **living** 19:12 | 47:11 49:23 | **lying** 138:12 |
| **letters** 90:15,21 | 20:25 21:25 | 51:10 52:20 | |
| 90:23 | 22:15 23:2 | 53:3 56:12 | **m** |
| **lie** 148:17 | 61:13 62:10 | 59:15,25 60:13 | **m** 19:25 20:2 |
| **lied** 119:12 | 63:8 | 86:4 88:16 | 24:1 |
| **life** 3:4,7,9,12 | **llc** 1:8 2:11 | 123:10 128:22 | **ma** 28:21,22 |
| 3:13 29:17 | 4:12 7:19 9:14 | 129:3,10,15,17 | **made** 15:21 |
| 43:14 44:3,17 | 159:4 160:1 | 143:9 146:3,6 | 92:6,25 113:21 |
| 44:20 45:21 | 161:1 | 146:10,12 | 120:8 144:10 |
| 46:2,17 48:6 | **llc's** 3:12,15,18 | 147:22 148:12 | 147:9 149:5 |
| 49:18 89:24 | **llp** 7:6 | 149:4 150:5,15 | 161:5 |
| 90:4,5 | | 150:18 151:1 | **mail** 49:24 50:6 |
| | | | 50:19 73:23 |

| | | | |
|---|---|---|---|
| 76:3,6,6 | **mangos** 95:5 | **matter** 2:12,14 | **memory** 33:19 |
| **mails** 50:23 | **manner** 124:24 | 2:17,19,21,23 | 33:22 59:8 |
| **main** 148:16 | **march** 60:13,19 | 2:25 3:4,7,10 | 123:17 |
| **maintain** 124:9 | 124:15 | 3:13 9:13 | **mention** 67:14 |
| **make** 62:15 | **marine** 24:24 | 41:18 143:22 | **mentioned** 22:8 |
| 86:23 90:22 | **marines** 25:1 | 143:23 144:5 | 111:7 148:22 |
| 101:10 | 27:17 | 145:9 156:15 | **messed** 83:14 |
| **makes** 35:12 | **mark** 16:19 | **mean** 22:3 30:9 | **messing** 119:13 |
| 90:21 120:14 | 37:2 38:19 | 35:6 36:8 37:9 | **met** 13:16 |
| 120:15,20,25 | 42:2 48:21 | 51:4 64:17 | **metro** 76:20,21 |
| 121:5,7,10 | 57:11 76:25 | 86:24 94:4 | **metropcs** 76:22 |
| **making** 68:5 | 91:22 112:19 | 95:2 119:1,20 | **microphones** |
| 123:19 139:16 | 141:21 145:23 | 121:12 131:4 | 9:5 |
| 139:18,19 | **marked** 16:20 | 134:2 144:22 | **midway** 88:16 |
| 142:18 | 16:23 33:5,8 | **meaning** 16:12 | **military** 27:24 |
| **malibu** 7:16 | 37:3 38:21 | **means** 46:3 | **mind** 29:10 |
| **man** 85:7 | 39:13,24 42:3 | 131:18,23 | 133:25 134:2 |
| **manager** 25:25 | 43:9 48:1,23 | 132:8 134:10 | **mine** 154:19 |
| **mango** 4:21,23 | 49:11 52:8 | **meant** 70:7 | **mine's** 50:13,13 |
| 74:5 93:7,11 | 57:13 59:3 | **media** 9:11 | **minute** 46:21 |
| 93:12 94:10,17 | 61:7 63:16 | 51:2,4 117:14 | 138:20 141:13 |
| 94:20 95:2,12 | 68:8 70:10 | 157:5 | 155:15 |
| 95:15 97:4,16 | 71:20 77:2 | **medical** 122:2 | **minutes** 14:10 |
| 104:10 106:4,6 | 91:3,23 92:9 | **medication** | 45:10 47:24 |
| 106:14,15,21 | 112:20 126:4 | 12:24 122:9 | 48:20 52:6 |
| 106:22,24 | 131:1 134:16 | **meet** 13:11,21 | 58:13,22 76:11 |
| 107:3,8,12 | 141:22 142:6 | 14:2,11 76:16 | 76:12 89:9 |
| 113:7,16 114:6 | 145:24 147:1 | **meeting** 14:18 | 141:15 |
| 114:14,17 | 148:19 149:23 | 14:20 15:4,6 | **mislabeled** |
| 115:10 120:7 | 150:10 151:3 | 15:10,11 | 74:15 |
| 121:8,9 130:7 | 152:24 153:19 | **members** 86:18 | **misleading** |
| 130:11,18 | **marriage** 23:12 | 86:19 88:2,6,8 | 72:19,23 75:5 |
| 139:5 147:5 | **married** 55:11 | **memorialized** | **mission** 96:20 |
| 148:11,23 | 55:13 59:13 | 41:10 | 96:22 |
| 149:15 155:25 | | | |

mom  19:20
  71:8
moment  83:11
  83:24,25 84:4
  84:14,16,18
  141:8
monetarily
  31:4
monetary
  138:2
money  31:13
  35:18,23 36:13
  66:5 69:15
  70:5 99:4
  100:12 102:13
  103:4,24
  105:19
monies  69:21
monte  66:20
  68:18,19
montgomery
  7:6 9:19
month  27:23
  86:2,2 105:10
  105:13 106:3
  115:12,17,20
months  102:5
  103:20 106:4,8
  106:11 113:11
morning  9:2
  10:7,9,18,19
mortgage  64:5
  64:11,16,17
  69:19

mother  62:18
mother's  20:3
motion  4:15,16
  45:21 46:1,16
  116:14 125:10
move  11:25
  20:14 67:4
moved  19:16
  20:9,10,21,23
  66:12,15,16,22
  67:15
movie  42:16
mucho  4:21,23
  93:11 94:10,17
  94:20 95:2,5
  95:11,15 97:4
  97:16 104:10
  106:4,5,14
  107:2,8,12
  113:7,16 114:6
  114:14,17
  115:10 130:7
  130:11,18
  139:5 147:5
  148:11,23
  149:15 155:25
multiple  156:2
mute  9:7

**n**

n  2:1 75:23
name  9:21
  10:20 13:24
  19:22 20:1,3,6
  23:8 28:6,10
  28:11 63:1

70:15 116:10
  154:18,19
named  125:4
  158:7
names  14:4
  23:22 67:23
naming  29:7
natural  73:1,3
  73:9,13 74:8,9
  74:16 83:13,13
  83:15,22 85:1
  85:2,10,17
  106:18 108:9
  108:10 109:14
  109:20 110:22
  111:15,17
  112:9 119:2
  121:25 129:22
  129:25 130:13
  130:19 131:4,6
  131:13,18,23
  131:23 132:7
  133:9,12
  138:10,11,15
  139:4,11,15
  140:2 143:18
  144:1,8,13,25
  145:8,17
  147:11,13,15
  148:15 149:8
nature  12:2
  16:8
near  110:3
necessarily
  151:22

necessary
  161:6
need  12:17
  122:25,25
  123:2
needed  56:25
needs  118:14
  118:17,25
negative  18:18
neighborhood
  103:12
neither  25:12
never  62:5,17
  71:16 74:17
  148:4 153:8
  154:19,23,24
new  7:22
  129:13
newspaper
  117:14
nice  68:21
nicholas  5:10
  125:5
nine  23:11
  25:21 157:5
nodding  12:12
nods  107:20
non  77:4 126:5
  134:17
nonverbal  12:9
nope  153:18
north  27:21
northern  1:2
  9:15 124:13

**notary** 161:13 161:19
**note** 9:5 159:10
**noted** 161:7
**notes** 50:10,12 141:9 143:9
**notice** 2:10 7:3 17:13 90:9,13
**noticed** 83:4,5 83:9
**noticing** 10:6
**novem** 113:25
**november** 34:15 67:2
**number** 9:16 49:24 53:4 59:18,20 66:20 86:4 96:21 123:10 157:4
**nutrition** 149:4
**ny** 159:15

**o**

**o** 19:25 20:2 23:23,24 24:1 70:24
**o0o** 1:3 7:12 9:1
**oath** 56:3
**object** 11:21 12:7 35:24
**objection** 11:22 30:17 31:6 34:22 35:2,5 35:20 36:15 41:2 90:18

**objections** 3:11 10:1
**obtain** 56:21 64:5
**occurred** 87:9 87:9
**october** 113:12 114:3 158:21 159:3
**offhand** 92:19 122:23
**office** 11:12
**offices** 7:5
**oh** 29:13 43:25 64:19 65:5 94:3 96:18 104:19,21 132:16 154:18
**okay** 11:16,19 12:8 14:14,18 16:14 20:8 24:1 30:24 31:10 41:15 46:6,22 49:3 50:8 59:14,22 71:5 89:11,11 89:12 94:1,3 101:1 104:22 106:17 107:5 132:9 133:5 138:21 141:10 141:11 143:10 144:20 145:10 154:22 155:16

**okinawa** 27:23
**old** 23:10,22 24:3,5 25:6
**older** 25:12
**olivia** 48:10
**ones** 29:7 74:4 74:5 101:22 104:4,24 120:15 128:12 130:3,5 145:2 145:10
**ongoing** 44:22
**online** 82:9,9 82:14,16 83:9 84:10 128:22
**opposed** 143:19 144:7
**oral** 2:10
**order** 4:15,16 124:12
**ounce** 108:19 108:20 109:1 110:3 112:1,17
**ounces** 102:21
**outcome** 9:25
**outside** 143:10 155:16
**overnight** 69:19
**overseas** 27:22
**own** 53:16 55:17 63:6 65:11 68:22
**owned** 19:13 19:18 20:8

21:11 66:10
**owner** 117:10
**ownership** 22:21,24
**owns** 22:19

**p**

**p** 7:20
**p.c.** 7:15
**p.m.** 157:3,20
**pacific** 7:5,16 157:20
**package** 32:23
**page** 2:2,9 3:2 4:2 5:2 6:2 37:20 38:9 42:11,25 49:15 50:2,5,7,17 52:21 53:4 57:24 59:20 66:19 72:2 73:25 77:5 94:1,2,4 123:11,12 126:4,6 132:2 132:4,5 133:2 134:16,18 151:13 160:4,7 160:10,13,16 160:19
**pages** 1:23,24 77:2
**paid** 125:15 129:2
**painter** 8:2 9:21

**panel** 149:5
**paragraph**
33:14,16 34:6
37:21 42:13,19
42:25 86:4
87:12 88:16
123:10 132:23
133:6
**parents** 22:20
61:17 62:18,21
63:14
**park** 7:22
24:10,15,23
25:11 124:19
**part** 4:15,15
25:11 133:15
**participating**
15:11
**particular**
101:22 132:23
**parties** 9:9 29:8
72:18 157:8
**party** 9:24 29:5
29:18 36:11
67:22 90:1
**pay** 69:15 82:9
125:16 143:17
143:25
**paying** 63:11
**payment** 66:6
70:7
**payne** 37:17
**penalty** 49:20
**pendleton**
27:20

**people** 15:13,14
120:8 124:20
131:17 132:8
**percent** 106:18
108:9 109:14
109:20 110:22
111:17 112:8
119:2 138:11
139:11 140:1,2
147:11,15
**period** 67:13,15
96:12 100:23
101:10
**periods** 99:15
**perjury** 49:21
**person** 75:14
116:20 125:4
**personal** 16:10
**personally** 7:8
21:13 106:22
**pertinent**
133:19
**petition** 3:20
59:17
**pets** 43:17,21
44:8,12
**phone** 73:23
76:18
**phones** 9:7
76:23
**photo** 4:20,22
4:24 5:4,6
**photocopy** 5:7
5:8

**photos** 5:25
**physical** 26:22
27:3
**physiology**
27:12,13
**pick** 9:6
**picking** 50:14
**pictures** 91:12
91:13
**place** 9:9
124:12 158:9
158:11,17
**placed** 54:12
**plaintiff** 1:6
2:10 3:11,14
3:17 7:14
10:10 29:25
36:23 37:25
43:15 52:14
**plaintiffs** 3:12
**play** 109:15,17
**please** 9:5,7
10:2,12 16:19
23:8 33:4 37:2
38:20 39:23
42:2,6 49:10
50:2 59:2
63:15 70:9
71:19 83:7
86:4 88:4,16
91:22 112:19
118:22 125:25
141:21 142:5
148:18 150:17
151:2 152:23

157:1
**point** 11:25
12:16 68:14
83:17 87:7
**poisoned** 152:7
**portion** 77:4
126:6 134:18
**pose** 11:13 13:3
14:23 16:9
**posed** 11:23
12:5 156:14
**position** 24:12
24:17 25:24
**positive** 120:22
**possible** 115:3
115:4
**prague** 4:3 21:2
21:3 22:3,8,12
22:19,22 53:8
53:19,24 54:5
71:11
**prediabetic**
122:3
**prejudice** 2:16
**prepare** 13:5
13:12,21 14:12
15:16 16:2
45:7
**preparing** 14:6
**present** 8:1
10:3 119:14
158:7
**preservative**
34:8 124:2,4

preservatives
  32:18,20,23,24
  33:2,20,23
  35:16 38:1,13
  123:8,17,20
  131:7,9 132:22
pressure
  122:12
presume  11:14
pretty  37:10
  51:9 96:11
  133:14
preventing
  60:9
previously
  153:4
price  64:8 68:2
  95:22,25 96:11
  99:12,14
  100:20,22
  102:23,25
  104:7 106:1
  107:1,2,9
  108:13,14,18
  108:20 109:1
  109:15,15,23
  109:24 110:3
  111:1,4,20,23
  112:1,12,12,16
  129:1
priced  107:6
print  82:13,15
prior  19:11
  20:15,25 21:6
  21:18,25 24:22

28:20 82:11,24
94:21 101:7
private  9:6
  67:22
privileged
  13:15 31:7
probably  55:3
  62:1 129:5,7
probation
  54:12
problem  41:6
proceed  10:13
  16:18 46:11
proceeding
  10:2 11:12
  34:17 61:1
  65:20
proceedings
  58:1 158:17,18
process  122:1
processed
  122:1 134:1
procure  64:5
produce  17:14
  25:25 125:25
  156:18
produced  7:9
product  3:8
  17:14,15,21
  18:13 32:25
  33:24 38:13
  43:21 44:7
  73:1,7 83:13
  83:15 85:3,4
  90:22 101:18

107:1,2,8
108:10,21
109:2,4,14,20
110:22 111:25
113:18 115:1,8
117:23 119:13
119:17,19
122:18,21
125:15 128:9
138:11 143:18
143:25 144:1,7
144:7 145:5,6
145:19 146:13
146:18,22
148:14 149:9
151:10 155:7
production
  3:18 56:11
  57:2,23
products  3:4,7
  3:9,12,13
  43:14 44:4,17
  44:20 45:21
  46:2,17 48:6
  51:24 74:8,10
  74:15 83:1,5
  89:24 93:2,5
  100:9 102:11
  104:14 108:25
  110:2 112:16
  116:20,22
  117:1,4,6,15,15
  117:17 118:1,3
  118:6,8,9
  119:5,15

121:15,16
124:10 129:23
130:1,10,19,20
130:21 131:6
131:10 133:20
133:20 139:22
139:24 142:19
142:24 143:3,6
143:19 144:11
144:11,18
145:12,16
152:6 153:12
profit  68:5
program  27:4
properties
  68:22
property  21:11
  55:17 64:2,4,6
  65:11,22 66:6
  66:10,13,16
  67:3,4,12,14,18
  68:15,17 69:1
  69:1,6 70:2
proposed  39:7
prosecution
  86:14 87:23
proven  34:20
  34:24
provided
  108:16
provider  76:18
  82:2
provides  26:1
providing
  60:22,25

[public - reason]                                                    Page 23

**public** 132:7
161:19
**pull** 128:21
**punch** 5:5
104:19,20,22
104:24 105:2
105:14,20
112:3,4,5,7,15
120:6 121:6
150:13,19
**punches** 105:16
120:1
**purchase** 42:14
64:2,8 74:4
94:18,20 96:16
97:11 98:25
99:21 100:10
100:16 101:3
101:13,16,19
103:7,18,22
105:17 106:14
107:23 109:16
109:17 114:14
114:17,25
115:6,10,14,19
116:22,25
119:5,15 128:8
134:5 139:16
139:18,19,21
144:12 149:5
156:19
**purchased** 67:3
68:14 70:2
93:6 94:14
95:2 96:12

97:6,17,19,21
97:23,25 98:2
98:4,9,20,22
99:15 100:2,6
100:23 101:25
102:6,11
104:14,25
105:8,14 106:4
106:5,9,12
107:13 113:22
113:24 115:8
118:8 119:18
120:18 121:1
122:18,21
130:5,20
142:20 145:18
146:7,22 147:6
147:19 148:14
148:24 149:2
150:6,20
151:11 153:13
155:25
**purchases**
17:15,22 18:21
97:3 101:7,11
103:9 114:19
116:19 128:3
128:21 129:12
129:14,18
144:10 147:9
**purchasing**
113:15 114:9
114:12,22,23
118:6 121:16
133:19,23

145:6
**purpose** 72:11
92:18
**pursuant** 2:15
7:3
**pursue** 37:25
**put** 21:7 66:5
70:5,6 108:18
117:20 126:2
156:5

**q**

**quench** 118:1
**question** 11:13
11:14,15,17,23
12:1,5,20 13:8
30:23,25 31:8
46:15 50:18
59:23 60:17
63:24 67:17
69:20 74:13
83:7 88:10
118:22 143:2
144:16 145:4
148:1 150:16
156:14
**questioning**
10:25
**questions** 6:1
12:10 13:1
16:9 35:25
36:3,23 45:13
45:13,14,15
98:8
**quick** 140:4

**quote** 37:24
38:1,2 86:10
119:5

**r**

**r** 70:24 75:21
75:23 160:3,3
**rack** 84:13
**radio** 117:4
**raising** 28:22
**rather** 27:4
28:11 110:1
**reach** 74:25
**reached** 40:20
40:21 73:10,14
73:15 74:23
**read** 76:8 84:2
86:10 87:13,19
91:17 117:13
118:21,23
122:25 123:2
123:14,16
141:8 153:8,11
159:9 161:5
**reading** 122:16
122:17,20
123:1 132:24
133:3
**real** 55:17 63:6
140:4
**realizing** 152:6
**really** 26:6
74:18 109:18
147:16 153:16
**reason** 106:16
106:19 108:8

108:11 109:12
110:20,23
111:18 112:10
118:13 145:9
152:3 153:17
159:11 160:6,9
160:12,15,18
160:21
**reasonable**
107:3 109:24
**reasons**  109:20
111:6
**rec**  24:15,22
25:11 124:19
**recall**  37:11
38:18 41:16
42:24 48:9,11
48:13 49:9
52:4 56:1 57:1
64:1,15,22
65:10 66:4,25
68:1,5 70:8
73:19,24 75:2
75:8,22 76:2
82:20,23 86:1
86:3 87:1,4,6
88:15 90:15
92:17 95:6
100:11,14
103:1,3,23
114:16 115:25
116:2,6,15,18
117:11 129:9
139:14 140:16
140:21 142:4

142:16
**receipt**  159:17
**receipts**  17:14
17:22 18:3,4,7
18:9,13,20
57:9 58:6,12
58:14,17,19,21
**receive**  30:15
31:3,3,13
35:18 76:3
**received**  36:13
69:21 75:1
76:5 82:19,21
**receiving**  57:1
85:24
**recent**  20:10
**recess**  89:16
**recognize**  33:9
**recollection**
38:14 67:11
156:14
**record**  9:3,10
10:5 11:22,24
12:6,14 18:16
47:2,5 67:10
89:1,4,5,6,10
89:15,18
108:23 118:23
129:12 138:24
139:2 140:3,5
140:7,8 141:12
141:17,19
143:8,12,13,15
155:17,19,20
155:22 157:2,7

157:18
**recorded**  9:12
**recording**  9:8
**records**  56:13
56:22 59:17
128:21 156:19
156:19,20
**recovery**  138:2
**recreation**
24:10
**recycling**  58:7
**redepose**  36:23
**reference**  60:18
132:6
**referenced**  39:3
59:18 65:11
66:16,19 159:6
**referring**  19:19
40:12 43:24
74:3 90:23
93:24 113:8
**refers**  49:24
50:19 61:15
71:3 87:3,7,13
87:13
**reflect**  67:10
**reflected**  46:4
52:2 60:1
65:22 66:6
67:4,18 70:2
115:23
**refresh**  33:19
33:22 59:8
**refreshes**
123:16

**refrigerator**
117:21
**regard**  12:21
35:4 90:16
93:2 103:15
155:4
**regarding**
18:20 58:1
**regular**  76:6
95:2
**rejuvenate**
29:13,14 43:23
44:2,3,18 90:2
**related**  9:24
72:18
**relating**  36:3
124:10
**relevant**  56:16
97:3
**remember**  11:9
17:10,11 20:17
21:21 28:6
31:16 32:1,12
33:3 37:9,18
37:18 43:16
44:11 55:21,23
56:2 60:21,24
60:25 61:2
62:3 64:15
69:8 73:8
74:18,21,23
76:7,8 83:11
83:12,23 84:4
84:7,9,11,12,14
84:15,19,21,22

85:9 91:13
94:15 95:20
99:1 114:19
116:6 140:24
141:1,2,3,7
147:9 149:10
154:11
**remembered**
7:3
**remotely** 10:4
**remove** 138:15
**render** 35:11
**rent** 63:11
**repeat** 30:25
83:7 144:15
**rephrase** 13:8
59:23 74:13
90:19
**report** 158:16
**reported** 1:21
**reporter** 7:8
9:22 10:11
57:12 88:3
91:2 150:17
156:24 157:18
158:4,12
**reporter's**
158:1
**repre** 154:15
**represent** 39:7
39:10 49:2
154:14
**represented**
30:2 41:17
44:5 86:14

87:23 125:8
154:14 155:2
**representing**
9:21
**represents** 30:3
**request** 3:18
57:4,23,25
**requested**
158:19
**requests** 57:1
86:12,16 87:22
88:1
**required**
161:13
**research** 83:3
85:16
**researching**
41:5
**reservation**
156:21
**reserve** 36:22
**reserving**
156:13 157:13
**reside** 19:4,11
20:9
**resided** 53:8,23
**residencies**
53:20
**residency**
53:24
**resolution**
35:25 36:24
**respect** 40:10
40:10,12 65:22
115:22 155:24

**responding**
58:3
**response** 49:23
**responses** 3:11
3:15,17 52:13
52:14,18 57:22
**responsive**
12:13,13 58:4
58:25
**restrictions**
121:24 133:15
**result** 30:16
35:18 36:14
38:7 90:9
**results** 85:20
**retained** 4:20
4:22,24 5:4,6
5:25 72:13
157:5
**retainer** 4:4
72:1,13
**retire** 25:15
**retired** 25:14
25:20
**return** 117:23
159:13,16
**review** 15:16
15:19 16:2
47:17,20,23
48:16,18 49:6
52:1 76:9
157:9,13
158:19 159:7
**reviewing**
16:25 17:4

37:8,23 53:7
59:21 92:14
104:16 132:18
142:3,12
153:24
**right** 14:25
20:19 23:3
25:18 29:24
30:14 32:22
33:17 34:20,24
36:22 43:17,17
46:7,24 60:3,4
65:5,6 71:11
74:11 85:14
87:10,17 89:21
90:2 91:12
94:2,8 96:9
115:10,20
119:10,12
121:18 123:18
124:13 131:25
133:6 144:19
148:16 149:13
156:13 157:13
157:17
**riordan** 26:9
**rivas** 37:13,18
**river** 7:21
**robert** 7:20
10:7
**robert.donovan**
7:23
**role** 109:16,17
**rosemary** 37:13
37:16,19

| | | | |
|---|---|---|---|
| **roughly** 25:17 25:19 | 27:15 28:8,18 71:1 96:23 | **see** 18:10 38:3 42:17 43:2 | **sell** 65:14 **selling** 117:15 |
| **rowland** 7:6 | 97:2 | 50:6 53:9 60:7 | **send** 82:8,16 |
| **rule** 2:15 4:18 157:12 | **saw** 17:9 83:10 92:16 139:5 | 60:12,14,18 61:11,20 66:18 | **sensitive** 9:6 **sent** 85:14,17 |
| **rules** 11:6,7,10 157:10,11,13 | 154:5 **saying** 34:3 | 71:9,10 73:11 74:1,19 83:16 | 85:18 90:15,21 91:14,18 92:3 |
| **ruling** 46:10 | 45:19,25 56:3 | 83:17 84:2 | 92:20 159:14 |
| **ryan** 40:17 75:7,9 | 58:16 84:3 85:9 113:25 | 85:20 86:7,21 88:20 89:13 | **sentence** 34:6 37:22,24 38:9 |
| **s** | 128:2 **says** 32:18,22 | 90:23 116:13 117:6 119:25 | 86:6 87:13 123:15 |
| **s** 2:8 3:1 4:1 5:1 | 32:23 34:7,16 | 128:22,25 | **separate** 1:25 |
| 19:25 20:2 | 37:21,24 38:11 | 129:22,24 | 68:17 77:3 |
| 23:9 24:1 64:9 | 39:17 40:3 | 130:18 139:25 | 126:5 134:17 |
| 160:3 | 42:9,19 43:4 | 140:20 142:2 | **september** 1:17 |
| **safe** 43:17,21 | 46:5 48:5 51:1 | 142:11 150:17 | 7:4 9:3 23:13 |
| 44:8,10,12 | 53:8 59:11 | 152:1 154:8 | 72:9,16 73:15 |
| 113:13 | 73:25 87:17 | 155:12 156:20 | **serve** 24:25 |
| **safeway** 25:13 | 88:12 108:9 | **seeing** 40:22 | **service** 82:2 |
| 25:14,15,22 | 129:1 149:9,19 | 83:19 90:15 | **services** 41:1 |
| 26:1,5 94:19 | **scare** 121:22 | 139:14 154:11 | **session** 14:9 |
| 96:17,18 97:7 | 134:15 152:15 | **seeking** 38:9 | **set** 3:12 |
| 99:22 101:4 | 152:19 | 39:6 46:16 | **setting** 62:4 |
| 103:8 105:3 | **school** 26:8,9 | 138:2,7,18 | **settle** 36:9 |
| 120:13 121:3,3 | 27:3 | **seemed** 106:17 | **settlement** 36:4 |
| 121:14,15 | **scoles** 64:3 | 110:7 | 36:6,17,18 |
| **salazar** 48:8 | **search** 41:23 | **seen** 16:24 17:6 | **seven** 20:12,20 |
| **sale** 65:21 | **second** 2:22 | 37:7,10 57:16 | 23:21 32:2,9 |
| 66:10 68:5 | 25:5 37:24 | 61:22 62:5,16 | **shakes** 125:1 |
| 90:8,8 | 40:3 42:6 | 63:20,24 71:6 | **sheet** 3:19 59:7 |
| **saled** 69:17 | 49:15 52:20 | 91:8,12 92:1 | 159:11 |
| **san** 3:21 4:3 7:7 | 59:20 66:19 | 92:13 117:8 | **shelter** 124:12 |
| 9:19 19:5,7 | 89:2 91:7 | 142:1,9 153:23 | **shopped** |
| 22:14 24:10,14 | 151:13 | 154:3,19,23,24 | 124:25 |
| 24:22 26:18 | | | |

| | | | |
|---|---|---|---|
| **shopping** 26:4 | 159:19 | 47:8,13,16,22 | 86:1,3,5,22 |
| 103:13,17 | **signing** 56:2 | 48:4,9,11,13,15 | 87:1,6 88:15 |
| 124:17 144:17 | 82:24 88:11 | 48:17,20 49:9 | 88:19,21,25 |
| **shops** 103:12 | **similarly** 1:5 | 49:14,16,19,22 | 89:22 90:25 |
| **short** 65:21 | **simple** 138:16 | 50:7,22,25 | 91:7,16,21 |
| 66:10 69:17 | **single** 102:17 | 51:3,25 52:4 | 92:1,2,4,7,12 |
| 90:8,8 | 102:20 | 52:11,22,25 | 92:15,17,19,21 |
| **shorthand** 7:8 | **sir** 10:23 11:2,9 | 53:2,10,12,21 | 93:1,4,13 94:6 |
| 158:4,12,12 | 12:15,23 13:2 | 54:6,7,8,11,13 | 94:9,13,16 |
| **show** 16:23 | 13:4,7 14:8 | 54:15,23 55:16 | 95:4,6,8,10,20 |
| 33:8 37:6 49:1 | 15:5,7,9,18 | 55:18,20,22 | 96:2,5,14 |
| 52:11 59:6 | 16:17,24 17:17 | 56:1,7,10,14,16 | 97:15,18,20,22 |
| 61:10 63:19 | 17:20,24 18:1 | 56:20,23 57:3 | 97:24 98:1,3,5 |
| 68:11 70:13 | 18:15,17,22 | 57:16,18,20 | 98:7,11,13,15 |
| 71:23 91:6 | 24:8,17,18 | 58:2,10,23 | 98:17,19,21,23 |
| 92:12 93:23 | 25:4 26:3,6,8 | 59:1,6,10,13,19 | 99:1,3,6,11,16 |
| 112:23 131:24 | 26:16 27:19 | 60:2,5,8,11,20 | 99:18,24 100:8 |
| 146:2 147:4 | 28:1,18 29:1,3 | 60:24 61:2,10 | 100:11,14,17 |
| 150:1 151:5 | 29:6,19 30:1 | 61:12,14,21,23 | 100:19,25 |
| 153:2,22 | 30:19 32:11,15 | 62:1 63:4,7,12 | 101:6,9,12 |
| 156:20 | 33:3,9,10,13 | 64:1,22 65:7 | 102:7,10,12,14 |
| **showing** 38:24 | 34:6,9,11,13,16 | 65:10,13,15,21 | 102:22,24 |
| 40:2 42:7 | 34:18,20 35:7 | 66:4 67:1,5,7 | 103:1,3,8,21,23 |
| 141:25 142:9 | 35:13 36:7,8 | 67:15,24 68:1 | 104:1,6 105:1 |
| **sic** 69:18 132:2 | 36:12 37:6,20 | 68:6,11,16 | 105:5,9,11,15 |
| **sign** 52:2 82:14 | 38:4,6,11,14,16 | 69:12,14,23 | 105:18,21,25 |
| 82:16 85:14 | 38:18 39:5,8 | 70:1,4,8,18 | 106:7,10,13,20 |
| 157:14 159:12 | 39:11,16,19,22 | 71:7,18,23,24 | 107:4,7,11,14 |
| **signature** 42:11 | 40:7,9,11,13 | 72:3,5,7,21 | 108:12,15,17 |
| 49:14 52:21 | 41:11,14,16,21 | 73:17,19,24 | 108:22 109:3,8 |
| 72:2,9 158:23 | 42:6,7,12,15,18 | 74:2 75:2,6,8 | 109:22,25 |
| **signed** 72:23 | 42:21,24,25 | 75:10,22 76:2 | 110:4,14 111:5 |
| 75:3 76:10 | 43:3,12,18,25 | 76:7,13 82:12 | 111:5,9,19,22 |
| 82:14,18,22 | 44:1,19 45:2,8 | 82:20,23 83:2 | 111:24 112:2 |
| 83:6 87:10 | 45:12,14 46:8 | 84:11 85:22 | 112:11,14,18 |

| | | | |
|---|---|---|---|
| 112:24,25 | 155:6,9,11,14 | **son** 28:22 | 102:13 144:6 |
| 113:3,5,9 | **sister** 19:21 | **soon** 74:25 | **spoke** 13:14,16 |
| 114:7,16 115:2 | 20:5 62:1 | **sorry** 17:2 21:4 | 14:1,13 |
| 115:16,18,21 | 70:17 | 21:15 25:19 | **spots** 97:7 |
| 115:25 116:3,6 | **sister's** 70:15 | 26:14 29:13 | **sr** 19:23,25 |
| 116:12,15,18 | **situated** 1:5 | 40:8 44:1 50:9 | **stapled** 50:14 |
| 116:21,24 | **situation** 56:3 | 50:11,12 62:13 | **start** 10:25 |
| 117:2,5,12,16 | **six** 19:1 28:19 | 71:13 72:6 | 152:5 |
| 117:19,22,25 | 32:2,8,10 43:7 | 92:22 98:6 | **started** 32:7 |
| 118:2,4,10,12 | 44:25 | 103:2 104:12 | 41:4 73:10 |
| 118:15 119:16 | **sixty** 25:20 | 105:12 111:16 | 154:7 |
| 120:9 121:24 | **size** 95:11,14 | 118:7 123:24 | **starts** 88:17 |
| 122:19,22 | 95:17,19,21 | 131:15 133:1 | **state** 10:2,4 |
| 123:6,9,21,23 | 100:15,17,18 | 138:5 139:17 | 26:18 27:16 |
| 123:25 124:8 | 102:15,18,19 | 142:14,14,22 | 28:8,18 158:5 |
| 124:11,14 | 104:2,5 105:22 | 145:21 151:6 | 158:13,25 |
| 125:6,9,14 | 105:24 110:2 | 151:19 154:1 | **statement** |
| 128:7 129:21 | 146:3 147:5 | **sort** 18:11 28:8 | 129:22,25 |
| 130:2,25 132:1 | 148:24 | **sorts** 144:22 | 130:19 139:5,7 |
| 132:19 133:18 | **sizes** 99:7,10 | **sound** 16:9 | 139:15 |
| 133:22 138:4,6 | **slack** 29:23 | **sounds** 56:18 | **statements** |
| 138:19 140:20 | **slipping** 29:10 | 75:20 | 128:23,24 |
| 141:1,7 142:1 | **slow** 88:4 | **source** 84:1,5,7 | 129:11 |
| 142:10 143:20 | **smaller** 95:14 | **speak** 13:11,20 | **states** 1:1 9:15 |
| 144:3,9 145:3 | **social** 51:1,4 | 14:11 52:16 | 24:24 |
| 145:20,22 | **sold** 65:25 | 73:18 101:1 | **stationed** 27:18 |
| 146:2,5,8,14,24 | 66:13 67:18 | **specifically** | **status** 30:6 |
| 147:4,7,11,20 | 68:24,24,25 | 85:11 87:1 | 44:16,20 |
| 148:4,6,10,25 | 90:11 107:9,9 | **specified** 158:9 | **stay** 4:17 99:14 |
| 149:3,6,8,12,18 | 108:18,25 | **spell** 19:24 20:1 | 124:19 125:12 |
| 150:14,21,24 | 109:1 110:2,2 | **spend** 47:9 | 156:6 |
| 151:15 152:11 | 111:25 112:1 | 99:4 | **stayed** 53:18 |
| 152:17,22 | 112:16,16 | **spent** 28:21 | **steph** 28:23 |
| 153:25 154:2,4 | **solutions** 8:2 | 43:1,5 44:23 | **stephen** 24:6 |
| 154:8,11 155:3 | 159:23 | 58:16,24 | |

stevens 7:21
stevenslee.com
 7:23
stipulate 157:9
stop 128:15
 133:23 138:12
stopped 113:15
 113:17,18,19
 114:5,8,11,21
 114:23 118:6
store 25:8
 28:25,25
 144:12
stores 116:20
 117:18
strawberries
 74:6 98:24
strawberry
 4:19 93:8,8,14
 94:11 96:15
 97:5,11 98:8
 99:5,8,12
 104:10,18
 106:9 107:23
 107:24,25
 108:5,25 114:9
 115:14 130:8
 130:11,18
 139:6 146:4
 156:1
street 3:21 4:3
 7:6 9:19 19:9
 20:23 21:2,3,3
 22:3,8,25 23:3
 23:18 53:8,19

53:25 70:20
 71:11 96:20,22
 96:25
strike 47:10,14
 57:10 67:17
 76:3 86:24
 104:12 108:19
stroke 53:17
study 26:21
stuff 27:11 51:7
 57:9 58:15
 74:6 134:8,10
 134:12
subject 104:14
 133:12 156:21
subscribed
 158:21 161:14
subsequent
 14:20 15:4
 139:20
substance
 29:17 138:17
sue 72:17 82:11
sugar 133:17
sugary 134:12
 134:12
suing 93:3
suit 104:15
suite 7:6,21
 9:19
sum 29:17
 138:17
supplemental
 3:15 52:13,14
 52:18

supposed 17:18
 133:16
sure 13:9,10
 17:6 35:6
 37:10 46:3
 50:3 51:9 88:5
 113:21 130:9
 130:21 138:22
 141:14 144:22
 145:1
surfing 42:1
swear 10:12
sweetened
 133:20,24
 134:1,10
sweetness
 108:6,7 110:16
sworn 7:10
 10:15 49:20
 52:23 89:21
 158:7 161:14

**t**

t 2:8 3:1 4:1 5:1
 19:25 20:2
 23:23,24 24:1
 70:24,24 75:21
 160:3,3
take 9:9 35:15
 45:9 46:21
 47:17,23 48:18
 52:1 58:11
 64:18 89:9
 122:11 138:20
taken 9:12 47:3
 89:16 138:25

141:18 158:10
 158:11
talked 139:4
talking 61:2
 132:13
talks 42:25
tape 46:20
tart 110:12
tartness 108:6
taste 106:23,25
 108:3,4 109:7
 109:9,19 110:9
 110:12,13,24
 111:14,16
 112:8 118:3
tastes 108:2
tatiana 75:20
 75:21
tea 5:3 93:9,17
 93:18,19 94:3
 94:4,11 101:2
 101:13,19
 102:1,9,16
 104:11,12
 110:5,17 111:2
 111:7 130:12
 130:14,15
 133:21 150:2
 155:13 156:1
television 117:7
tell 11:18 12:19
 26:17 29:7
 38:24 39:16
 42:7 43:12
 52:12,21 59:16

| | | | |
|---|---|---|---|
| 68:11 70:13 | **therapist** 26:23 | 2:18,20,22,24 | 47:2,5,9,17,19 |
| 83:4,10 87:12 | **therapy** 27:3 | 2:24 3:3,6,9,11 | 47:23 48:18 |
| 93:5 101:22,25 | **thing** 33:25 | 3:13,14,17 4:9 | 51:22 52:4 |
| 102:3,4,5 | 34:4 64:19 | 4:11 7:1,9 9:12 | 55:7,14 56:8 |
| 132:10 139:7 | 138:10 139:25 | 9:14 10:10,14 | 58:11,24 59:16 |
| **telling** 31:21 | 148:11 | 20:2 42:9 | 63:5,8 66:25 |
| 62:3,9 75:17 | **things** 34:5 | 52:14 157:4 | 68:23 72:23 |
| **ten** 24:5 25:6 | 83:4,9 | 158:6 159:4,5 | 73:5 75:3 |
| 58:13,22 76:11 | **think** 13:7,24 | 160:1,2,24 | 84:14,18 85:23 |
| 76:12 89:10 | 15:13 28:13 | 161:1,2,4,12 | 89:4,7,15,18 |
| **tenants** 63:22 | 41:21 56:16 | **thought** 44:7 | 92:16 97:12 |
| **term** 131:4 | 68:4 70:6,22 | 72:25 73:4 | 100:1 101:10 |
| 133:11 | 71:12,14 75:10 | 106:17 110:21 | 107:13 122:18 |
| **terms** 36:3,10 | 85:15 90:7 | 147:10 154:19 | 122:21 123:1 |
| 36:18 | 91:1,10,11 | **thousand** 64:23 | 124:23 125:17 |
| **terrible** 68:20 | 106:2 107:2 | 64:24,25 | 138:24 139:2 |
| **testified** 10:16 | 108:14 111:23 | **three** 11:4,5 | 140:6,9 141:17 |
| 29:2 101:8 | 112:3 113:24 | 23:7,16 28:22 | 141:20 143:9 |
| 130:6 139:23 | 117:10 120:3 | 33:15,16 34:6 | 143:12,15 |
| 146:23 150:20 | 123:21 131:20 | 42:14 86:4 | 144:12 154:5 |
| 153:4 155:25 | 132:11,20 | 87:12 107:19 | 155:19,22 |
| **testify** 130:23 | 133:7 140:1 | 107:22 156:8 | 156:2,22 |
| **testimony** | 148:22 150:2 | **threw** 44:4 | 157:20 158:8 |
| 53:22 60:22,25 | 155:16 | **thurman** 48:10 | 158:11 159:18 |
| 67:11 83:8 | **thinking** 83:14 | **tiara** 75:11,13 | **timeframe** |
| 115:7 157:3 | 96:9 108:10 | 75:15,21 | 159:8 |
| 159:9,17 161:8 | 109:13 | **time** 7:5 9:8 | **times** 11:3,5 |
| **text** 76:14 | **third** 29:12 | 10:2 11:20 | 128:3 |
| **thank** 40:11 | 96:25 154:8 | 12:16 14:13,15 | **tocopherols** |
| 46:24 50:12,14 | **thirst** 118:1 | 15:7 16:16 | 34:4 |
| 89:13 141:25 | **thirsty** 153:16 | 20:10 22:15,17 | **today** 13:18 |
| 156:21,23 | **thirty** 24:16 | 24:17 25:11 | 43:6 154:6 |
| **theater** 42:16 | 25:16 | 31:25 40:16 | **today's** 157:3 |
| **thefoundatio...** | **thomas** 1:4,15 | 41:15 42:22 | **told** 46:20 |
| 50:21,22 | 2:10,11,13,16 | 43:1,4 44:23 | 53:23 74:22 |

114:24

**tomas** 19:23,25
23:23 24:1
25:10 61:15
69:24
**took** 32:6
158:17
**top** 37:9,11
40:14 50:7
102:22
**torbert** 48:12
**total** 99:4
100:12 157:4
**tour** 27:19
**town** 22:13
**transaction**
71:17 90:8
**transcribed**
158:14
**transcript** 77:4
126:6 134:18
156:25 158:15
158:19 159:6
159:19 161:5,8
**transfer** 4:17
125:12
**transferring**
71:11
**trial** 3:3,6 5:10
29:2
**tricked** 118:19
**tried** 18:10
83:18 128:25
129:18

**true** 38:5 53:1
53:11,13 73:11
73:13 83:10
86:24 139:22
158:15 161:8
**trust** 56:9
61:19,22,25
62:4,7,16,24
63:1,3 69:22
69:24,25 71:4
71:6,9,11
**trustee** 56:9
60:22 71:4
**trustees** 71:9
**truthful** 56:4
**try** 12:4 18:3
56:21 89:9
**trying** 26:22
28:5 58:15
60:10 84:13
**turn** 42:13
57:24 132:2
**turns** 44:8
**twenty** 19:16
23:21 25:21,24
**two** 14:3 21:9
21:10,17,24
25:6,12,20
26:25 31:15
65:18,25 67:7
67:19 123:10
**type** 27:4,4
55:2 149:1
**typewriting**
158:14

**u**

**u.s.** 24:24
**uh** 33:18 60:15
67:20 70:16
72:10 88:13
152:15
**ultimately**
27:15
**unable** 49:5
**unaware**
148:13
**under** 1:25
4:18 12:24
49:20 56:2,9
61:25 63:1
77:3 86:17
88:1,6 122:9
126:2,5 134:17
157:10,11,13
**understand**
11:11,18 12:22
12:25 144:15
**understood**
11:15 41:8
**unit** 9:11 66:20
**united** 1:1 9:15
24:24
**units** 27:2
157:5
**university** 28:8
**unknown** 21:25
**unnatural**
131:10
**unrecollected**
22:1

**upgrade** 68:20
**upgraded**
68:18
**upset** 41:4
**usa** 1:8 2:11
3:15,18 4:12
7:19 9:14
140:20 159:4
160:1 161:1
**use** 28:10 50:20
51:12,16,18,23
125:18,19
128:3,8
**used** 51:20 82:6
128:3,12 157:5
159:19

**v**

**v** 71:3 159:4
160:1 161:1
**value** 69:22
108:16,19
**varying** 133:12
**venice** 3:22,24
20:16,18,25
21:7,18 65:24
66:9,14 68:13
68:14 69:1,1
**verbal** 12:10
**verbally** 12:10
107:21
**verify** 159:9
**veritext** 8:2
9:22,23 157:6
159:14,23

veritext.com
159:15
versus   2:11,13
2:17,18,20,22
2:24 3:4,7,9,13
4:9,11 5:10
9:14 144:1
video   9:8,12
videographer
8:2 9:2,22
10:11 47:1,4
89:3,6,14,17
138:23 139:1
140:5,8 141:16
141:19 143:11
143:14 155:18
155:21 157:2
videotaped
1:15 7:1
view   112:13
119:3 133:11
134:4
vision   122:13
122:23
voluntarily
2:16
voluntary
59:17
vs   1:7

w

wait   11:21,23
12:5 14:23
25:18 26:14
55:11

walmart   117:1
want   16:15
64:9 82:4
93:23 132:2
145:11
wanted   16:6
110:19 119:7
143:22
war   12:18
warm   117:18
wary   152:20
watch   53:17
watching   53:19
wave   82:4,7
way   16:7 21:7
31:4,4 58:4
66:6 75:16
83:19 108:18
129:18 142:24
143:6,19
we've   104:21
wear   122:15
website   116:23
155:8
week   14:19
156:7,7,10
week's   58:15
weight   19:2
welch   2:13,17
33:11 34:17
36:14 37:15
38:17 39:9
156:15
welch's   29:9
32:16,22 33:1

33:24 89:24
90:6 120:14,21
went   69:19
128:22 144:17
whereof   158:20
whispering   9:6
wife   23:7 28:2
28:10,13,24
55:7,12 61:16
67:9 107:19,22
wife's   23:8
william   37:17
willing   143:17
143:25
wish   31:19
wishes   37:25
witness   7:9,11
10:12,15 16:25
17:4,4 31:9
35:6,21 36:16
37:8,23 41:3
53:7 59:21
88:5 89:12
92:14 104:16
107:20 125:1
126:1 132:18
138:22 142:3
142:12,16
153:24 156:23
158:8,20 159:8
159:10,12,18
won   31:14
34:25 35:9
work   24:19,23
25:11,22 28:2

28:24 58:15
worked   24:14
25:7,13 28:17
124:18
working   24:22
32:13
works   28:5
worth   58:14
written   45:13
45:15 116:13
157:7
wrong   87:8,12
110:25 152:19
wrote   45:16,18

x

x   2:1,8 3:1 4:1
5:1

y

yana   72:4
yeah   13:25
15:25 17:2,10
17:12 18:6,12
27:1 28:16
29:13 30:21
36:21 37:12
41:3 42:1 43:8
43:22 44:3
45:5 46:3,14
46:23 51:9
62:3,3,25
64:15,19 69:5
69:18 70:8
74:24 75:15,22
76:7 82:9

83:11 84:8
96:1 102:4
104:19 110:21
117:8 120:2,12
120:24,24
123:1 124:6
128:25 130:8
130:12 131:14
134:8,12
140:24 142:4
142:16 147:25
148:15 154:6,9
157:11
**year**   21:9,16
23:22 24:3,5
25:6 26:10
32:6,9 42:14
65:17,17,25
67:7 98:9
101:17 102:6
105:13,13
106:4 121:20
122:6 134:14
152:16
**years**   19:14,15
19:17 20:12,13
20:20 21:10,17
21:24 22:18
24:16,25 25:2
25:16,21,23,24
26:19,25 28:19
28:22 32:3,9
32:10 51:20,21
54:15,19,20,22
67:19 69:7,9

94:21,22,23
101:23 102:4
106:5,8,11
128:16 129:5
**yesterday**
14:17 15:8,12
**yup**   23:25
104:23

**z**

**z**   75:23
**zach**   75:23,25
**zoom**   13:23
14:18,22,22,22
15:4

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.